J-S64009-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOSEPH PETER GUARRASI | |
| Appellant | No. 3514 EDA 2015 |

Appeal from the PCRA Order Dated October 20, 2015
In the Court of Common Pleas of Bucks County
Criminal Division at No: CP-09-CR-0005423-2004

BEFORE:  STABILE, J., SOLANO, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STABILE, J.:               **FILED NOVEMBER 15, 2016**

Appellant Joseph Peter Guarrasi appeals from the October 20, 2015 order of the Court of Common Pleas of Bucks County ("PCRA court"), which denied his request for collateral relief under the Post Conviction Relief Act (the "Act"), 42 Pa.C.S.A. §§ 9541-46.  Upon review, we affirm.

The facts underlying this case are undisputed.[1]  Briefly, Appellant was a practicing attorney who maintained an office on York Road in Bucks County.  He devised a scheme to defraud insurance companies by staging automobile accidents.  To this end, Appellant attempted to elicit the aid of

---

[*] Former Justice specially assigned to the Superior Court.

[1] Unless otherwise specified, these facts come from this Court's July 6, 2006 decision.  *See Commonwealth v. Guarrasi*, No. 1796 EDA 2005, unpublished memorandum, at 1-2 (Pa. Super. filed July 6, 2006) (citing Trial Court Opinion, 8/25/05, at 3).

others to engage in this fraud and file false claims. He also purchased a home in Doylestown that he planned to renovate into a "Kama Sutra" sex club. Because of problems with the real estate transactions, and failed attempts to evict tenants from the properties, Appellant solicited Michael Samios to kidnap, assault, and "make disappear" the resident of the house he intended for the Kama Sutra club. After becoming frightened of the plan and the nature of Appellant's instructions, Samios contacted and cooperated with the authorities. Samios was wired by investigators for the District Attorney, and several conversations between him and Appellant were intercepted and recorded.

On March 28, 2005, Appellant entered a plea of *nolo contendere* to criminal attempt to commit homicide and pled guilty but mentally ill to charges of criminal intent to commit aggravated assault, attempt to commit kidnapping, attempt to commit unlawful restraint, attempt to commit false imprisonment, attempted burglary and criminal solicitation to promote or facilitate insurance fraud. On June 8, 2005, Appellant was sentenced to six and one-half to fifteen years' imprisonment. On July 6, 2006, we affirmed Appellant's judgment of sentence. *See Commonwealth v. Guarrasi*, 907 A.2d 1133 (Pa. Super. 2006). Appellant did not file a petition for allowance of appeal. Consequently, his judgment of sentence became final on August 5, 2006. On June 29, 2007, Appellant filed the instant, timely PCRA petition, which was amended multiple times thereafter. Following sixteen days of PCRA hearing, spanning over a six-year period, the PCRA court denied

Appellant's PCRA relief. In support of its denial of Appellant's PCRA petition,

the PCRA court issued a 112-page opinion. Appellant timely appealed to this

Court. Following Appellant's filing of a Pa.R.A.P. 1925(b) statement of errors

complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion,

largely incorporating its October 20, 2015 opinion denying Appellant's PCRA

petition.

On appeal,[2] Appellant raises six issues for our review, reproduced here

verbatim:

> 1. Did the [PCRA c]ourt err or abuse it's discretion by denying
> PRCA relief based on 42 Pa.C.S.A. Section 9543(b) prejudice to
> the District Attorney's Office ("DAO") from the death of Samios
> when, after the death of Samios, the [PCRA c]ourt Ordered that
> Section 9543(b) prejudice did not insure against the DAO
> resulting from Samios' death, the DAO testified that whole case
> rested on the Wiretaps and the Wiretaps are in evidence,
> [Appellant] testified to due diligence and that PCRA delays
> violated [Appellant]'s rights, and then four (4) years later,
> contrary to the plain language of 42 Pa.C.S.A. Section 9543(b),
> **Commonwealth v. Renchenski**, 52 A.3d 251 (Pa. 2012) and
> stare decisis, the [PCRA c]ourt reversed it's prior ruling without
> conducting the required Section 9543(b) hearing for the DAO to
> present prejudice resulting from delays in [Appellant]'s filing of
> the PCRA Petition or Amended Petition?
>
> 2. Did the [PCRA c]ourt err or abuse it's discretion by denying
> PCRA relief based upon Judge Cepparulo not recusing when, his
> failing health caused PCRA hearing delays and his early
> retirement, motion left unadjudicated for years,
> misapprehending or ignoring facts of record, misquoting Wiretap
> Law, misapplying PCRA and Wiretap Law, finding credible former
> ADA Gambardella and Detective Carroll contrary to their
> demonstrable perjury, including 2/27/2004 Jurat Affiant
> presence, Wiretap transcript existence, Wiretap contents,

---

[2] "On appeal from the denial of PCRA relief, our standard of review requires us to determine whether the ruling of the PCRA court is supported by the record and free of legal error." **Commonwealth v. Widgins**, 29 A.3d 816, 819 (Pa. Super. 2011).

Wiretap errors and causes, and the alleged $2000 payment and forfeiture order, accepting lay witness testimony on mental illness as if accepted as experts, violating Stare Decisis and conflicts of interests?

3. Did the [PCRA c]ourt err or abuse it's discretion by denying PCRA relief based upon [Appellant]'s presented incompetence when, and involuntary, unknowing and unintelligent plea was caused by an innocent seriously mentally ill [Appellant] subjected to an involuntary cessation of all prescribed medications for several days before the plea, at the plea exhibited signs of mental illness, contemporaneous psychiatry progress notes record [Appellant] with probable delusions, judgment and insight poor, and Dr. Cohen testified and opined that the [Appellant] would have experienced a sling-shot effect of serious bipolar with delusions, psychosis and fugue state, and Judge Biehn found [Appellant] seriously mentally ill, in need of prescribed medications, and sentenced [Appellant] to serve some or all of his sentence in a mental facility, but contrary to expert testimony the court accepted lay persons opinions on mental illness?

4. Did the [PCRA c]ourt err or abuse it's discretion by denying PCRA relief based upon the presented defective guilty plea colloquy when, the [Appellant] was not present for the general colloquy as he was meeting in the holding cell with Attorney Tauber, no facts were contemporaneously read into the record for the seriously mentally ill unmediated [Appellant], but instead, Judge Beihn incorporated by reference a document authored by defense counsel–which refuted the existence of a corpus delecti, and then gave incorrect instructions of the Law, the [Appellant] pled unaware of affirmative defenses including a lack of corpus delecti, Wiretap violations, and the renunciation of any possible crimes, as Tape 6 only has money paid for a truck title, Tape 9 has no words of "kill" or any other words of violence, and Tape 10 ends mid-sentence with directions for Samios to ignore everything and to just get work finished at the Bar in Maryland, all contrary to DAO testimony, and then two (2) months later at Sentencing, DAO switched the "incorporated" document by reading into the record an unfiled document authored by former ADA Gambardella, not read by the [Appellant], the [Appellant] was never asked if he agreed with those facts, and the ADA document read at Sentencing lacked corpus delecti for all the elements of the crimes charged?

5. Did the [PCRA c]ourt err or abuse it's discretion by denying PCRA relief based upon the presented Wiretap Act violations, and Constitutional violations when, the [PCRA c]ourt, by misquoting and misapplying the Law, found compliant and without violation, Wiretaps made in Maryland because they were `initiated' in Bucks County, Monitor Records created six (6) years after conviction because it was not "applicable" until then, multiple undisclosed errors in Wiretap recording, dating, custody and copying because they were "unintentional", a 18 Pa.C.S.A.

Section 5704(a)(2)(ii) ADA designation used in the absence of a 18 Pa.C.S.A. Section 5704(2)(a)(iv) designation, the administrative criminal Judge was accepted as the unwritten unspoken President Judge's designee, the Wiretap "order" that purported to authorize Wiretaps in 'any home, residence or place of abode of the [Appellant] or anywhere conversations may take place', found not overbroad but specific enough, the DAO's press-conferences that disclosed Wiretap Tape contents in excess of court filings not a violation because court filings are public, and an Wiretap affidavit Jurat in which the Affiant did not sign or swear to the underlying facts in front of the issuing Judge not a violation because the Affiant's co-worker signed it in front of the Judge?

6. Did the [PCRA c]ourt err or abuse it's discretion by denying PCRA relief based upon [c]ounsel's deficient performance when, [c]ounsel failed to undertake a reasonable investigation as he failed to identify Wiretap Act violations as he failed to listen to the Wiretap tapes but instead relied upon a non-law-trained private investigator to inform him of the Wiretap contents, [c]ounsel failed to follow-up with requested discovery as he failed to discover that the second (2) copy set of Wiretap Tapes were more defective that the first (1) copy set, and he failed to obtain a written transcription of the Wiretap tapes, [c]ounsel failed to litigate a filed meritorious Wiretap suppression motion as he failed to know that tape 6 containing the alleged corpus delecti was orally dated outside the Wiretap order, testifying that if he knew Tape 6 was orally dated outside the Wiretap order he definitely would have litigated the suppression motion and won, [c]ounsel failed to object or correct a defective colloquy, [c]ounsel was paid $250,000.00, and [c]ounsel outright lied to [Appellant] to induce a guilty plea?

Appellant's Brief at 4-7.[3]

_____

[3] Appellant's second issue is waived because, as the PCRA court noted, he raised it for the first time in his Rule 1925(b) statement. **See** Pa.R.A.P. 302(a); Pa.R.A.P. 1925(b)(4)(vii); **Commonwealth v. Melendez– Rodriguez**, 856 A.2d 1278, 1287 (Pa. Super. 2004) (*en banc*) (holding issues raised for first time in 1925(b) statement waived); **accord Commonwealth. v. Tejada**, 107 A.3d 788, 790 (Pa. Super. 2015); **see also Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa. Super. 2011) ("It is well-settled that issues not raised in a PCRA petition cannot be considered on appeal.") (internal quotation marks and citation omitted), **appeal denied**, 30 A.3d 487 (Pa. 2011). Moreover, we note that Appellant's third, fourth and fifth issues on appeal are also waived because
*(Footnote Continued Next Page)*

After careful review of the record, and the relevant case law, we conclude that the PCRA court accurately and thoroughly addressed the merits of Appellant's only two issues preserved for appeal, his first and last issues. **See** PCRA Court Rule 1925(a) Opinion, 01/07/16, at 2-4; PCRA Court Opinion, 10/20/15, at 72-110. Accordingly, we affirm the PCRA court's October 20, 2015 order.[4] We further direct that a copy of the PCRA court's January 7, 2016 Rule 1925(a) Opinion and its October 20, 2015 opinion be attached to any future filings in this case.

Order affirmed. Motion for appellate judicial notice denied.

*(Footnote Continued)* ─────────────

they could have been raised on direct appeal. Under the PCRA, "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal[,] or in a prior state postconviction proceeding." 42 Pa.C.S.A. § 9544(b); **see Commonwealth v. Ford**, 809 A.2d 325, 329 (Pa. 2002) (holding that petitioner's claims of trial court error, constitutional error, and prosecutorial misconduct, which could have been raised on direct appeal but were not, were waived under the PCRA). To the extent any of the issues could have been considered on collateral review, we dispose of them on the basis of the PCRA court's Rule 1925(a) opinion and its October 20, 2015 opinion.

[4] We deny Appellant's July 18, 2016 "Motion for Appellate Judicial Notice."

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-09-CR-0005423-2004

                v.                      :

JOSEPH GUARRASI                     :

## OPINION

### I.   INTRODUCTION

Appellant, Joseph Guarrasi (Petitioner), has appealed to the Superior Court of Pennsylvania from this Court's Order of October 20, 2015 denying and dismissing his Amended Post-Conviction Relief Act ("PCRA") Petition which was originally filed on June 29, 2007, pursuant to 42 Pa.C.S. § 9541 *et. seq.*, and amended numerous times thereafter. We file this Opinion pursuant to Pennsylvania Rule of Appellate Procedure ("Pa.R.A.P.") 1925(a).

### II.   FACTUAL AND PROCEDURAL BACKGROUND

The relevant factual and procedural history underlying this matter has been extensively set forth, most recently in our Opinion which accompanied our Order of October 20, 2015. A copy of our Opinion and Order is attached hereto as "Exhibit A." Petitioner filed a timely Notice of Appeal from that Order on November 18, 2015. On November 20, 2015, this Court issued an Order pursuant to Pa.R.A.P. 1925(b) directing Petitioner to file a statement of errors complained of on appeal. On December 3, 2015, Petitioner filed his Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b).[1] A copy of that Statement is attached hereto as "Exhibit B."

---

[1] Petitioner sent a copy of his Statement of Errors and accompanying cover letter, which were both dated November 17, 2015, to this Court's Chambers, which were then received sometime after we had issued our 1925(b) Order on November 20, 2015. Petitioner thereafter reissued his Statement of Errors by correcting the date to reflect December 3, 2015.

## III.   ERRORS COMPLAINED OF ON APPEAL

The six (6) issues identified in Petitioner's Statement of Errors may be summarized as follows:

(1)     It was an abuse of discretion to deny Petitioner PCRA relief, pursuant to 42 Pa.C.S.A. § 9543(b), based upon prejudice to the Commonwealth resulting from the death of one of the principle witnesses, Michael Samios;

(2)     It was an abuse of discretion to deny Petitioner PCRA relief "based upon Judge Cepparulo not recusing" himself when his failing health caused *inter alia* PCRA hearing delays, his early retirement, motions left unadjudicated, misapplication of the law and faulty credibility findings;

(3)     It was an abuse of discretion to deny Petitioner PCRA relief due to alleged statutory and Constitutional violations involving the Wiretapping and Electronic Surveillance Act, 18 Pa.C.S. § 5701, *et seq.* ("the Wiretap Act");

(4)     It was an abuse of discretion to deny Petitioner PCRA relief based upon "Counsel's deficient performance" as a result of *inter alia* failure to investigate and attempt to suppress the Wiretap Act communication intercepts;

(5)     It was an abuse of discretion to deny Petitioner PCRA relief due to "defendant's presented incompetence" which resulted in his "involuntary, unknowing and unintelligent plea caused by an innocent seriously mentally ill defendant subjected to an involuntary cessation of all prescribed medications for several days prior to the plea;" and

(6)     It was an abuse of discretion to deny Petitioner PCRA relief "based upon the presented defective guilty plea colloquy when, the defendant was not present for the general colloquy."

## IV.   ANALYSIS

Following the sixteen (16) days of PCRA evidentiary hearings, this Court issued an Order on August 11, 2014, directing Petitioner to serve upon the Commonwealth and this Court a standard appellate brief "outlining any and all issues cognizable under the PCRA statute." (Order, 8/11/14.) Petitioner complied with our Order and submitted a sixty five (65) page "Brief for

Defendant" on September 4, 2014, in which he identified five (5) questions/issues, which are summarized as follows:

1)     Ineffective assistance of counsel which caused a "severely mentally ill defendant, unmedicated for several days," to enter an involuntary and unknowing guilty plea;

2)     Ineffective assistance of counsel for failure to correct "a patently defective guilty plea colloquy, where defendant wanted to go to trial, unaware of available affirmative defenses;"

3)     Ineffective assistance of counsel which caused defendant to enter an "involuntary and unknowing plea by failing to litigate an intercept suppression;"

4)     Ineffective assistance of counsel which caused defendant to enter an "involuntary and unknowing plea by failing to undertake a reasonable investigation, unaware of law fundamental to the case, abandoning requested discovery, and stipulating to false facts;" and

5)     PCRA hearing delays violated defendant's due process rights such that the District Attorney's Office was precluded from alleging prejudice as a result of Mr. Samios' death.

All of the five issues identified above from Petitioner's September 4, 2014 Brief have been extensively discussed and addressed in our Opinion of October 20, 2015, which as noted has been attached hereto as Exhibit A.

In addition, Petitioner now alleges that he was "not present for the general colloquy" and that this Court's failure to recuse itself resulted in PCRA hearing delays, unadjudicated motions, misapplication of the law and faulty credibility findings.

It is well-established that an issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding." Commonwealth v. Reid, 99 A.3d 470, 481 (Pa. 2014) (citing Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007); 42 Pa.C.S.A. § 9544(b)). Despite the lack of any evidentiary support for Petitioner's bald allegations as well as his refusal to acknowledge that he has been responsible for

the delay and continuation of these PCRA evidentiary hearings over the preceding nine years, Petitioner failed to raise or address these issues in these PCRA proceedings and we therefore consider them waived.

## V.   **CONCLUSION**

As noted in our Opinion and Order of October 20, 2015, we believe after a thorough review of the complete record that Appellant's PCRA allegations are meritless and Petitioner is not entitled to relief pursuant to the PCRA.

Albert J. Cepparulo, Judge

**COMMONWEALTH OF PENNSYLVANIA vs. JOSEPH GUARRASI**
**NO. CP-09-CR-0005423-2004**

Copies sent to:

Joseph Guarrasi
Inmate No. GF6410
SCI BENNER TOWNSHIP
301 Institution Drive
Bellefonte, PA 16823

*Defendant Pro Se*

Karen Diaz
Office of the District Attorney
BUCKS COUNTY JUSTICE CENTER
100 North Main Street
Doylestown, PA 18901

*Attorney for Commonwealth*

# EXHIBIT A

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :     CP-09-CR-0005423-2004

             v.

JOSEPH GUARRASI         :

**ORDER**

AND NOW, this _20th_ day of **October, 2015,** it is hereby ORDERED and DECREED that the Post-Conviction Relief Act ("PCRA") Petition of Petitioner, Joseph Guarrasi, filed on June 29, 2007, and Amended on February 3, 2010, is hereby DENIED and DISMISSED.

Petitioner shall have thirty (30) days from the date of this Order in which to file an Appeal to the Superior Court of Pennsylvania.

BY THE COURT:

_____
ALBERT J. CEPPARULO, JUDGE

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-09-CR-0005423-2004

            v.                     :

JOSEPH GUARRASI                    :

## OPINION AND ORDER

### I.   INTRODUCTION

Pending before this Court is Appellant/Petitioner Joseph Guarrasi's timely Post-Conviction

Relief Act ("PCRA") Petition, filed on June 29, 2007, pursuant to 42 Pa.C.S. § 9541 et. seq., and

amended numerous times thereafter, as set forth at length below. Upon careful consideration of

the facts of the instant case, derived from the evidence submitted throughout the sixteen (16) days

of PCRA evidentiary hearings spanning over a six (6) year period,[1] the plain language of the PCRA

statute, applicable caselaw, and the reasons stated herein, we enter the attached Order denying and

dismissing Appellant's PCRA Petition.

### II.   FACTUAL AND PROCEDURAL BACKGROUND

The facts of the underlying conviction were set forth by our retired colleague, the

Honorable Kenneth G. Biehn ("Judge Biehn"), in his August 25, 2005 Opinion as follows,

*verbatim*:

> Guarrasi was a practicing attorney who maintained an office on York Road in
> Bucks County. He devised a scheme to defraud insurance companies by staging
> automobile accidents. To this end, Guarrasi attempted to elicit the aid of others to
> engage in this fraud and file false claims. He also purchased a home in Doylestown
> [Borough] that he planned to renovate into a 'Kama Sutra' sex club. Because of
> problems with the real estate transactions, and failed attempts to evict tenants from

---

[1] Three (3) additional hearings were held pursuant to motions and other matters relating to this PCRA litigation.

Page 1 of 112

the properties, Guarrasi solicited Michael Samios to kidnap, assault, and 'make disappear' the resident of the house intended for the Kama Sutra club. After becoming frightened of the plan and the nature of Guarrasi's instructions, Samios contacted and cooperated with the authorities. Samios was wired by investigators for the District Attorney, and several conversations between him and Guarrasi were intercepted and recorded.

Trial Court Opinion, 8/25/05.

Based upon the extensive and interwoven fact pattern that underlies Appellant's conviction in the instant case, this Court carefully reviewed both the defense and the Commonwealth's exhaustive recitation of the relevant factual background, and we found the District Attorney's recitation to be more in accord with the facts to which Appellant pled guilty/*nolo contendere*. Accordingly, we have referenced only the Commonwealth's recitation of the facts. This recitation was largely based on the facts read into the record at Appellant's Guilty but Mentally Ill/Sentencing Hearing, as stipulated to by the parties, memorialized in a "Habeas Corpus" document, and entered into evidence as the Court's Exhibit 1.

For purposes of this Opinion, it is important to add that, following our independent review of the recordings following the close of the PCRA proceedings, the intercepted conversations proved particularly incriminatory and evidenced Appellant's criminal intent to commit insurance fraud as well as the crimes involving the planned establishment of his "sex club."

On March 2, 2004, Appellant was arrested and charged with fourteen (14) counts of Criminal Attempt,[2] including Criminal Attempt to Commit Murder,[3] Aggravated Assault,[4] and Kidnapping,[5] as well as other related charges. Appellant was also charged with ten (10) counts of

---

[2] 18 Pa.C.S. § 901(a).
[3] 18 Pa.C.S. § 901(a) § 2501(a).
[4] 18 Pa.C.S. § 901(a) § 2702(a)(1).
[5] 18 Pa.C.S. § 901(a) § 2901(a)(2)&(3).

Criminal Solicitation[6] to commit Murder, Aggravated Assault and Kidnapping and related, less serious crimes.

On March 28, 2005, Appellant entered both an open *nolo contendere* plea to Criminal Attempt to Commit Murder and a guilty but mentally ill (GBMI) plea to Criminal Attempt to Commit Aggravated Assault, Kidnapping, Unlawful Restraint, Burglary, and Criminal Solicitation to Commit Insurance Fraud before Judge Biehn. At the request of the District Attorney, this Court *nolle prossed* Count Ten (10) through Count Eighteen (18) of the criminal information. The Court deferred acceptance of the plea and the subsequent sentencing pending a mental health evaluation to aid the court in determining whether Appellant was indeed mentally ill when he committed the offenses for which he was charged. *See* N.T. 3/28/05, pp. 19, 21-22.

Judge Biehn proceeded with Sentencing on May 25, 2005. Prior to the sentencing portion of this hearing, the Court heard testimony from mental health professionals in order to determine whether the Appellant (1) was severely mentally ill at the time of the commission of the instant offense(s) and (2) is severely mentally disabled and in need of treatment so as to support a plea of guilty but mentally ill pursuant to the Mental Health Act and 18 Pa.C.S. § 314(b). *See* N.T. 5/25/05, pp. 2-3, 32-36. Upon consideration of a number of reports and testimony from mental health experts opining that Appellant meets the "guilty but mentally ill" threshold, the Court found Appellant to be guilty but mentally ill and, accordingly, accepted Appellant's plea. *See* N.T. 5/25/05, pp. 88-89.

Appellant was thereafter sentenced to not less than six-and-a-half (6 ½) nor more than fifteen (15) years' incarceration.[7] At the time of sentencing, Judge Biehn did not elaborate on

---

[6] 18 Pa.C.S. § 902(a).

[7] The Sentencing Guidelines called for a sentence of four (4) to five (5) years' incarceration in the mitigated range, five (5) to six-and-a-half (6 ½) years' incarceration in the standard range and six-and-a-half (6 ½) to seven-and-a-

exactly which count or counts of the information Appellant was being sentenced, nor was there a delineation on the court sheet. However, prior to imposing sentence Judge Biehn referred to the Sentencing Guidelines on Count 1- Criminal Attempt to Commit Murder. N.T. 5/25/05, p. 90. Therefore, we believe that sentence was imposed on Count 1, and we have recognized that this would have been in fact a lawfully imposed sentence. *See* N.T. 1/23/08, pp. 4-5.

Appellant filed a Post-Sentence Motion to Modify Sentence on May 27, 2005, which was denied without a hearing by Order dated May 27, 2005. This Court, however, entered a subsequent Order on June 9, 2005, giving Appellant credit for ten (10) months and eight (8) days for time served at the Bucks County Correctional Facility (BCCF) prior to his sentencing and, additionally, twenty-four (24) days for time spent at Friend's Hospital.

Appellant was represented by Richard Fink, Esquire (Fink) at his preliminary hearing, in pre-trial motions, at his guilty plea and sentencing, and throughout the disposition of post-sentence motions.

On June 24, 2005, Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania. On July 22, 2005, he filed a Statement of Matters Complained Of on Appeal, raising solely the issue of the discretionary aspects of his sentence. Appellant was represented by Alan J. Tauber, Esquire (Tauber) for purposes of his direct appeal.[8]

The Superior Court of Pennsylvania affirmed Appellant's judgment of sentence on July 6, 2006. *See* Commonwealth v. Guarrasi, 907 A.2d 1133 (Pa.Super. 2006) (table). Appellant did not seek review with the Supreme Court of Pennsylvania. As a result, Appellant's judgment of

---

half (7 ½) years' incarceration in the aggravated range. Appellant did not have a prior record score. N.T. 5/25/05, p. 90.

[8] Appellant filed numerous motions shortly after the filing of his direct appeal including a Motion for Return of Seized Property, a *pro se* Motion for Return of Property and a "Praecipe Under B.C.R.C.P. 208.3(a)."

conviction and sentence became final on August 5, 2006, and he therefore had until August 5, 2007 to file a timely PCRA Petition. *See* 42 Pa.C.S. § 9545(b)(1).

Appellant filed the instant timely *pro se* PCRA Petition on June 29, 2007. Thereafter, the Bucks County Public Defender's Office was appointed to represent Appellant.

Following the appointment of counsel, Appellant filed *pro se* the following Motions between July 2007 and October 2007: "Misconduct of D.A. for Willful and Gross Negligence;" "Motion for Formal Discovery;" "Motion for Return of Property;" "Motion for Judicial Notice;" "Notice of Typographical Error in PCRA;" "Motion to Compel Discovery and Impose Sanctions;" a "Motion for Contempt;" "Appeal from the District Attorney's Failure to Charge;" "Motion to Compel Answer to Petitioner's PCRA;" and "Appeal from DAs Failure to Charge."

On November 27, 2007, the Public Defender's Office filed a Petition for Appointment of Private Counsel due to a conflict of interest. As a result, Ron Elgart, Esquire, was appointed to represent Appellant on December 5, 2007. On December 13, 2007, Attorney Elgart filed a Motion to Vacate Order and Appoint Private Counsel.

Despite the fact that Appellant had two experienced criminal defense attorneys appointed successively on his behalf, he continued to file *pro se* motions from December 2007 through January 2008, including a "Motion for Contempt of Court," a second "Motion to Compel Answer to Petitioner's PCRA," a "Motion for Continuance and Appointment of New Conflict Counsel," and a "Motion for Recusal and Change of Venue."

On January 23, 2008, a hearing was held on the numerous motions at which Appellant was provided with the opportunity to testify in furtherance of those motions. Based on the voluminous nature of the issues raised in Appellant's initial *pro se* Petition, we handled only preliminary

matters at this hearing in order to create an opportunity for Attorney Elgart to meet with Appellant to further refine the PCRA claims.

Following the presentation of evidence and the conclusion of arguments of counsel, this Court denied the following: "Motion to for Appointment of New Conflict Counsel"; "Motion to Recuse Judge Cepparulo and Motion to Disqualify the entire Bucks County Bench"; "Motion for Discovery"; and "Petition for Return of Property." *See* N.T. 1/23/08, pp. 9-47, 48-9, 51-59, 61-77, 89-91. In his "Petition for Return of Property," Appellant had requested the return of all property seized by the Commonwealth following his arrest. In denying this Motion, this Court reasoned that "[i]f in fact Mr. Guarrasi is entitled to relief, it may well be that relief would entail some type of new trial, and if he is entitled to relief and if that relief involves a new trial, obviously the Commonwealth would need the evidence which it seized..." N.T. 1/23/08, p. 90.

On February 8, 2008, Appellant filed a "Concise Statement of P.C.R.A. Issues" on his own volition. These "concise" claims are as follows: (1) Defective Guilty Plea Colloquy; (2) Lack of Subject Matter Jurisdiction; (3) Ineffective Assistance of Counsel; and (4) Prosecutorial Misconduct. *See* "Concise Statement," 2/8/08, ¶¶ I-IV.

On February 26, 2008, Attorney Elgart filed a second Motion to Vacate Order of Appointment, alleging that Appellant had filed a civil complaint against him which created an inherent conflict of interest and made his continued representation of Appellant impossible. This Motion was granted on March 12, 2008, and Harry J. Cooper, Esquire, was appointed to represent Appellant.

On June 26, 2008, November 24, 2008, and December 19, 2008, three (3) counseled PCRA evidentiary hearings were held, in which testimony was received from Appellant, his guilty plea

and sentencing counsel, Fink, and one of the investigating officers, Bucks County Detective Timothy Carroll (Detective Carroll or Carroll).

At the conclusion of the third day of testimony, Mr. Cooper was instructed to submit a brief within forty-five (45) days from his receipt of the requisite Notes of Testimony. Following the submission of Appellant's brief, the Commonwealth was instructed to file a reply brief within thirty (30) days. This Court noted that we would then render a decision unless further testimony was necessary, in which case another hearing would be scheduled.

Despite Mr. Cooper's representation, Appellant continued to file numerous *pro se* motions, including a *Pro Se* Entry of Appearance and Motion for Conference/Experts on June 10, 2008; a Motion for Removal of Counsel on June 20, 2008; a Motion for Grazier Hearing and Colloquy on October 27, 2008; a Motion to Develop the Record with Exculpatory Brady Evidence of Prosecutorial Misconduct on December 17, 2008[9]; and a Motion for Recusal and Change of Venue on February 12, 2009.

On February 19, 2009, Mr. Cooper filed a Motion for Leave to Withdraw Appearance.

On January 14, 2009, in the midst of the preparation of briefs in support of or opposition to Appellant's instant PCRA Petition, Appellant filed a Notice of Appeal to the Superior Court of Pennsylvania, without assistance from his appointed counsel, in which he raised the following issues: Appellant's request to proceed *pro se*, this Court's refusal to recuse ourselves, and this Court's denial of change of venue. On April 16, 2009, we issued an Opinion in which we

---

[9] This Motion was forwarded to Appellant's attorney of record - Mr. Cooper.

determined that Appellant's appeal was not ripe for adjudication, as there had been no final decision regarding his PCRA Petition.[10]

On April 7, 2009, Appellant filed a Petition for Payment of Expert Witness, and on April 29, 2009, this petition was granted.

On April 23, 2009, Michael Goodwin, Esquire, was appointed to represent Appellant.

On May 8, 2009, this Court issued an Order directing Appellant to file a brief within ninety (90) days in support of his instant PCRA Petition and the evidentiary hearings held thereon. We also directed the Commonwealth to file a responsive brief within thirty (30) days from the date of receipt of Appellant's brief.[11]

On June 12, 2009, Attorney Goodwin filed a "Petition to Vacate Appointment of Conflict Counsel." In his Petition, Mr. Goodwin alleged that within two (2) years prior to the offenses underlying the charges against Appellant, Attorney Goodwin had been appointed to represent another Appellant in a different criminal matter who had previously consulted Appellant, and based upon information provided by this criminal Appellant and his wife, Attorney Goodwin had reported a potential ethical violation by Appellant to the Bucks County District Attorney's Office. *See* Petition to Vacate Appointment of Conflict Counsel, 6/12/09, ¶¶ 2-3.

An in-person PCRA evidentiary hearing was scheduled for August 13, 2009. On August 7, 2009, however, Appellant filed a Motion for Video Hearing. In order to accommodate Appellant's request, a video hearing was therefore scheduled for October 1, 2009, at which, upon consideration of Appellant's numerous requests to proceed *pro se* via written motions, in-court

---

[10] The Superior Court of Pennsylvania issued a non-precedential and unpublished Memorandum Opinion on March 30, 2010, quashing Appellant's appeal. *See* Commonwealth v. Joseph Guarrasi, 996 A.2d 542 (Pa.Super. 2010) (table).

[11] All relevant Notes of Testimony were filed as of the date of this Order. The briefs were never filed, however, based upon our granting of Appellant's request to proceed *pro se*, as will be explained in detail below.

requests and otherwise, we held a hearing pursuant to Commonwealth v. Grazier.[12] At this hearing, and following a formal colloquy on the matter, this Court determined that Appellant was making a knowing, intelligent and voluntary waiver of his right to counsel on this first PCRA Petition. We accordingly granted Appellant's request to proceed *pro se* via written Order dated October 1, 2009, and simultaneously granted Mr. Goodwin leave to withdraw as counsel. We further ordered Appellant to file a Petition to Open his PCRA Proceedings within thirty (30) days of the date of the order, and granted the Commonwealth a thirty (30) day period to file a response following receipt of Appellant's Petition.

On October 26, 2009, Appellant filed a "Motion for Disclosure of Intercepted Communications," to which the Commonwealth filed a response on March 9, 2010. On March 18, 2010, Appellant filed a "Reply with New Matter to Commonwealth's Answer to Petitioner's Motion for Required Disclosure of Intercepted Communications."

On November 4, 2009, Appellant filed a "Petition to Open Further Proceedings and/or New Proceedings," alleging that he had additional "meritorious causes of action" which he wished to raise, including "Defective Guilty Plea Colloquy, Ineffective Assistance of Counsel, Prosecutorial Misconduct and proceeding in a Tribunal in which venue and jurisdiction is in question." *See* Petition to Open, 11/02/09, p. 5.

On February 3, 2010, pursuant to our Order of December 11, 2009 granting Appellant's "Petition to Open," Appellant filed an Amended PCRA Petition (which was dated January 29, 2010). This Amended Petition consisted of thirteen (13) separate pages and alleged that Appellant's conviction was the result of the following defects pursuant to 42 Pa.C.S. § 9543(a)(2)(i), (ii), (iii), (iv), (viii): an unlawfully induced plea of guilty where "the circumstances

---

[12] 713 A.2d 81 (Pa. 1998).

make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent;" a violation of the United States or Pennsylvania Constitution or laws which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place;" ineffective assistance of plea counsel which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place;" the improper obstruction by government officials of Appellant's right to appeal where meritorious appealable issues existed and were properly preserved; and finally a "proceeding in a tribunal without jurisdiction."

More specifically, the following claims were raised in his *pro se* Amended Petition, including, but not limited to: his guilty plea was unlawfully induced as he was incompetent "due to the sudden cessation of all psychotropic medication for several days prior to the plea;" there was no factual basis to his *nolo contendere* plea and, therefore, it was unlawfully induced; the Commonwealth violated the Constitutions of the United States and the Commonwealth, respectively, by violating the Wiretapping and Electronic Surveillance Act ("the Wiretap Act"), 18 Pa.C.S. 5701 et seq.;[13] plea counsel was ineffective based on his lack of awareness of the allegedly constitutionally infirm wiretap evidence; plea counsel "mislead and misinformed" Appellant as to the "authorship and contents of the 'Habeas Corpus' documents;" appellate counsel did not withdraw Appellant's plea upon request; there was "improper obstruction" of Appellant's

---

[13] Appellant claims in further detail that Judge Biehn's authorization of the wiretap by Order dated February 23, 2004 was a "legal nullity," as Appellant alleges that Judge Biehn was not the President Judge of Bucks County nor was he a designated signee by writing, order or statute. *See* "Amended PCRA to Supplement PCRA Petition Pursuant to Order Dated 12/10/2009," 2/03/10, ¶ 5(A)(a)(i). Appellant further contends that the Wiretap Act was violated by the Commonwealth's failure to comply with record keeping and custody requirements, failure to obtain consent from "informants Fryling or Samios," and failure to seal the recordings to prevent tampering, intercepting oral communications outside the geographical limits of Bucks County. Id. at ¶ 5(A)(b)-(f). Appellant asserts that "Expert Audio Forensic analysis of the original audio evidence has scientifically proven that there is objective forensic evidence of intercept tampering in the original recordings." Id. at ¶ 5(A)(h).

PCRA collateral appeal by "Bucks County Governmental Officials;"[14] and this Court proceeded without proper venue. *See* "Amended PCRA to Supplement PCRA Petition Pursuant to Order Dated 12/10/2009," 2/03/10, pp. 3-10.

On May 6, 2010, the Commonwealth filed a response to the Amended Petition and Request to Reopen the Record.

Following the Court's grant of *pro se* and *in forma pauperis* (IFP) status, and throughout the litigation of his claimed amended issues during the preceding thirteen (13) evidentiary hearings, Appellant filed numerous motions. These motions included the following[15]:

1. A "Fifth Motion for Return of Property" filed on February 16, 2010;

2. A "Motion for Judicial Notice that in 2010 Detective Fabricated Wiretap Documents" filed on March 29, 2010. (The Court declined to act on this Motion and it was therefore denied by operation of law);

3. A "Motion to Receive Audio-Visual Expert" filed on the same date. (The Court also declined to act on this Motion and it was therefore denied by operation of law);

4. A "Motion for Hearing" and a "Motion for Judicial Notice" filed on April 28, 2010;

5. A "Motion for Rule Absolute" filed on May 12, 2010;

6. A "Motion for Judicial Notice of 201 PA Code 706(e) Requiring the Filing of an Executed Form" filed on May 13, 2010;

7. A "Motion to Hold the Commonwealth in contempt of Orders dated 12/10/09 and 2/5/10" filed on May 13, 2010;

8. A "Motion to Order Commonwealth to Answer Amended PCRA As Ordered"[16] filed on May 24, 2010;

---

[14] Appellant later elaborated that this was based on either the Bucks County District Attorney's Office or the Bucks County Detectives tampering with the evidence, presenting false evidence and/or failing to follow the Wiretap Act "in many different ways." N.T. 8/26/10, p. 15.

[15] All of the "Motions" are in Appellant's own words.

[16] This Motion was denied on June 2, 2010, as the Commonwealth had previously filed a response to Appellant's Amended *pro se* PCRA Petition.

9. A "Memorandum in Support of Amended PCRA" filed on May 28, 2010;

10. A "Motion to Reconsider 'Declining to Act' on Open Motions as it Prejudices Petitioner" filed on June 16, 2010;

11. A "Motion for Handwriting Exemplars of Former Judge Biehn" and a "Motion for Judicial Notice" filed on June 16, 2010;

12. A "Motion to Compel Service of Commonwealth's Responses" filed on June 21, 2010;

13. A "Motion for Standby Counsel" filed on July 8, 2010;

14. A "Motion for Audio-Forensic Expert to Testify by Video at Video-Teleconference on 8/12/10" filed on July 12, 2010; and

15. A "Motion for the State to Bear Expert Costs" filed on July 28, 2010.

The last three motions filed in July of 2010 were denied or stayed until disposition at trial, and the PCRA hearing was continued until August 26, 2010.

On August 16, 2010, the Commonwealth filed a "Motion for Mental Health Records." We issued an Order scheduling a hearing on this Motion for August 26, 2010, to be heard in conjunction with the previously-scheduled evidentiary hearing.[17]

On August 26, 2010, at the first PCRA evidentiary hearing following the foregoing amendments, Appellant added that in terms of his ineffective assistance of counsel claims he was raising all of the following:

> "[f]ailing to litigate a suppression motion, failing to object to a defective guilty plea colloquy, promising a certain sentence that was not given, failure to investigate the case and giving incompetent advise based on lack of knowledge of the case; stipulating to false information and…not communicating honestly with me, not offering any defense documents but allowing defense documents to be offered by the Commonwealth" and "[w]aiving a preliminary hearing without [Appellant's] presence."

---

[17] At the August 26, 2010 hearing, this Court ordered that the Mental Health Services Unit at the Bucks County Correctional Facility provide the District Attorney's Office with certified copies of Appellant's records. A written Order followed.

*See* N.T. 8/26/10, pp. 14-15.

In terms of his claim that this Court did not have subject matter jurisdiction over his crimes, Appellant confirmed that he based this claim on the fact that the interceptions occurred in Montgomery County and Maryland and Judge Biehn was not designated by the President Judge to sign the authorization order. N.T. 8/26/10, pp. 16-17.

At the August 26, 2010 hearing, Appellant submitted an offer of proof as to each of his claims raised in the Amended Petition in addition to the evidence and testimony previously submitted to this court during the June 26, 2008, November 24, 2008, and December 19, 2008 evidentiary hearings when Appellant had been represented by Attorney Cooper. *See* N.T. 8/26/10, pp. 21-36. Appellant explained that he wished to call Attorneys Fink and Tauber as witnesses in order to introduce certain documentation into evidence to support his defective plea colloquy claim and prove his claim regarding the voluntariness of his guilty plea. He testified that he sent out subpoenas to the psychologists involved in his mental health care and to the medical record custodians at the prison that went unanswered. N.T. 8/26/10, pp. 22-26.

Appellant stated that he intended to call Attorneys Fink and Tauber, in addition to experts that were unable to attend this hearing, including Herbert Joe, in an effort to prove his claim of ineffective assistance of counsel. N.T. 8/26/10, pp. 28-30. Appellant also indicated that he intended to call Detective Carroll and Detective McAteer as witnesses. N.T. 8/26/10, p. 31. For the prosecutorial misconduct claim, Appellant testified that he intended to call [Deputy District Attorney and now Magisterial District Judge] Gary Gambardella, Judge Diane E. Gibbons,[18] and

_____

[18] Judge Gibbons previously held the position of Bucks County District Attorney during the relevant period of Appellant's investigation, arrest, charging and criminal conviction, and will be referred to hereinafter as District Attorney Gibbons.

former President Judge David Heckler.[19] N.T. 8/26/10, pp. 32-33. Finally, concerning the legality of the wiretap interception involved in this case, Appellant intended to call Herbert Joe and Detective Mosiniak. N.T. 8/26/10, p. 35. Appellant would rely on his own testimony from previous hearings and stated that he would not be testifying further. N.T. 8/26/10, p. 36.

On September 10, 2010, Additional Discovery was filed by the District Attorney's Office.

At the end of the evidentiary hearing on August 26, 2010, we ordered the parties to file briefs on the issue of the admissibility of the expert testimony of Mr. Herbert Joe regarding audio forensics. On September 10, 2010, Appellant filed a "Memorandum Regarding the Audio Forensic Expert [Mr. Joe]". On September 27, 2010, the Commonwealth filed a "Memorandum of Law in Opposition to Admissibility of PCRA Petitioner's Proposed Expert Testimony," to which the Appellant filed a "Reply to ADA's Memorandum" on October 6, 2010.

On September 30, 2010, Appellant filed a "Praecipe to Attach to Amended PCRA Memorandum as Exhibit 24."

On October 25, 2010, the District Attorney forwarded the requisite mental health/medical records to Appellant. On this same date, Appellant filed Supplemental Exhibits for PCRA Hearing.

On October 27, 2010, Appellant filed a [16] "Motion to Compel Attendance of Hostile and Commonwealth Witnesses" and a [17] "Motion for Petitioner to Maintain Physical Possession of Legal Work." On November 3, 2010, Appellant filed a "Notice for Commonwealth to Produce Originals." On November 10, 2010, Appellant filed a "Praecipe to Attach as Page 13 to Amended PCRA," and he filed "Petitioner's Supplemental Exhibits for PCRA Hearing" on November 15, 2010.

---

[19] Judge Heckler currently holds the position of Bucks County District Attorney.

On December 15, 2010, Appellant filed a [18] Motion for PCRA Discovery which was denied on December 28, 2010.

On January 31, 2011, Appellant filed a "Supplemental PCRA Hearing Exhibits Set 3."

On May 2, 2011, Appellant filed a "Notice for Commonwealth to Produce Original Record and Docket Entry Sheets pursuant to Pa.R.E. 1004(3)."

On June 10, 2011, Appellant filed "Supplemental PCRA Hearing Exhibits J 14 and J 26."

Significantly, on August 5, 2011, the Commonwealth filed a "Motion to Deny and Dismiss PCRA Action Based on Substantial Prejudice to the Commonwealth," claiming substantial prejudice due to the death of an essential witness, Michael Samios. On August 18, 2011, Appellant filed a response to this Motion, and on September 14, 2011, this Court entered an Order denying the Commonwealth's Motion.

In the interim, Appellant filed a [19] "Motion for Judicial Notice" on September 1, 2011[20] and "Supplemental PCRA Hearing Exhibits - W Set" on September 8, 2011.

On November 7, 2011, Appellant filed a [20] "Motion for Notice that Detective Carroll did not take Oath and Termination Date from Bensalem Twp PD."

On January 9, 2012, Appellant filed a "Praecipe to File Petitioner's Subpoenaed Witnesses." On January 19, 2012, Karen Ann Ulmer filed Certificates of Service of Subpoena upon the District Attorney's Office, Clerk of Courts, Custodian of Records of Bensalem Township, and Chief Detective McAteer.[21] On this same date, Appellant filed "Supplemental PCRA Hearing Exhibits Set Y."

---

[20] This Motion was returned to the file without action by this Court.

[21] Motions to Quash Subpoena were filed on September 16, 2011, January 19, 2012, and June 17, 2014. On June 26, 2014, this Court granted the Motion to Quash Subpoena and for Protective Order filed by the Honorable Diane Gibbons, shielding Judge Gibbons from further subpoenas in this PCRA matter.

On February 21, 2012, Appellant filed "Supplemental PCRA Hearing Exhibits Set B."

On February 24, 2012, Appellant filed a [21] "Motion to Order Compliance with Order of 1/20/2012."

On March 27, 2012, the Commonwealth filed a "Memorandum of Law in Opposition to Request for Introduction of Various Evidence and Testimony," as directed by this Court during the January 20, 2012 hearing, and a "Motion in Limine to Preclude Introduction of Evidence and Testimony" on April 25, 2012.[22] Appellant filed responses on April 27, 2012 and May 9, 2012.

On June 1, 2012, Appellant filed a [22] "Motion to Compel Commonwealth Production of Original Intercept Tapes and Recorders Utilized" and a [23] "Petition to Declare Commonwealth's PCRA Delays Violate Petitioner's Due Process and Equal Protection."

On June 27, 2012, Appellant filed a [24] "Motion for Audio-Forensic Expert," which was denied on June 28, 2012.

On July 18, 2012, Appellant filed a [25] "Motion for Judicial Notice [that] ADA Diaz Did Not File 16 P.S. 3403 Oath of Office for her Current Position." On July 30, 2012, Appellant filed a "Stipulation Pursuant to Order 1/20/12," and on August 15, 2012, he filed "Supplemental Exhibits Set A."

On September 12, 2012, Appellant filed a [26] "Motion for Judicial Notice that Commonwealth's Exhibits 2A, 2B, 2C Do Not Contain any 16 P.S. 3403 Oaths of Offices for ADA Gambardella, Nor Detectives Carroll, Mosiniak or Chief McAteer." On September 27, 2012, Appellant filed a [27] "Motion in Limine to Order Sprint to Produce Informant Cell Phone Records from 1/15/04-3/15/04," a [28] "Motion to Order Commonwealth PCRA Production of All Parts of Multiform Property Receipts 4666 & 4667" and a [29] "Motion in Limine to Permit Examination

---

[22] The Commonwealth's Motion in Limine was returned for consideration at the time of the next PCRA evidentiary hearing.

of Corroboration Witness Mosiniak and Affiant Carroll." On October 19, 2012, Appellant filed a [30] "Motion to Transcribe Commonwealth's Compilation Tape Admitted as C-PCRA-1." On October 31, 2012, we issued an Order denying Appellant's Motions in Limine and Motion to Order Production of Property Receipts.

On November 2, 2012, Appellant filed a [31] "Motion to Order Commonwealth's PCRA Testimony Warrants Limited to PCRA Discovery." On November 28, 2012, Appellant filed a [32] "Motion to Permit PCRA Witnesses Confirming CI Samios Provided Drugs to Targets during Intercepts," a [33] "Motion to Compel PCRA Production of Seized Meth Baggie with CI Samios Fingerprints" and a "Praceipe to Attach Witness Affidavit Confirming CI Samios Provided Drugs to Target as Exh. D1."

On December 5, 2012, Appellant filed a [34] "Motion to Permit Audio Evidence and Transcript of C-1 Confirming CI Samios Provided Drugs to Target," as well as a "Praecipe to file Transcript of Intercept Compilation Tape PCRA Admitted as CW Exhibit C-1."

On December 14, 2012, Appellant filed a "Praecipe to Attach to Amended PCRA as Exhibit D1, Transcript of 20 Min. Compilation Tape."

On December 28, 2012, a [35] Motion for Rule to Show Cause Bill of Sale for Truck Confirming $2000 Paid to Samios for Truck Title" was filed.

On February 1, 2013, Appellant filed a "Praecipe to file PCRA Hearing Exhibits Set D."

On February 11, 2013, Appellant filed an "Application for Bail Pending Disposition of PCRA Petition," as well as a Brief in Support thereof. We denied this motion on August 9, 2013.

On February 22, 2013, Appellant filed a [36] "Motion for Judicial Notice of Maryland Wiretapping and Electronic Surveillance," a [37] "Motion for DAO Sanctions," and a

"Memorandum of Law." On February 28, 2013, Appellant also filed a [38] "Motion for Sanctions Per Pa.R.C.P. 1023.2." This was returned to the file without action.

On March 26, 2013, Appellant filed a "Praecipe to Attach Exhibits G" and a "Praecipe to Attach Exhibits T," and he filed another "Praecipe to Attach Exhibit S" on April 19, 2013.

On March 27, 2013, Appellant filed a [39] "Motion to Compel Production of Seized Office Billing Records."

On April 19, 2013, Appellant filed a "Praecipe to Move Open Motions as BCLRCP 208.3(a) Uncontested." Despite the fact that Rule 208.3(a) constitutes a local rule of civil procedure, Appellant invoked this rule in an attempt to "move open motions" that were "uncontested."

On July 15, 2013, Appellant filed a "Praecipe to Attach as Exhibit T-T to Amended PCRA Petition."

On August 26, 2013, Appellant filed a [40] "Motion to Transcribe PCRA Hearings dated 5/3/13, 8/12 & 8/13/13," and on September 3, 2013, he filed a [41] "Motion to Order PennDOT to Provide Certified Vehicle Title and Lien Histories."

On November 6, 2013, Appellant filed a "Praecipe Notice PCRA Transcripts Not Received by Appellant for PCRA Hearing of 5/3, 8/12, 8/13, 10/10 Nor 10/11/2013 Pursuant to Pa.R.Crim.P. No.'s 113, 114 & 115."

On December 6, 2013, Appellant filed a [42] "Motion for Transcripts," which was denied by this Court on December 11, 2013.

On December 18, 2013, Appellant filed a "Stipulation."

On December 30, 2013, Appellant filed a [43] "Motion Re: DAO Intercept Media Disclosures of 3/3/2004 for Notice of Testimony" as well as a Brief in support thereof.

On January 29, 2014, Appellant filed another "Praecipe to Attach Exhibit to Amended PCRA."

On April 25, 2014, Appellant filed a [44] "Motion for Sanctions Against DAO Continuances and Delays." This Motion was denied at the hearing held on June 30, 2014, since it was Appellant's request that the hearing scheduled for April 22, 2014 be continued because he was unprepared for the hearing and his slanderous claim that the District Attorney's Office had *ex parte* communications with this Court to get the hearing continued was patently false. *See* N.T. 6/30/14, pp. 17-26.

Appellant filed additional "Praecipes" to attach exhibits to his Amended PCRA Petition on May 22 and June 20, 2014.

In summary, this Court carefully reviewed each and every motion filed by both Appellant and the Commonwealth. Many of Appellant's Motions that were not directly disposed of by written Order or not immediately acted upon were either inappropriately filed pursuant to civil procedure rules (as opposed to following proper criminal procedure channels) or placed in the file for disposition at the time of the relevant evidentiary hearings, and/or, in the case of the Exhibits and Exhibit Sets filed, should have been presented in court subject to cross-examination in order to determine the exhibits' relevance and admissibility.[23]

PCRA evidentiary hearings took place on August 26 and November 19, 2010; February 7, June 13 and September 19, 2011; January 30 and August 17, 2012; May 3, August 12, August 13,

---

[23] As we will set forth in detail below, some of these exhibits were in fact authenticated and later admitted into evidence, and some were not.

October 10, and October 11, 2013; and finally June 30, 2014.[24] These hearings consisted solely of Appellant's case-in-chief.

Following the last evidentiary hearing, this Court directed the parties to submit briefs. Appellant and the Commonwealth submitted briefs on September 4, 2014 and October 6, 2014, respectively.

A complete set of the sixteen (16) analog cassette tapes which are referred to by all witnesses during the course of the PCRA evidentiary hearings was entered into evidence as C-PCRA-7.

### a. Appellant's PCRA Testimony

Preliminarily, we noted that upon consideration of Appellant's contention that he was unable to make a knowing and intelligent decision to enter a guilty plea as a result of being off his medications, Dr. Strochak, who testified at Appellant's Guilty but Mentally Ill/Sentencing Hearing, "did not wish to give a full opinion with regard to the coming off of medications because he does not dispense medications." Dr. Strochak did, however, recommend Dr. David Nover, who later indicated that it was necessary to review a list of medications that Appellant was off of and his guilty plea colloquy transcript before giving his professional opinion. N.T. 6/26/08, pp. 13-15. On December 15, 2008, Dr. Nover submitted a report to Appellant and his attorney. At the hearing on December 19, 2008, defense counsel indicated that he would not be offering the report into evidence, as it was his opinion that "it doesn't help this petition and this relief that is requested." Defense counsel also indicated that he reviewed and explained this to Appellant. N.T. 12/19/08, p. 6.

---

[24] Some additional evidentiary hearings were originally scheduled but had to be continued due to unavailability of Appellant, the District Attorney or other witnesses.

Appellant testified to the facts he believed to be in existence supporting the allegations made in his February 8, 2008 "Concise Statement" as set forth above.

Appellant first addressed his contention that this Court [the Bucks County Court of Common Pleas] lacked subject matter jurisdiction in accepting Appellant's guilty plea and sentencing him thereafter. Appellant averred that "[d]uring periods of time that these alleged offending conversations were allegedly made, I, myself, was in Maryland, and some of the time I was in Montgomeryville…" He testified that he did not know where the individual who placed the telephone calls which led to the recordings was geographically at the time they were made and simultaneously recorded. He claimed that the Commonwealth did not offer any logs to indicate where the confidential informant (C.I.) who placed the calls was at the relevant time the calls were placed and the incriminating statements were made. Furthermore, Appellant testified that it was his belief and opinion that if the incriminating conversations did not happen in Bucks County, this Court did not have jurisdiction to authorize the wiretaps underlying the recorded telephone calls, and this jurisdiction did not "follow them to other states and to other countries." N.T. 6/26/08, pp. 19-28.

During the relevant period of February and March, 2004, when the crimes underlying Appellant's conviction occurred, Appellant's parents lived in Plumstead Township, Bucks County, and Appellant's office and residence were located in Furlong, Bucks County. Appellant also agreed that, pursuant to the Notes of Testimony from Appellant's Sentencing Hearings, a recitation of the facts indicated as follows:

> …on February 27 the detectives conducted a taped conversation at Guarrasi's parents' house, Guarrasi tells Samios that he cannot write out a sketch for him because it would have his handwriting on it, but he would have a schematic back at the office that he can provide him with. He then pays Samios two thousand dollars as a downpayment and he even counts out the money on tape.

Appellant admitted that if this were a "true statement," the Court would have had jurisdiction. He also admitted that during the relevant time period, he gave Mr. Samios (Samios)[25] money and blueprints of the Lower State Road residence and had conversations with him. N.T. N.T. 6/26/08, pp. 39-46, 63-64; N.T. 11/25/08, pp. 53-54.

Nevertheless, Appellant now claims these facts are completely erroneous and that he never solicited Samios to kill Thomas Witthauer or his family.[26] N.T. 6/26/08, pp. 41, 64-65; N.T. 11/25/08, pp. 56-61. Instead, Appellant claimed that despite Mr. Witthauer's continued residence, he had hired Samios to perform landscaping/construction work on the Lower State Road property because the corporation of which he was an owner had purchased this property.[27] N.T. 11/25/08, pp. 49-51. Appellant also indicated that he wanted to review his personal telephone bill or the telephone records of Detective Carroll and Samios. On cross-examination, Appellant explained that, in his opinion, the locus of the crime was located in Montgomery County. N.T. 6/26/08, pp. 27, 35-36.

In terms of his mental state at the time of Appellant's Guilty Plea hearing on March 28, 2005, Appellant claims he was off medication and was "out of [his] mind." N.T. 6/26/08, p. 70. In response to the District Attorney's question as to what he did not understand in relation to the guilty plea, Appellant claimed that he was not paying attention to the proceeding and he was "just there to agree" and agreed to "whatever was going to be said." N.T. 11/25/08, p. 65. However, although Appellant had claimed he was on medication at his Guilty but Mentally Ill/Sentencing

---

[25] Throughout his testimony, Appellant referred to Mr. Samios as the "C.I." We do not agree with his designation of Samios, as Samios was a named informant.

[26] The Notes of Testimony from Appellant's Guilty Plea hearing indicate that Appellant informed the trial court that he understood the charges against him and that there were numerous victims with regard to his attempted crimes. *See* N.T. 3/28/05, pp. 7-14, 16-17.

[27] Appellant later testified that Samios conducted construction work on numerous properties Appellant owned in Pennsylvania and Baltimore, Maryland. N.T. 11/25/08, pp. 95-97.

Hearing on May 25, 2005, and was therefore "more in [his] right mind then," he claimed he still "wasn't as clear" as he was on the date of the June 26, 2008 hearing. N.T. 6/26/08, pp. 70, 75. Appellant also claimed he was not as clear mentally when Attorney Tauber represented Appellant on his direct appeal, and he claimed that Attorney Tauber refused to attempt to withdraw Appellant's guilty plea upon request. N.T. 6/26/08, p. 71.

Appellant admitted, however, that as a former attorney representing a number of criminal Appellants, he understood how guilty pleas are performed, was familiar with the elements of colloquies and the constitutional rights a Appellant gives up following entrance of a guilty plea, as well as the limited right to appeal and the dictates of the Wiretap Act. Appellant indicated that he understood the rights that an individual possesses that are waived in order to enter a guilty plea. Furthermore, he indicated that at the time he entered the guilty plea, he understood that he entered a nolo contendere or guilty but mentally ill plea to crimes that occurred in Bucks County. N.T. 6/26/08, pp. 30-31, 69, 97; N.T. 11/25/08, pp. 46-48.

Appellant additionally indicated that he understood that by entering an open guilty plea, his sentence was dependent upon the trial judge, and he understood that no recommendation was made as to sentence. Finally, he recalled that Judge Biehn instructed him regarding the Sentencing Guidelines and that his sentence was in fact within the standard range of the Guidelines. N.T. 11/25/08, pp. 67-68, 70, 89-90. Appellant did not raise a claim that he was wrongfully induced to enter into a guilty plea until the filing of the instant PCRA Petition. N.T. 6/26/08, p. 78.

Appellant claimed he entered into a nolo contendere plea because Attorney Fink informed him he would never go to jail and would be housed in a mental hospital, and had assured him that "he got this all worked out." N.T. 6/26/08, p. 80-81. Appellant testified that he remained steadfast in the proposition that he wanted to go to trial and that Fink never explained to him the reasoning

behind his recommendation to enter into a guilty plea besides that it was in his best interest. N.T. 11/24/08, 36, 39. Appellant testified that according to Fink, "he was supposed to spend one year [at a mental health hospital] and go home" following his sentencing. N.T. 6/26/08, 84-86.

Appellant later testified at the November 24, 2008 hearing that Fink suggested he enter a guilty plea to solicitation to commit aggravated assault and that he would be looking at "two to four [years] maybe spent in a mental hospital."[28] N.T. 11/24/08, pp. 36, 73. Appellant testified that if he would have received a two (2) to four (4) year sentence in the Bucks County Correctional Facility he "probably" would not have filed an appeal to the Superior Court. N.T. 11/25/08, p. 87. Appellant also indicated that Fink said that by pleading guilty he could "keep [his] stuff," meaning his law license, properties and contact with his family. N.T. 11/24/08, pp. 73-74. Receiving a sentence of time served in a mental health institution as opposed to incarceration in a correctional facility was an important consideration when Appellant entered his plea. N.T. 6/26/08, pp. 81-82. However, following his sentencing Appellant was "unexpectedly" transported to SCI Graterford for classification purposes, then he went to SCI Camp Hill for a "couple months," followed by SCI Cresson, where he continues to serve his sentence. N.T. 6/26/08, p. 83.

Thereafter, Appellant referred to the Notes of Testimony from his Guilty Plea, during which Judge Biehn informed Appellant that if, at the time of sentencing, he is still in need [of treatment] or severely mentally disabled, he *may* serve part of his sentence in a mental institution. N.T. 6/26/08, pp. 88-89; N.T. 11/25/08, pp. 77-79; *see* N.T. 3/28/05, pp. 15-16.[29] Furthermore, at the Guilty but Mentally Ill/Sentencing Hearing, Judge Biehn indicated that Appellant would be

---

[28] Appellant testified that he would have done whatever Fink suggested, as he was his "expert" and he trusted him. N.T. 11/25/08, pp. 71-72.

[29] The Court explained further that Appellant would serve some or all of his sentence in a mental health institution until Appellant is found "to be no longer severely mentally disabled and in need of that kind of treatment under the Mental Health and Procedures Act." Appellant indicated that he understood. N.T. 3/28/05, pp. 15-16.

evaluated and serve the initial part of his sentence in a mental health and psychological facility and/or a drug and alcohol facility. N.T. 6/26/08, pp. 89-90; N.T. 11/25/08, pp. 92-93; *see* N.T. 5/25/05, 99-100.

Prior to the entry of his Guilty Plea, Appellant admitted that he reviewed the Affidavit of Probable Cause attached to the criminal complaint. N.T. 11/25/08, p. 64. In addition, Appellant listened to relevant portions of the tapes at the District Attorney's Office prior to the plea, Fink provided him with copies of the tapes prior to the plea as well, and he advised Judge Biehn at his sentencing hearing that he listened to the tapes. N.T. 11/24/08, p. 19; N.T. 11/25/08, p. 64; N.T. 5/25/05, pp. 90-91.

Judge Biehn informed Appellant of his right to file a motion to withdraw his guilty plea within ten (10) days, indicated that Appellant appeared to understand the proceeding, and ensured that Appellant did not have any questions of the Court. N.T. 11/25/08, pp. 79-80. *See* N.T. 3/28/05, p. 20. Appellant also testified at his guilty plea that he was satisfied with Fink's representation and did not have any questions of the court. N.T. 11/25/08, pp. 79-80.

It was uncontradicted that Appellant did not possess written proof that he would receive a two (2) to four (4) year sentence or that he would serve his sentence in a mental hospital. N.T. 11/25/08, pp. 70-71, 91.

Appellant claims that there existed no factual basis for his plea contained on the record because the District Attorney did not read the affidavit of probable cause or other documents into

the record.[30]  Furthermore, the tapes/interceptions[31] of Appellant's recorded conversations were not played for the Court. N.T. 6/26/08, p. 100. However, the Notes of Testimony indicate that both the District Attorney and defense counsel agreed that the notes presented to the court from the litigation concerning Appellant's Motion for Habeas Corpus were sufficient to establish the factual basis for the plea. *See* N.T. 3/28/05, pp. 17-18.

Appellant testified at the Guilty Plea hearing that he reviewed the stipulation and acknowledged that the facts set forth therein formed the basis for his conduct underlying the instant charges. *See* N.T. 3/28/05, pp. 18-19. However, this stipulation was not located within the transcript from Appellant's guilty plea hearing. Appellant claimed that there were different versions of the habeas corpus petition and supporting documents and he had not reviewed some of these documents, including the factual stipulation. As such, Appellant claimed he did not read this document prior to his Guilty Plea or Guilty but Mentally Ill/Sentencing Hearings. N.T. 6/26/08, pp. 103-105.[32] Appellant was later referred to Page 10 of the Guilty Plea hearing transcript. At this point in the hearing, Judge Biehn explained that the *nolo contendere* plea followed disposition of Appellant's Petition for Habeas Corpus and that Appellant was acknowledging that there was

---

[30] The defective plea colloquy claim also encompasses an ineffective assistance of counsel claim, as Appellant alleges that Fink failed to adequately go over the stipulated document that was later read into evidence, said document was not signed by Fink or dated, and there were lines drawn through it. N.T. 11/24/08, pp. 39-40. He also claims that some of the factual averments contained therein were false and "not supported by anything [the Commonwealth has] in evidence." N.T. 11/24/08, p. 40. The District Attorney explained that following the Sentencing hearing, the Court Reporter requested a copy of the Habeas Corpus document and the District Attorney accordingly provided it. N.T. 11/24/08, p. 44. He indicated that the paragraphs which were crossed out were not recited for the Court or, in the alternative, were summarized for the Court in the District Attorney's own words. N.T. 11/24/08, pp. 44-45.

[31] Because both Appellant and the Commonwealth characterize the recorded conversations relevant to the instant case that were later memorialized on cassette tapes as either tapes or interceptions, we use these terms interchangeably throughout the remainder of our Memorandum Opinion.

[32] In later testimony, Appellant claimed that trial counsel was ineffective for failing to inform Appellant of the contents of said document prior to his Guilty Plea and Guilty but Mentally Ill/Sentencing Hearings. N.T. 11/24/08, pp. 28-30, 31.

sufficient evidence to establish the relevant charge despite Appellant's lack of admission thereto. N.T. 11/25/08, pp. 94-95. *See* N.T. 3/28/05, pp. 9-10.

At Appellant's Guilty but Mentally Ill/Sentencing Hearing, the Habeas Corpus document was read into the record and entered into evidence as the Court's Exhibit 1 (Exh. CE-1). *See* N.T. 5/25/05, pp. 6-30, Exh. CE-1. Appellant claimed he brought his disagreement with some of the facts to Fink's attention but to no avail. N.T. 6/26/08, pp. 135-37.

Specifically, Appellant underwent an analysis of each and every page of the recitation of Exhibit CE-1 at the November 24, 2008 hearing. He claimed that the vehicles that he used to further his insurance fraud scheme were "on blocks" and therefore not in working order to facilitate a car crash. He also claimed that Samios and Ms. Fryling (Fryling) had no automobile insurance at this time, intimating that the statements and proposed testimony of these witnesses were false. Additionally, he claimed he only had one (1) single limousine whereas the District Attorney claimed he had several. N.T. 11/24/08, pp. 50-51, 55. Furthermore, he claimed that (1) there was no intended victim in the instant case and (2) he owned the Lower State Road property and Mr. Witthauer "was a crack addict that broke into one of my houses, barricaded himself, and had crack parties." N.T. 11/24/08, pp. 53, 54; N.T. 11/25/08, p. 110. Appellant called the police numerous times in an attempt to remove Mr. Witthauer from the property. N.T. 11/25/08, pp. 110-11. He also denied that he planned to purchase the Lower State Road property to renovate it into a "kama sutra" club, and in fact blamed Mr. Witthauer for the sex club scheme.[33] N.T. 11/24/08, p. 53.

Ultimately, Appellant refused to take responsibility for the crimes to which he pled guilty, as he claimed that no crimes were committed and "there's no responsibility to take." N.T. 11/25/08, pp. 112-13.

---

[33] While questioning Detective Carroll on direct-examination, Appellant again attempted to inculpate Mr. Witthauer in the scheme. N.T. 8/13/13, pp. 24-26.

Moreover, Appellant claimed that any incriminating statements made were not "insidious commands" but, based on the fact that "laughter" and "words of comedy" were cut out of the transcriptions, in reality these statements were the result of "people that are drinking, doing meth and in a different frivolity." He contends that many of the statements that either he or Samios made regarding the solicitation scheme were mischaracterized and presented to the Court in a "false light" and that they were "represented improperly." N.T. 11/24/08, pp. 60, 65; N.T. 11/25/08, p. 103. Appellant complained that certain dates of the transcriptions were wrong. Finally, Appellant claimed that any "ruses" to get Samios into the property were based on legitimate legal documentation demonstrating that Appellant was the actual owner of the property. N.T. 11/24/08, pp. 61, 63.

Later, Appellant testified that he purchased the Lower State Road residence from Ms. Fryling, and, thereafter, there was a dispute about Fryling and Samios moving back into the residence. Appellant agreed to "take over" that property and give Fryling and Samios a trailer in Valley View Trailer Park. Appellant testified that a lot of work had to be done to this particular property as a result of "deferred maintenance." He claimed Samios had a crew of approximately six (6) to twelve (12) construction workers and that this was his purpose for him being at the Lower State Road property. He admitted on cross-examination that he had purchased the property from the Witthauers and that Patricia Witthauer's name was still on the deed to the property prior to Lower State Road Associates purchase thereof. N.T. 11/25/08, pp. 98-106; see N.T. 2/07/11, pp. 191-93; Exh. P-104, P-105, P-106.

On November 24-25, 2008, Appellant testified regarding his ineffective assistance of counsel claim against Fink. Appellant testified that Fink met with him only a "few" times regarding this case. He claimed that following his preliminary hearing, his bail was increased and he was

subsequently sent to the Bucks County Correctional Facility (BCCF) and then a mental hospital for approximately one (1) month. During his time at the mental hospital, Appellant averred that Fink did not meet with him. Following his stay at the mental hospital, Appellant was returned to BCCF, and was thereafter released on house arrest in January of 2005 until March of 2005. He was later re-committed back to BCCF as a result of cocaine use. Appellant testified that Fink did not meet with him during either his time in BCCF or on house arrest at his residence in Furlong, Bucks County. However, he did visit with Fink approximately three (3) times while on house arrest to discuss the case. On one occasion, Marty Lyons (Lyons), the investigator Appellant had hired through Fink, was present and allegedly indicated that there were problems with the interceptions. N.T. 11/24/08, pp. 32-35.

More specifically, Appellant testified that his ineffective assistance of counsel claim includes Fink's alleged failure to do the following: challenge the prosecution's case by waiving the preliminary hearing in his absence; obtain discovery from the District Attorney's Office; provide Appellant with a full copy of discovery; include a complete copy of the tapes of his recorded conversations with Samios or a transcription of the tapes and the chain of custody of said tapes; listen to the tapes/transcriptions;[34] litigate a suppression motion and add allegations of a constitutional violation of the Wiretapping Act to said motion as well as adding a notice of intent to impeach both Samios and Fryling by evidence of past criminal convictions;[35] challenge the

---

[34] Significantly, Appellant later admitted that both he and Fink listened to a portion of the tapes in the District Attorney's Office. N.T. 11/24/08, pp. 19-21.

[35] Appellant further testified these violations were the result of conversations being recorded of him in his home without a valid search warrant, as well as conversations being recorded that took place out of state or outside the country. He also alleged that investigating officers utilized false statements and omissions to obtain the warrant to conduct electronic surveillance. Furthermore, Appellant testified that although the prosecution claimed there were between ten (10) to eighteen (18) hours of transcription, when he received copies there were only approximately six (6) hours that contained "all kinds of edit marks and all kinds of breaks in the tapes...and gaps." N.T. 11/24/08, pp. 16-18.

chain of custody for the alleged $2,000.00 paid to Samios to order the hit of Mr. Witthauer; and retrieve both Appellant and Detective Carroll's cell phone records[36] and his "Palm Pilot" showing his schedule. In terms of the habeas corpus document that provided the factual basis for Appellant's nolo contendere and guilty but mentally ill plea, he testified that he was unsure as to who authored the document and it was not dated or signed by either Fink or the District Attorney. N.T. 11/24/08, pp. 13-28, 37, 69, 75.

Later, Appellant claimed that Fink informed him that the prosecution "had no case" and he would have the case thrown out at the preliminary hearing. Specifically, Appellant testified that Fink said the case will be "taken care of" or "gone" following the preliminary hearing. He also stated that, prior to the preliminary hearing, Fink's office confirmed that Appellant should go to the hospital and Appellant was under the impression that the hearing would be continued.[37] N.T. 11/25/08, pp. 13-14, 104-05.

Later in his testimony, Appellant added a claim that Fink failed to file and litigate a Motion to Withdraw Guilty Plea that he requested "soon after" he entered into the plea. However, despite this, Appellant permitted Fink to continue his representation through the Guilty but Mentally Ill/Sentencing Hearing. N.T. 11/25/08, pp. 24, 25.

Finally, Appellant made the blanket assertion that Fink was ineffective for failing to communicate with him honestly, as Fink informed him that investigating officers did not violate the Wiretapping Act and that he reviewed all the evidence against him very thoroughly. N.T. 11/24/08, pp. 71-72.

---

[36] Appellant has since obtained his personal cell phone records, which were attached to his PCRA Petition as Exhibit 132. N.T. 11/24/08, pp. 76-77.

[37] Fink later testified that he could not verify that his secretary at the time spoke to Appellant regarding his failure to appear at the preliminary hearing. However, he indicated that he recalls speaking to Dr. Strochak afterward who said that if Appellant was experiencing "such severe reactions that [he] should go to the hospital." N.T. 8/26/10, pp. 78-79, See Exh. P-1 (e-mail from Dr. Strochak to Mr. Fink relating to Appellant's hospitalization).

Appellant testified that Tauber was part of Appellant's counsel team prior to his guilty plea in order to assist and consult with Fink. He also retained Tauber and his firm, Levant, Martin & Tauber, to litigate his direct appeal. Appellant contracted with Tauber for $100,000. Appellant claimed he is raising an ineffective assistance of counsel claim in relation to their representation. Appellant filed a civil suit claiming breach of contract and legal malpractice against Tauber and his firm, on the basis that Appellant asked them to withdraw his guilty plea,[38] file motions, enter their appearance, and raise certain issues on appeal and they failed to do so. Appellant enumerated the issues on appeal he requested be raised, including the fact that he believe his sentence was too long, the sentencing judge improperly used mental illness[39] as an aggravating factor, as well as an issue relating to the withdrawal of his guilty plea. Appellant also added that he wanted Tauber to take over the case from Fink. N.T. 11/25/08, pp. 8-11, 17, 25-26, 34-35.

Appointed defense counsel, Harry Cooper, Esquire, explained that the basis for Appellant's prosecutorial misconduct claim encompasses the District Attorney's failure to turn over exculpatory evidence in discovery, the exaggerated language contained on the interceptions, as well as the tampered, destroyed and fabricated physical evidence and violations of the Pennsylvania Wiretapping Act. N.T. 11/24/08, pp. 79-80.

Appellant also raised an issue, presumably in the context of prosecutorial misconduct, that Samios was permitted to provide Appellant drugs and alcohol at the time the conversations were intercepted by law enforcement. Appellant testified that Samios admitted this to Lyons, the private

---

[38] Appellant testified that he specifically requested Mr. Tauber or other members of his firm to withdraw his guilty plea; however, they failed to do so either before or after sentencing. During this time, however, Fink was Appellant's attorney of record. N.T. 11/25/15, pp. 22-23.

[39] Following Fink's entry of appearance, Appellant was treated by Dr. Strochak and Dr. Cohen. Prior to this, he was diagnosed at Friends Hospital with bipolar, mania, dissociative identity disorder and psychosis and was placed on medication. He testified that he agreed with both doctor's reports as well as Dr. Strochak's testimony before Judge Biehn. N.T. 11/25/08, pp. 36-39.

investigator, and this admission was brought to Fink's attention via e-mail. Appellant also indicated that it was his belief that Fink should have litigated this issue via a suppression motion. N.T. 11/24/08, pp. 80-85.

### b. Richard Fink's PCRA Testimony[40]

Fink indicated that he had been practicing law for about thirty (30) years, and his practice is and has been primarily in criminal law. Appellant privately retained Fink to represent him in the instant case. Fink went to the Lehigh County prison to meet with Appellant following an indication from a Philadelphia defense attorney that Appellant was interested in meeting with him. Upon consideration of the fact that Fink viewed this case as complex and the added notoriety based on Appellant's position as an attorney, his fee was substantial. N.T. 11/24/08, 89-91, 145-46.

Fink met with Appellant prior to the preliminary hearing. Fink testified that "the potential adverse consequences of having the preliminary hearing as opposed to obtaining all of the discovery very early in the case" were discussed. It follows that the District Attorney agreed to such an arrangement. Fink testified that the case itself was largely based on the recorded interceptions of conversations between Appellant and Samios and, as a result, full discovery early on in the case would enable him to start preparing the case for trial. He explained that the only disadvantage to waiving the preliminary hearing would be foregoing the testimony of Samios, who was the Commonwealth's main source of information in the case. Appellant's biggest contention was that Samios had been supplying him with drugs at the time their conversations took place. Fink determined that this could potentially constitute an entrapment defense in this case and,

---

[40] Mr. Fink testified at Appellant's counseled hearing on November 24, 2008. Mr. Fink was recalled by Appellant after he was permitted to represent himself at the August 26, 2010 and November 19, 2010 hearings. In the interest of judicial economy, we have summarized Mr. Fink's collective testimony and categorized it by relevant claim to avoid duplication.

therefore, he wanted to look for confirmation of Appellant's contention. N.T. 11/24/08, pp. 91-94, 155-56; N.T. 9/19/11, p. 60.

In his testimony, Fink identified the potential danger of having the preliminary hearing as follows:

> There had been some publicity in this case, some really bad adverse publicity. The fact he was [a] lawyer, first of all, created a lot of publicity. The allegations of the sexual operation created a lot of publicity. There was a lawyer who got involved in the case and stated to the newspaper that Mr. Guarrasi was creating a sorority house out of...this building and not a bordello. And then the publicity from the newspaper writer that the college this lawyer alluded to had no sororities, so people were starting...to prejudge the case. It would have been well attended by the newspaper because of a lot of substantial interest.

N.T. 11/24/08, pp. 92-93; *see* N.T. 2/07/11, p. 8.

Fink recommended to Appellant that he waive the preliminary hearing in order to obtain the benefit of early discovery and to avoid the publicity that he felt would have generated a "worse sentence." N.T. 11/24/08, p. 97. Fink testified that he discussed this at length with Appellant well before the date of the preliminary hearing and Appellant agreed to waive it. N.T. 2/07/11, pp. 5, 7-8. Fink testified that he never informed Appellant that the case would be dismissed prior to the preliminary hearing. N.T. 9/19/11, p. 75.

On August 11, 2004, Fink sent a letter to the District Attorney advising him that he was authorized by Appellant to waive the preliminary hearing on three (3) conditions, including "[r]eceipt of all the documentation regarding the wiretaps, a copy of the tapes, together with...any transcripts made, as well as any discovery which will be expedited."[41] N.T. 11/19/10, p. 175; N.T.

---

[41] Fink later testified that the Commonwealth eventually complied with all conditions. In a letter dated November 2, 2004, Fink wrote to the District Attorney inquiring as to when the documents authorizing the wiretap would be forwarded. Fink filed a Motion for Discovery thereafter. N.T. 11/19/10, pp. 176-179; *see* Exh. P-38. A November 19, 2014 letter from the District Attorney to Fink contained the requisite wire documents, although these documents were not filed with the Clerk of Courts as of this date because (1) they were provided in the form of informal discovery and

2/07/11, pp. 5-8; *see* Exh. P-34. After the District Attorney permitted Fink to interview Samios prior to the preliminary hearing on August 16, 2014, Fink again advised Appellant to waive the preliminary hearing.[42] N.T. 11/24/08, pp. 94-95, 150. Fink recalled that the District Attorney gave him "free reign" to ask questions at this point, many of which would not have been admissible at the preliminary hearing. N.T. 11/24/08, 150; N.T. 2/07/11, 209. Samios denied any drug usage and anything that Fink determined "might have been helpful and [he] could have corroborated." Fink also acquired Samios' background and did not recall any specific prior convictions but did testify that his criminal background was "relatively insignificant." He found Samios to be credible and felt he would be believed by a jury. N.T. 11/24/08, pp. 95-97, 156. Furthermore, he testified that Samios was a hostile witness and, although he adamantly denied providing Appellant with drugs at the time the interceptions were recorded, in terms of Fink's investigator "he had an interest in telling Marty Lyons the things we wanted to be told so that he could get in turn something that he wanted." N.T. 6/13/11, pp. 115-18. Ultimately, Fink uncovered no evidence to support an entrapment defense, nor did he find any indication that any of the information found towards the end of the investigation would lend credence to Appellant's contention that the information constituted "jokes." N.T. 9/19/11, p. 60.

Fink also recognized that mental health experts opined that Appellant had a "serious mental health problem." N.T. 8/26/10, pp. 72-73. Accordingly, Appellant was evaluated by Dr. Strochak and Dr. Cohen for purposes of determining whether to proceed with a mental illness defense. N.T.

---

(2) because it was Fink's request that the District Attorney share as much information as early as possible with him to avoid further publicity. N.T. 6/13/11, pp. 69-71; *see* Exh. J-2.

[42] Appellant did not appear at the preliminary hearing, however, because he checked himself into Warminster Hospital [Mental Health Unit] the night before it was scheduled. N.T. 11/24/08, pp. 148-49. A police officer witnessed Appellant in the waiting room in the hospital, saw a television show with his picture on it announcing that he failed to appear at his preliminary hearing, and thereafter arrested him. N.T. 11/24/08, p. 149. Appellant was later granted bail and was placed on house arrest. N.T. 8/26/10, p. 90.

11/24/08, p. 162; N.T. 8/26/10, pp. 74-75. Fink discussed the insanity affirmative defense with Appellant. N.T. 9/19/11, p. 27. However, both doctors found Appellant to be competent to stand trial. N.T. 11/24/08, pp. 162-63. Dr. Strochak was of the opinion that Appellant was not legally insane at the time the instant crimes were committed, despite his March 20, 2005 e-mail to Fink indicating that the "Minnesota Multi-Phasic Index" (personality test) suggests "severe mental disturbance" on the part of Appellant. N.T. 11/24/08, pp. 164-65; N.T. 8/26/10, pp. 82-85, 86-87; N.T. 9/19/11, p. 58. *See* Exh. P-8.

Fink testified that Appellant's house arrest was revoked and Appellant was remanded back to the BCCF following his cocaine use and bail was set thereafter in March of 2005. Fink recalled receiving a letter from Dr. Cohen on March 22, 2005 which indicated that it is important that Appellant continue to take prescribed medications while incarcerated. N.T. 8/26/10, pp. 88-90; *See* Exh. P-9. Fink instructed his secretary to send correspondence to BCCF on March 23, 2005 attaching a copy of Dr. Cohen's letter (Exh. P-9). Furthermore, Fink identified a letter sent on March 29, 2005 to the BCCF Mental Health Department requesting that Appellant continue to receive his medications as prescribed. N.T. 8/26/10, pp. 91-92, 101-102; *See* Exh. P-10, Exh. P-11.

Fink requested a CD ROM of the intercepted conversations, however, he did not recall exactly how many hours or how much time the tapes encompassed. He testified that he recalled the detectives having difficulty transposing the tapes to a CD ROM and, therefore, they provided him with copies of the actual cassette tapes. N.T. 11/24/08, pp. 98-99. Fink admitted that he listened to the tapes, however, he did not listen to all of them and could not estimate exactly how much he listened to. N.T. 11/24/08, p. 99; N.T. 11/19/11, p. 30. He specifically recalled the end part of the tapes where Appellant instructs Mr. Samios on "what he wants him to do" and that this

portion did not constitute "a short time." However, Fink relied on his investigator, Marty Lyons, to listen to the tapes in their entirety. N.T. 11/24/08, pp. 99, 101; N.T. 11/19/11, p. 30. He instructed Lyons to review the tapes and pay attention to not only the words that were said but also the tone of voice used by the parties being intercepted, whether they sounded like they are joking, whether they sounded high or like they are puffing cigarettes or doing drugs, etc. Once Lyons finished listening to the tapes, he detailed everything that would be of interest to Fink's theory of entrapment and informed him of such via e-mail and subsequent in-person conversations. N.T. 11/24/08, pp. 101-102, 179-80. The e-mails were introduced into evidence as Exhibit D-1.

The first e-mail, which was in response to Fink's request that Lyons conduct a complete review of the tapes, indicated that Lyons found certain tapes which exhibited mistakes in the copying process, including parts of Tape Nos. 3, 4, 5 and 9. N.T. 11/24/08, pp. 110-111.

He recalled that Lyons indicated that there were areas in the tape that sounded like "he had been cut off"[43] and that there were gaps in the tape. Fink brought this directly to the attention of the investigating officer, Detective Carroll, who explained that while making the recordings, he accidently inserted a previously used tape as opposed to a new blank tape at a part of the interceptions that Fink did not find significant. Fink received an excised version of a transcript of the interceptions from the District Attorney's Office. N.T. 11/24/08, pp. 104-111. Additionally, Fink described an e-mail from Lyons indicating that there was a mistake made in the copying of one of the tapes. N.T. 2/07/11, 94-95; See Exh. P-78. Later in his testimony, Fink stated that there was one (1) problem that he identified with the taping regarding the malfunction in the recorder

---

[43] Fink elaborated that this meant that the voice that was being intercepted had gone down in volume or the tape sounded clear and no one was talking. N.T. 11/24/08, p. 103. Exhibit P-79 constitutes an e-mail from Lyons to Fink describing the dates of the tapes which contained supposed errors in the copying process. Lyons met with Detective Carroll to review his perceived errors. Fink received more accurate copies of the tapes thereafter. N.T. 2/07/11, pp. 96-101.

wherein a tape that had two sides was flipped onto auto reverse and, therefore, seconds of the other side were taped over.[44] N.T. 6/13/11, p. 152; N.T. 9/19/11, pp. 33-34. Furthermore, one of the intercept tapes (Tape 10) ended in mid-sentence. N.T. 6/13/11, p. 158. He described these as "minor" technical problems involving the recording of the tape. N.T. 9/19/11, p. 59. Fink contacted Detective Carroll who remedied the problem and sent a complete and corrected copy. N.T. 2/07/11, p. 95.

Fink testified that both he and Appellant listened to the interceptions in the District Attorney's Office prior to the preliminary hearing.[45] N.T. 11/24/08, p. 142; N.T. 9/19/11, p. 84. The portion of the tapes which they both listened to at this time totaled approximately twenty (20) to thirty (30) minutes.[46] N.T. 11/24/08, p. 142; N.T. 2/07/11, p. 131. Although he had instructed Appellant not to react to the interceptions that were played at this time, Fink did not follow his own instructions, and he reacted to what he perceived as "very dangerous" words spoken by Appellant. He stated that these words made Appellant seem like an "evil" person and they "dehumanized" him. N.T. 11/24/08, pp. 151-153. He explained that the statements made by Appellant during the intercepts were "devastating" in the sense that "it was worse than instructing someone to engage in these actions. It was more like personal guru instruction to someone as to how to live their life and how to be a hit man." Fink agreed that following his review of the intercepted conversations, it became "less a matter of cross-examination and more a matter of trying to limit the damage." N.T. 9/19/11, p. 83.

---

[44] Fink testified this would constitute a violation of the Wiretap Act, however, it would be a technical violation which would not result in suppression. N.T. 9/19/11, p. 88.

[45] Furthermore, when Appellant was on house arrest, Fink made a copy of the tapes for Appellant to review. N.T. 11/24/08, pp. 157-58; N.T. 9/19/11, pp. 85-86.

[46] This included much of the content played for Judge Biehn during Appellant's sentencing proceeding. N.T. 9/19/11, p. 84.

Following his review of what he perceived to be more incriminatory statements made to Samios in furtherance of the solicitation, Fink noted as follows:

> The beginning of the tapes, from earlier days and much earlier times was not of as much interest to me because, unless in the beginning of the tapes he was saying, 'I'm going to make a big joke at [the] end of these tapes,' I don't see how it could have affected my determination.

N.T. 11/24/08, pp. 100-01; *see* N.T. 9/19/11, pp. 59-60.

Fink indicated that the Commonwealth transcribed portions of the recorded conversations, but they were summaries and not word-for-word verbatim transcripts. N.T. 9/19/11, pp. 31-32.

Fink was aware that the currency collected from Samios was confiscated; however, he never examined it and did not recall whether or not it was dusted for Appellant's fingerprints. N.T. 11/24/08, pp. 138-39; N.T. 2/07/11, p. 177; N.T. 9/19/11, p. 35.

According to his independent review of the tapes prior to the guilty plea, Fink testified that the intended victim was Mr. Witthauer as well as his wife and child.[47] N.T. 11/24/08, pp. 168-69. Fink characterized Mr. Witthauer as a holdover tenant. However, it was Fink's "vague recollection" that when Mrs. Witthauer sold Appellant the property, there was an agreement that the family was allowed to stay in the house. N.T. 2/07/11, pp. 189, 194-95.

Fink filed a suppression motion with regard to the wiretaps; however, after a thorough review of the wiretap statute and related caselaw, and after consultation with co-counsel Tauber, he determined with his staff attorneys, as well as Appellant, that this motion **would be meritless.** (emphasis supplied)[48] N.T. 11/24/08, pp. 122-23, 173; N.T. 2/07/11, pp. 12-13, 148-53; N.T. 2/07/11, pp. 112-13; N.T. 9/19/11, p. 61. In arriving at this conclusion, Fink reviewed the Wiretap

---

[47] At his guilty plea, Appellant agreed that he was entering a guilty plea to two (2) separate counts of criminal attempt to commit aggravated assault to different individuals. *See* N.T. 3/28/05, p. 13.

[48] This included review of whether Detective Carroll established probable cause for the issuance of an in-home interception authorization order. N.T. 2/07/11, pp. 145-46.

Act.[49] N.T. 2/07/11, pp. 13-17; N.T. 9/19/11, pp. 60-61. His outline of all the potential "attacks which could be launched on the wire" were contained in his file, of which Appellant then had possession.[50] N.T. 11/24/08, pp. 124-25; N.T. 9/19/11, p. 74. Fink testified that he had not had the opportunity to review his file since 2005. N.T. 9/19/11, p. 74. Furthermore, Fink, Tauber, and other attorney's from Tauber's firm examined the Affidavit of Probable Cause for the issuance of the wiretap order and determined that "there was probable cause if you deleted the items which [Appellant] [was] contending were false." N.T. 9/19/11, p. 44. Fink could not specifically recall if he checked whether the tapes were sealed or the chain of custody; however, he assured Appellant that he had investigated every avenue upon which the wiretaps could be challenged. N.T. 11/24/08, pp. 123-24, 137. He later testified that it was his belief that Detective Carroll had the tapes in his possession throughout the entirety of this case. N.T. 2/07/11, pp. 108, 125, 129; N.T. 11/24/08, p. 137. Further, he explained to Guarrasi that by entering a guilty plea he was waiving his right for the motion to be heard. N.T. 11/24/08, pp. 125-26. Fink did not recall receiving any monitor records/master logs pursuant to the interceptions in this case. N.T. 2/07/11, pp. 116, 166.

Fink believed that Appellant's words contained in the interceptions and his directions to Samios were damning and sufficient to potentially constitute Solicitation to Commit Murder. N.T. 11/24/08, pp. 119-20. Regardless, he filed a Petition for Habeas Corpus, challenging the sufficiency of the evidence to establish each element of each charge. N.T. 11/19/10, p. 117. A

---

[49] Fink explained that the District Attorney designated an Assistant District Attorney to make interceptions of Mr. Samios and Appellant's conversations, as required by the Wiretap Act. Appellant went through the painstaking analysis of attempting to establish that because the District Attorney in the instant case was a Chief Deputy/Deputy District Attorney at the time the interceptions were authorized, this was a violation of the Wiretap Act. Fink succinctly responded as follows: "I think it's not relevant for this reason: I think that a Deputy District Attorney as well as a Chief Deputy District Attorney or any of the inclusive provisions you can use to denominate District Attorneys includes an Assistant District Attorney." N.T. 2/07/11, pp. 23-57.

[50] Fink stated that Appellant never denied it was both his and Mr. Samios' voices on the intercepted tapes, nor did Appellant indicate that he was not physically present in Bucks County at the time they were recorded. N.T. 9/19/11, 61-62

conference on the Habeas Corpus Petition was held in Judge Biehn's chambers, with both defense counsel and the District Attorney present. Fink testified that it occurred before the guilty plea. N.T. 11/19/10, p. 113; N.T. 9/19/11, p. 95. In discussing the Petition for Habeas Corpus further, Fink recalled that it was submitted to Judge Biehn on the stipulated facts (i.e., the Habeas Corpus document that established the factual basis for Appellant's plea) and, therefore, there was no in-court evidentiary hearing. N.T. 2/07/11, p. 11.

He described the Habeas Corpus document, which was used to establish the factual basis of Appellant's plea, as follows:

> To the best of my recollection, this is the document which was prepared for the purpose of a determination at my request by Judge Biehn at a writ of habeas corpus, the facts being submitted to him as the facts in light best seen pro prosecution.
> In other words, I was asking Judge Biehn to give us an opinion as to whether or not the evidence seen in the best light as favor – most favorable to the prosecution would support a verdict of guilty of attempted murder. We briefed it, we presented the facts to him, and conferenced it with him, and presented a writ of habeas to him.

N.T. 11/24/08, p. 135. The District Attorney prepared this document. Nevertheless, Fink testified that he had the opportunity to review it and it was his opinion that the District Attorney "was casting [the facts] a little towards the side of fairness to Mr. Guarrasi instead of overstepping him." N.T. 11/24/08, p. 136.

With regard to the statements made by Appellant pursuant to the transcriptions as they appear in the Habeas Corpus document, Fink testified as follows:

> ...I believe that the extract that was basically what I have said is the very worst things that [Appellant] said, and that's what was admitted into evidence. The part where the crime was planned and the part where [Appellant] [was] offering money to Samios and those portions, I did listen to. And I told [Appellant] that I thought that they were...just some of the worst things I've ever heard. And that was in this extract.

N.T. 2/07/11, p. 162.

In terms of the *nolo contendere* and guilty but mentally ill plea, he met with Appellant a number of times between the preliminary hearing and the guilty plea. N.T. 11/24/08, p. 126. He could not recall meeting Appellant in his holding cell prior to the plea; however, it was something that he normally would do. N.T. 11/19/10, pp. 159-60. Because Appellant requested another law firm to "check everything" Fink had done on the case, all of the attorneys met with Appellant and discussed the evidence against him, the possibility of a guilty plea and any trial tactics. Appellant was "...very interested in our opinions and the reasons for them and analyzing them." Fink indicated that Appellant understood that, ultimately, it was the consensus of the attorneys that his best course of action was to pursue a guilty plea. Fink stated, however, that he was quite certain that he informed Appellant it was his ultimate and personal decision as to how he wanted to proceed and the lawyers could only express their opinion on the matter. Fink testified that "...I took great pains to make sure that [Appellant] understood..." and that it was his belief Appellant did in fact understand the decision to enter a guilty plea, the reasons supporting this decision and that "...[Appellant] made a very intelligent decision by decided to plead guilty." N.T. 11/24/08, pp. 126-128, 159-160, 173-174, 178; N.T. 9/19/11, pp. 67, 72. Fink later reiterated that he was satisfied in the number of his meetings with Appellant and additional communications with him, and that he understood what the facts of the case were. N.T. 9/19/11, pp. 57, 72.

Fink explained that his strategy in advising Appellant to plead guilty plea was a result of his legal research into the elements of the crimes charged and what evidence was required for the Commonwealth to prove those elements beyond a reasonable doubt, his determination that there were no defenses applicable, and the fact that the probable cause affidavits pursuant to the court order and arrest warrant substantially set forth the facts and established probable cause, even with

the excising of statements made by the informants that Appellant alleged were misstatements of fact. Furthermore, he also considered his meeting with Samios, as set forth above. He described Samios as being "eager to assist the Commonwealth and eager to help prosecute Mr. Guarrasi," and he did not have any information that Samios did not voluntarily consent to the interceptions. N.T. 9/19/11, pp. 63-66, 77.

Fink testified and we accepted that he did not threaten Appellant in any way to force him to enter a guilty plea, nor did he make a recommendation as to his ultimate sentence. Furthermore, Fink did not promise Appellant a specific amount of time he would serve, nor did he promise him the place of incarceration. N.T. 11/24/08, pp. 161, 170; N.T. 9/19/11, pp. 67-68.[51] In fact, he testified that an individual who enters a *nolo contendere* and guilty but mentally ill plea will be classified first by the state, after which a determination is made as to where an individual will serve their sentence. Appellant understood that it would be an open guilty plea. Fink also stated that he did not witness the other attorneys with whom he was working threaten Appellant in any way. N.T. 11/24/08, pp. 161, 171.

Fink testified that he anticipated Appellant would be sentenced to a four (4) to eight (8) year sentence of incarceration. However, he informed Appellant that he expected the best a judge could possibly do for him was a two (2) to four (4) year sentence; however, he cautioned Appellant that "two years is an awfully small number for a crime of this seriousness." He informed Appellant of this prediction and he testified that he "believe[d] that [Appellant] understood everything that I was telling him." N.T. 11/24/08, pp. 117, 129.

Fink further testified that prior to the guilty plea, Appellant informed him that he had not been taking his medication, which was brought to Judge Biehn's attention. However, Fink did not

---

[51] Fink assumed that Appellant would lose his attorney's license, but another attorney was representing Appellant on that issue. N.T. 9/19/11, p. 68.

have any reason to believe that Appellant was incompetent up to the date of the guilty plea and during the entire plea proceedings. It was his opinion that Appellant understood the proceedings in their entirety. Furthermore, if there had been any question of Appellant's competence to proceed, Fink would have brought that to the Court's attention and asked for a competency evaluation by a psychiatrist. N.T. 11/19/10, p. 154; N.T. 9/19/11, p. 68-72; *see* N.T. 3/28/05, pp. 16, 22.

Fink also had no recollection of Appellant discussing the withdrawal of his guilty plea prior to sentencing, and he did not see any grounds upon which the plea could be withdrawn. He recalled, however, that he received "some correspondence with Tauber's firm about withdrawing the plea for him and their declining to do so." N.T. 11/24/08, pp. 133-134; N.T. 9/19/11, p. 81.

At his Guilty but Mentally Ill/Sentencing Hearing, the Commonwealth played a "compilation" of the recorded intercepts, which comprised a total of twenty-one (21) minutes. *See* N.T. 5/25/05, p. 31. Fink testified that he assumed this compilation was put together by the District Attorney. He was of the opinion that

> "...the compilation...which is an extraction and a summary of the tapes, was not including a number of things that were detrimental to you...when I got it and reviewed it that it was fairly done, in that it could have...been extracted to have worse things that you had said during these conversations."

Fink reviewed the compilation prior to it being played in court. N.T. 9/19/11, pp. 38, 82.

When asked about Appellant's prosecutorial misconduct claim, Fink opined that the case was handled by the District Attorney's Office professionally and both he and Appellant were treated fairly and without any malice. N.T. 11/24/08, p. 172. Fink further testified that he did not witness or suspect any intentional misconduct. He stated that he did not have any evidence that any documents or interceptions were falsified. N.T. 9/19/11, p. 80.

### c. Detective Timothy Carroll's PCRA Testimony[52]

Detective Carroll testified that he has been a law enforcement officer since 1977, and his current position is Detective with the Bucks County District Attorney's Office. He began his law enforcement career with the Bensalem Township Police Department (BTPD), first as a police officer and then as a detective, until he left on September 14, 1998 to become a county detective. N.T. 11/24/08, p. 182; N.T. 9/19/11, p. 180; N.T. 10/11/13, p. 47.

While holding the rank of detective with the BTPD, Carroll received an "A" Certification in March of 1994 through the Pennsylvania State Police to perform consensual and nonconsensual telephone interceptions or "consensual wires." He has maintained the "A" Certification throughout his employment with the BTPD, and he has been a Detective with the Bucks County District Attorney's Office since September 14, 1998. In order to ensure that his "A" Certification remained current, there was no lapse of service between his employment with BTPD and his employment with the District Attorney's Office and, as a result, on September 14, 1998 he was on record for employment by both agencies. As of the last day of his testimony in this litigation, Carroll maintained his "A" Certification. N.T. 9/19/11, p. 47; N.T. 10/11/13, pp. 48-51, 54-55; *see* Exh. C-PCRA-6.

As a result of his "A" Certification, Carroll had experience in wiretaps and electronic surveillance, and had recorded hundreds of phone calls and supervised many in-person meetings. He was also responsible for copying the intercepted tapes and proof-reading transcriptions of said tapes. N.T. 11/24/08, p. 182.

---

[52] Detective Carroll testified at Appellant's counseled hearing on November 24, 2008. Detective Carroll was recalled by Appellant, after Appellant was permitted to represent himself, and testified at the September 19, 2011, August 17, 2012, May 3, August 12, August 13, October 10, October 11, 2013 and June 30, 2014 hearings. In the interest of judicial economy, we have summarized Detective Carroll's collective testimony and categorized it by relevant subject matter so as to avoid duplication.

Carroll was the lead investigator, although he worked "hand in hand" with Detective Mosiniak. N.T. 8/17/12, p. 6. Carroll was responsible for the recording, monitoring and copying of tapes relating to the one-party consent intercepts within Appellant's residence. N.T. 9/19/11, pp. 180-181. None of the phone calls were intercepted before authorization was issued by Judge Gambardella, who was then Deputy District Attorney (DDA) at the time, nor were any in-home intercepts done without court approval by Judge Biehn. N.T. 10/10/13, pp. 19-20.

Carroll identified the Memorandum of Consent on Case Number 253-2004, which was prepared by him and then signed by both him and Samios on February 27, 2004.[53] He also identified the Application for Intercept Order authored by DDA Gambardella, the Memorandum of Request, and the Affidavit of Probable Cause attached thereto and authored by him and sworn to and subscribed by both him and Detective Mosiniak. N.T. 8/17/12, pp. 66, 71, 76; N.T. 6/30/14, pp. 51-53. He testified that the Affidavit of Probable Cause was true and accurate to the best of his knowledge, information and belief. N.T. 6/30/14, p. 53.

Carroll was not physically present at the time DDA Gambardella and Detective Mosiniak presented these documents to President Judge Heckler because he was with Samios outside the courthouse in order to record a telephone conversation with Appellant made in response to voicemail messages left by Appellant for Samios. N.T. 8/17/12, pp. 75, 86-88; N.T. 5/03/13, pp. 57-58; N.T. 10/11/13, pp. 78-79. Carroll explained that he left the newly amended Probable Cause Affidavit in the courthouse and he "left with a consent form and met Mr. Samios, and Mr. Samios was re-consented by phone by Mr. Gambardella...[a]nd Detective Mosiniak brought that consent

---

[53] Although the last in-person intercept occurred on the evening of February 26, 2004, which led investigating officers to consult with DDA Gambardella and obtain a second intercept order covering suspicions of more serious criminal offenses based on the content of the intercepts, the process of preparing the documents and "reconsenting" Mr. Samios a second time, as well as presenting the information to an available Common Pleas Judge, took until the end of the business day of February 27, 2004. N.T. 5/03/13, pp. 57-60; N.T. 8/12/13, p. 46.

form back and took all of the required forms to Judge Heckler, and I was with Mr. Samios at Doylestown." N.T. 10/11/13, p. 79.

Carroll also identified all documents on Case No. 254-2004, including the February 23, 2004 Application for Intercept Order as well as the attached Affidavit of Probable Cause authored, sworn to and subscribed by him (and co-sworn to and subscribed by Detective Mosiniak). The information contained within the Affidavit of Probable Cause was true and accurate to the best of Detective Carroll's knowledge, information and belief. N.T. 10/11/13, pp. 78-79; N.T. 6/30/14, pp. 55-56.

Carroll testified that DDA Gambardella was responsible for determining Samios' knowing and willful consent. N.T. 8/17/12, 121. Carroll had no knowledge of any promises or offers made to Samios to secure his cooperation and/or consent. N.T. 10/10/13, 130; N.T. 10/11/13, 58, 59, 93. Furthermore, Samios did not hesitate to be consensualized and have those conversations recorded. N.T. 10/11/13, pp. 59, 93.

Detective Carroll authored the Memorandum of Interception[54] as well as the Affidavits of Probable Cause. N.T. 8/17/12, p. 49. He explained that in preparing the Memorandum of Interception, he "listened to the tapes in their context and with the understanding of the investigation and decided in my [his] summary what was pertinent, [and] tried to summarize it in that way." He did not believe that anything in the Memorandum of Interception mischaracterized any portion of the intercepted conversations. Any parentheses present in these documents were utilized to show the context of the words. N.T. 5/03/12, pp. 112-113, 115; N.T. 10/11/13, p. 103.

The Affidavit of Probable Cause attached to the Criminal Complaint was dated March 2, 2004. N.T. 8/12/13, p. 152. In terms of this Affidavit, Carroll confirmed that, as stated directly in

---

[54] The Memorandum of Interception was entered into evidence as C-PCRA-5. It was not made until 2010 after Detective Carroll reviewed the intercept tapes. N.T. 9/19/11, pp. 207-08; N.T. 5/03/13, p. 113.

the Affidavit, on March 2, 2004, Ms. Fryling and Mr. Samios were no longer living at the 703 North Street, Doylestown, Bucks County property, because they had reported to Detective Carroll that they believed they were the victims of Appellant who may have been involved in a theft by deception of that property.[55] N.T. 8/17/12, pp. 96-98; N.T. 10/10/13, pp. 130-31. Following a meeting with Fryling and Samios, it was further revealed to Carroll that they had known Appellant for some time, that he was involved in an insurance fraud scheme and, additionally, it was his plan to turn the 703 North Street property into a brothel.[56] N.T. 8/17/12, p. 98; N.T. 10/10/13, pp. 163-64; N.T. 10/11/13, p. 58; N.T. 6/30/14, pp. 64, 67. Carroll testified that the Affidavits of Probable Cause supporting the wire application did not contain known incorrect statements of fact. N.T. 8/17/12, p. 116. In relation to this alleged fraud, the Affidavit stated that Appellant continued to pay for lodging for Fryling and Samios at two (2) motels in Bucks County at this same time. N.T. 8/12/13, pp. 150-51. This was also indicated on the Affidavit of Probable Cause relating to the February 27, 2004 Application for the interceptions. N.T. 8/12/13, pp. 151-53, 163. It is uncontroverted that at the beginning of 2004, Fryling and Samios were in danger of losing their real property and that Samios was in need of money for his family. N.T. 8/12/13, p. 167; N.T. 10/10/13, p. 142.

---

[55] Detective Carroll testified that pursuant to a February 18, 2004 interview with Ms. Fryling and Mr. Samios, and as memorialized in the February 23, 2004 Probable Cause Affidavit pursuant to 224-2004, they averred that they were living at the 703 North Street property at this time. N.T. 8/17/12, p. 102; N.T. 10/10/13, pp. 156-57, 162. However, because Appellant was never charged or convicted of any crimes related to this property or the mobile home that Ms. Fryling and Mr. Samios subsequently obtained from Appellant, we found all testimony regarding this property to be irrelevant. *See* N.T. 8/17/12, pp. 108-11; N.T. 10/10/13, pp. 133-34, 135, 156-57, 162.

[56] Although he does not recall specifically taking notes from the interviews of Fryling and/or Samios, he no longer has them. N.T. 9/19/11, pp. 185-86; N.T. 8/17/12, pp. 45-48. He testified that "[t]he written record of that interaction between myself, Fryling, Samios, and also Detective Mosiniak was incorporated in the officer's memo of request" relative to his request that DDA Gambardella approve electronic intercept surveillance. N.T. 9/19/11, p. 186; N.T. 8/17/12, pp. 47-48. Further, that information is also reflected in the Probable Cause Affidavits relating to the Criminal Complaint as well as the interception requests. N.T. 9/19/11, 186.

Carroll testified that all one-party consensual interceptions were conducted and intercepted in Bucks County, and he was present with Mr. Samios for all of the recorded telephone calls. N.T. 8/12/13, pp. 55-56; N.T. 10/10/13, pp. 119, 152; N.T. 10/11/13, p. 64. In terms of Appellant's location during intercepted telephone calls, Carroll testified that "there may have been times when" Appellant was in Baltimore. N.T. 5/03/13, pp. 96-97, 98; N.T. 8/12/13, p. 57. There were no wiretap applications or orders of approval to intercept conversations in Maryland regarding this case, nor did Detective Carroll or any other investigating officer travel to Baltimore on case. N.T. 5/03/13, pp. 98-99; N.T. 8/12/13, p. 147.

Six (6) of the tapes were in analog, ninety (90) minute, two-sided standard cassette tape form representing recordings from telephone conversations, whereas the remaining tapes represented in-person intercepts and were two (2) hour long digital tapes (or "NT" tapes), as this is easier to conceal on the person and they are tapes of longer duration. N.T. 9/19/11, p. 184; N.T. 8/12/13, pp. 95, 163. Carroll stated that a total of 9.12 hours of actual conversation had been intercepted, and the remaining seventy-one (71) minutes include "drive time" and Detective Carroll's preamble. In regards to related civil litigation, pursuant to a request for admissions, Carroll approximated that there were seventeen (17) hours' worth of tapes relating to the instant case. He later explained that the 17 hours encompasses the total available hours of both the analog and digital tapes themselves, not considering the actual amount of content placed on the tapes. N.T. 10/10/13, pp. 98-107.

When Carroll copied the digital tapes to analog, he created more than one (1) cassette tape per digital tape. N.T. 9/19/11, p. 184. He testified that, as a result, there are sixteen (16) "working copies" created from ten (10) original tapes representing the recorded interceptions conducted in this case, which occurred from February 23 through March 2, 2004. N.T. 9/19/11, p. 184; N.T.

8/12/13, p. 125; N.T. 10/10/13, pp. 93-94. The working copies were made in order to maintain the integrity of the original recordings and represent the intercepted conversations in their entirety. N.T. 10/11/13, pp. 61-62, 95-96. In terms of the actual recording of the in-person meetings between Samios and Appellant, Detective Carroll used what he referred to as an "extended ear microphone," which is placed in the ear of the consenting party, who in this case was Samios. He explained that "…there is a wire that runs from that microphone, like a one-eighth inch plug that plugs directly into the input of the cassette recorder, that extending mic picks up both sides of the conversations through the ear mic." Carroll testified that he could listen in real time to the conversations by placing a set of earphones in the earphone jack of the recorder which he had on his person, but he did not always choose to do so. He was not sure if the ear mic ever fell out of Samios' ear during any of these in-person interceptions, but he did not believe this ever happened, as it would have resulted in an ambient sound and/or Samios' voice on the tape sounding more distant. N.T. 8/12/13, pp. 97-99, 117-18.

The original tapes were contained in envelopes, with each envelope containing the case number, the Bucks County Detectives' case number, the number of the tape, the master log number, whether the tape is original or copy, the detective assigned, the date of the interception, the location of the interception, the consenting individual and the target or the person intercepted. N.T. 6/30/14, pp. 27-28, 37-38; *see* Exh. C-PCRA-8 (copies of the original envelopes). Mr. Herbert Joe previously inspected these envelopes on Appellant's behalf. Carroll identified the contents contained on each envelope as related to each individual tape. N.T. 6/30/14, pp. 36-51.

In terms of the content of the tapes, Carroll testified that prior to any intercept there is a discussion between him and the confidential informant regarding whether it is "likely [the C.I.] could even talk to this person about these crimes?" In the instant case, there was an agreement

with Samios at the time he consented to the interceptions that he could discuss the scheme further with Appellant. N.T. 10/11/13, p. 65.

Carroll explained that there were two (2) different types of recording devices utilized in the instant case. The first was a cassette recorder/player and the second was a Sony NT digital cassette recorder. N.T. 8/17/12, p. 140; 10/11/13, p. 73. The NT digital cassette recorder was placed on Samios' body and Samios was not aware of how to turn the machine off. After all four (4) in-person meetings Detective Carroll had to turn the recorder off himself. Furthermore, when the machine is turned on or off the tape captures the sound of the mechanism of the tape. N.T. 10/11/13, pp. 73-75; N.T. 6/30/14, p. 87. However, when the tape runs out, it turns itself off. N.T. 10/11/13, p. 75.

Carroll testified that on some tapes it generally appears that a different pen was used to mark the date on the tape itself, and this was the result of instances in which the tape was not yet full and was therefore kept in his possession and used on a subsequent day to record additional interceptions. He testified he never went back and changed the date on any of the tapes after the fact. N.T. 8/17/12, pp. 133-35.

Each tape contains a preamble, which identifies Detective Carroll, the location, the date and the time. Further, each tape includes times when a second or subsequent telephone call is made, as well as any corresponding telephone numbers. N.T. 9/19/11, p. 187; N.T. 8/12/13, p. 72; N.T. 10/11/13, p. 103; N.T. 6/30/14, p. 83. In each interception, Appellant was the target and Samios was the consenting individual. N.T. 6/30/14, pp. 37-51.

Tapes 1 and 2 represent recorded telephone conversations between Appellant and Samios from February 23, 2004.[57] N.T. 5/03/13, pp. 68-69. Specifically, Tape 1 contained three (3)

---

[57] For the foregoing explanations regarding what is contained on Tapes 1-10, Detective Carroll relied on his Memorandum of Interception, entered into evidence as C-PCRA-5.

separate phone conversations between Samios and Appellant of varying lengths which occurred from approximately 7:00 p.m. to 7:50 p.m., and the place of interception was the Doylestown Township Police Department Headquarters (DTPDHQ).[58] N.T. 8/12/13, p. 126; 6/30/14, p. 38; *see* Exh. C-PCRA-5.

The telephone conversation between Samios and Appellant contained on Tape 2 occurred from 9:30 p.m. to 10:12 p.m., and the calls were also intercepted at the DTPDHQ.[59] This tape also contains content of a call that went to Appellant's voicemail. N.T. 8/12/13, pp. 127-28; N.T. 6/30/14, p. 40; *see* Exh. C-PCRA-5.

It was uncontroverted that no interceptions were made of any conversations on February 24, 2004. N.T. 8/12/13, p. 128.

Tape 3 contains phone conversations from February 25 and February 26, 2004. N.T. 5/03/13, p. 69. The phone calls occurring on February 25, 2004 took place between 6:44 p.m. to 9:59 p.m., respectively.[60] N.T. 8/12/13, p. 130; *see* C-PCRA-5. Furthermore, Tape 3 also reflects a ten (10) minute phone conversation at 12:27 p.m., a one (1) minute conversation at 2:25 p.m., and voicemails left by Samios for Appellant which occurred as early as 9:28 a.m. N.T. 8/12/13, pp. 130-31; *see* C-PCRA-5. The interceptions on Tape 3 were made at the Pineville Tavern, Pineville, Wrightstown Township, Bucks County and Doylestown Township, Bucks County. N.T. 6/30/14, pp. 40-41; *see* Exh. C-PCRA-5.

---

[58] The DTPDHQ is located in Doylestown Township, Bucks County. N.T. 6/30/14, pp. 44-45.

[59] This tape first contains a recorded telephone call made from Samios to Appellant, in which he left a voicemail and Appellant returned his call shortly thereafter. N.T. 8/12/13, pp. 127-28.

[60] These conversations were scattered throughout this time period and encompassed six (6) calls of varying lengths. *See* C-PCRA-5.

Tape 4 consists of an in-person body wire intercept that occurred on February 26, 2004 at Appellant's home office located at 2995 York Road, Furlong, Warwick Township, Bucks County. N.T. 5/03/13, p. 71; N.T. 10/11/13, p. 75; N.T. 6/30/14, pp. 41-42; *see* Exh. C-PCRA-5. This occurred from approximately 2:45 p.m. to 4:35 p.m. N.T. 8/12/13, p. 131. During this in-person meeting, Appellant made a $500 payment to Samios that he was owed as a result of his completion of work unrelated to the instant investigation. N.T. 8/13/13, p. 35. In order to get this currency, Samios and Appellant travelled to a nearby bank, and detectives kept the two under surveillance. N.T. 10/11/13, pp. 75-76. Detective Carroll permitted Samios to keep the currency because the payment was unrelated to the crimes underlying Appellant's conviction in the instant case. N.T. 8/13/13, pp. 35-36; N.T. 10/10/13, p. 144; N.T. 10/11/13, p. 77. After this meeting, the focus of the investigation shifted away from fraud (insurance or otherwise) to the solicitation by Appellant to harm Mr. Witthauer. N.T. 10/11/13, pp. 77-78.

Tape 5 contains two (2) telephone conversations which took place on February 27, 2004, from approximately 4:17 p.m. and 5:32 p.m., which were intercepted by Detective Carroll at the DTPDHQ. N.T. 5/03/13, p. 71; N.T. 8/12/13, p. 132; N.T. 6/30/14, p. 42; *see* Exh. C-PCRA-5. The first call is a response to several voicemails left by Appellant to Samios whereas the second call is only two (2) seconds long before the tape stops. N.T. 8/12/13, p. 132. This call occurred one (1) hour prior to an in-person meeting which was recorded on Tape 6. N.T. 10/11/13, p. 100; *see* Exh. C-PCRA-5.

Tape 6 contains a two (2) hour digital body recorder type tape. N.T. 5/03/13, p. 74. The recording of the face-to-face conversations between Appellant and Samios which comprise Tape 6 were intercepted at Appellant's parents' property in Gardenville, Plumstead Township, Bucks

County.[61] N.T. 5/03/13, p. 77; N.T. 10/11/13, p. 80; N.T. 6/30/14, p. 43; *see* Exh. C-PCRA 5. This in-person meeting occurred from about 6:32 p.m. to 7:52 p.m. on February 27, 2004. N.T. 8/12/13, pp. 132-33; *see* C-PCRA-5. Tape 6 contains the $2,000.00 payment made by Appellant to Samios. N.T. 5/03/13, p. 77; N.T. 8/13/13, pp. 48-49; N.T. 10/11/13, p. 83; N.T. 6/30/14, pp. 43-44. Detective Carroll and other investigators conducted surveillance during this intercept; however, it was more difficult to watch the Gardenville property because it was situated along a two-lane highway and, therefore, the officers conducted drive-bys and waited at a nearby intersection. N.T. 10/11/13, p. 81.

Tape 7 contains two (2) telephone calls placed by Samios to Appellant that went to Appellant's voicemail on February 28, 2004 at 5:11 p.m., and another placed at 5:19 p.m., which Appellant answered, with that conversation lasing approximately 1.5 minutes. N.T. 5/03/13, p. 79; N.T. 8/12/13, pp. 133-34; *see* Exh. C-PCRA-5. The calls were intercepted at the DTPDHQ. N.T. 6/30/14, p. 44; *see* Exh. C-PCRA-5. The call made at 5:11 p.m. was an outgoing call to Appellant, as prior to this, Appellant called Mr. Samios and left a voicemail message. N.T. 8/12/13, pp. 133-34.

Tape 8 contained an in-person meeting which occurred at Appellant's home office at 2995 York Road, Furlong, Bucks County, on February 28, 2004. N.T. 8/12/13, pp. 134-35; N.T. 6/30/14, pp. 45-46; *see* Exh. C-PCRA-5. This meeting took place from 5:45 p.m. to 7:31 p.m. N.T. 8/12/13, pp. 134-35; *see* Exh. C-PCRA-5. During this meeting, Samios received paperwork from Appellant meant "to purport [sic] some legitimacy to be at the Lower State Road property," which he turned over to Detective Carroll following the meeting. N.T. 10/11/13, pp. 87-88; N.T. 6/30/14,

---

[61] Detective Carroll testified that he did not physically view this meeting nor did any video surveillance record said meeting. N.T. 5/03/13, 89.

pp. 46, 68. Included in the paperwork was a blue print of the Lower State Road property as well as a letter typed by Appellant. N.T. 6/30/14, pp. 47-48.

Tape 9 represents a series of telephone calls, including a five (5) minute conversation lasting from 7:39 p.m. to 7:44 p.m. N.T. 5/03/13, p. 80; N.T. 8/12/13, pp. 135-36; *see* Exh. C-PCRA-5. Furthermore, one conversation from March 1, 2004, occurring at approximately 9:43 a.m. and lasting only forty-one (41) seconds, is also reflected on Tape 9. The second call on Tape 9 was placed at 10:20 a.m. to Appellant but went to Appellant's voicemail. The third and fourth calls took place at 6:06 p.m. and 6:17 p.m., and again both went to Appellant's voicemail. The next call intercepted was placed at 7:00 p.m. and constituted a three-minute-twenty-second conversation. Another call lasting ten (10) seconds was intercepted at 9:51 p.m., which was followed by a thirty (30) second incoming call. Finally, a call from March 2, 2004 from 5:52 p.m. to 5:54 p.m. is contained therein.[62] N.T. 8/12/13, pp. 136-139; *see* Exh. C-PCRA-5. All of these telephone communications were intercepted by Detective Carroll in Doylestown and Plumstead Township, Bucks County. N.T. 6/30/14, pp. 49-50; *see* C-PCRA-5.

Tape 10 consists of an in-person interception, which occurred from 10:42 p.m. on March 1, 2004 to 12:52 a.m. on March 2, 2004 at Appellant's parents' property in Gardenville, Plumstead Township, Bucks County. N.T. 8/12/13, p. 138; 10/11/13, p. 94; *see* Exh. C-PCRA-5.

We accepted Detective Carroll's qualifications as an expert witness in the field of narcotics investigation in this case. N.T. 8/13/13/, pp. 96-98. Carroll testified that he did not have any knowledge of Appellant being provided cocaine at the time the conversations between him and Samios were intercepted and recorded. N.T. 8/17/12, p. 117; N.T. 5/03/13, pp. 103, 109; N.T. 10/11/13, p. 12. Carroll further testified that in his conversations with Samios, Samios did not

---

[62] This call is contained on Tape 9 despite the fact that it actually occurred one (1) day after the previous calls, as Detective Carroll testified that he still had room on Tape 9. N.T. 8/12/13, p. 139.

appear to be under the influence of alcohol or drugs at any point during the course of the investigation. Carroll testified that if Samios appeared to be under the influence, he would not have continued. N.T. 10/11/13, pp. 58, 60-61, 76-77, 80, 85.

Carroll recalled that he made numerous copies of the tapes, which were provided to Attorney Fink and his investigator Lyons, and he was later advised by Lyons that there were issues with some of the tapes that were first copied in December of 2004. N.T. 8/12/13, pp. 101-02, 110; N.T. 10/11/13, p. 96. These issues were later addressed by Detective Carroll's explanations, as set forth below, and another set of corrected copies was provided to Fink sometime prior to Appellant's guilty plea hearing, although Detective Carroll could not specifically recall exactly when those tapes were provided. N.T. 8/12/13, pp. 122-23.

In terms of the "gaps" present in some of the transcriptions, Detective Carroll testified as follows:

> During the investigation...which lasted...a couple weeks, there were numerous phone calls to Mr. Guarrasi that resulted in voice mail where Samios in my presence over his cell phone, with me recording, it would connect with Guarrasi's cell phone or office and would...[result in] voicemail.

> So I just kept a tape—instead of using a new tape for every phone call, I kept the tape in my possession and we continued to make calls...[W]hat I used to record the call is an ear microphone and standard cassette recorder with a cassette tape. During one of the conversations with the tape, as it should in the machine, flipped to the second side, it automatically does that. One of my habits is, before the next call I always check the tape to make sure I'm ready to go.

> On one of these occasions after the tape had flipped to the second side and before making another call, I opened the cassette recorder to make sure my tape was good, closed it, made my call, didn't realize that when I opened the recorder, it flipped back to the first side of the tape, so my next call was taping over something that had been on side one. I realized it. And that's what happened on that particular tape occasion.

N.T. 11/24/08, pp. 183-84. Carroll further explained that although he did not agree with defense counsel's characterization of the spaces between the phone calls/voice mails as "gaps," he testified that if a telephone call is made and/or Samios received a voicemail, he would turn the tape off. Therefore, this would constitute the space in the tapes between the phone calls. N.T. 11/24/08, pp. 184-185.

Carroll indicated that Tape 3 had oral communications made out of chronological order. N.T. 9/19/11, pp. 182-83; N.T. 8/12/13, p. 116. He explained that once a recording has filled one side of a cassette tape, it automatically flips to the other side and continues recording. N.T. 8/17/12, p. 143. He explained this constituted an unintentional tape-over of part of the previously recorded conversations on his part. N.T. 8/12/13, p. 115. He further explained: "When I listened to [Tape 3] I realized there were some of the calls that should have been on B had actually overrode some conversations on A...and that was my error." N.T. 8/12/13, pp. 116-17; N.T. 10/11/13, pp. 70-71. He later specified that on Tape 3, two (2) calls from February 26, 2004 inadvertently taped over call 7 from February 25, 2004 for approximately 172 seconds. N.T. 10/11/13, pp. 67, 71. Carroll recalled that there was not a lot of material conversation that was taped over other than where Appellant and Samios should meet next in person. N.T. 10/11/13, pp. 69-70.

Tape 5 stopped recording during a telephone call. N.T. 9/19/11, pp. 182-83; N.T. 10/11/13, p. 89. Carroll testified that he was unsure exactly why the tape had stopped recording but explained it was his opinion it was a mechanical issue with the recorder. N.T. 8/12/13, pp. 97-99, 115, 117-18; N.T. 10/11/13, p. 89. He recalled that the remaining conversation which did not record regarded where Samios and Appellant should meet the next day, and that meeting was intercepted and recorded in Tape 6. N.T. 8/12/13, pp. 98-99.

Tape 6 is orally dated April 27, 2004 in Detective Carroll's preamble,[63] which was an admitted mistake on Carroll's part, and the actual date of this interception was February 27, 2004. N.T. 9/19/11, pp. 182-83; N.T. 8/12/13, p. 72; N.T. 10/11/13, p. 84. Additionally, the last call on the tape was cut off, although Carroll could not recall why the recorder stopped. N.T. 8/17/12, pp. 37-38.

Appellant attempted to establish that Tape 6 was not protected from alteration or edit because "the red tab was not punched out." N.T. 8/17/12, p. 129. Carroll explained as follows:

> ...I believe that's the digital, small digital tapes that were the in-person tapes. They have a very small red clip or a little mechanism that you punch through to keep the tape from being taped over. I think they can be pushed back. I'm not sure. So that could have been pushed through and pushed back. I'm not sure. But I don't know that they necessarily protect tape-over as well as an analog tape, because an analog tape, you actually break the tab on top. There's – on either side of the top of the tape you break down a tab, and it prevents the wheels to be operated by the tape recorder. I'm not so sure that's exactly the technology with the digital tapes. There's a tab to punch through, but I think that tab can be returned for a tape-over.

N.T. 8/17/12, pp. 130-31; *see also* pp. 137-138 (identifying a photograph of one of the tapes in which the red tab is not pushed through). It is Detective Carroll's general practice to push the red tabs all the way through following the recording of said tapes. N.T. 8/17/12, p. 138.

Tape 10 stopped mid-sentence as the tape ran out of time. N.T. 9/19/11, pp. 182-183; N.T. 8/12/13, pp. 113, 115; N.T. 8/13/13, pp. 83, 84-85; N.T. 10/11/13, pp. 91-92. Carroll testified that he did not recall how long of a period of time the conversation continued; however, he called Samios to instruct him to leave twice, and Samios followed Detective Carroll's directions just a few minutes later. N.T. 5/03/13, pp. 94-95; N.T. 8/13/13, pp. 84-85. Thus, the conversation only continued for a few minutes. N.T. 8/13/13, p. 85.

---

[63] This tape contains the payment of $2,000 from Appellant to Samios. N.T. 8/17/12, p. 37.

Carroll testified that during the in-person interceptions, he and other law enforcement officers conducted surveillance in the form of driving by the target location and waiting at nearby locations. He testified that sometimes they would momentarily lose visual contact of Samios. N.T. 8/17/12, pp. 124-25. There was no video surveillance with regard to any of the in-person interceptions. N.T. 8/12/13, p. 132; N.T. 6/30/14, pp. 67-69. Furthermore, Carroll did not recall any summaries he made regarding the voicemails left by Appellant to Samios. N.T. 8/12/13, pp. 141-42.

Carroll did not intentionally delete or make any edits to the tapes; nor did he do anything in an attempt to purposefully prejudice Appellant. N.T. 11/24/08, pp. 185-86; N.T. 8/12/13, p. 92; N.T. 10/11/13, pp. 62, 95-96. Furthermore, he did not splice together different conversations. N.T. 10/11/13, pp. 62-63.

Carroll had possession of the original analog and digital tapes until they were turned over to storage. N.T. 11/24/08, p. 186; N.T. 9/19/11, p. 181; N.T. 8/17/12, pp. 50-51, 55; N.T. 10/11/13, p. 65. Thereafter, Chief McAteer maintained custody of the tapes in the evidence locker located in the detective's section of the District Attorney's Office. N.T. 9/19/11, p. 193; N.T. 10/11/13, pp. 65-66. Carroll identified a portion of the Master Tape Log which reflected these tapes being logged into evidence, and in which certain entries were crossed out in black ink, as they related to other cases. The Master Tape Log represented an excerpt from a larger log kept by all county detectives who conduct recordings for any of their respective cases. N.T. 8/12/13, pp. 83, 84-85, Exh. P-75.

Carroll testified that Chief McAteer kept these original tapes in his custody until he gave them back to Detective Carroll, who met with Herbert Joe in May of 2009. At this time, a bar code

was noted on the tapes, as the county had purchased a bar code evidence system in 2004.[64] Following this meeting, the tapes were transported to the Bucks County storage facility at the Thiokol warehouse where they were placed into a temporary evidence locker. N.T. 9/19/11, pp. 193-194, 196.

Chief Deputy County Detective McAteer had assigned an evidence number for Appellant's case on or before March 12, 2004. N.T. 8/17/12, p. 49. However, prior to this, Detective Carroll provided Detective McDonough with $2,000,[65] a file and other items seized pursuant to a search warrant on Appellant's residence.[66] N.T. 9/19/11, p. 192.

Carroll recalled that the murder-for-hire scheme was developed mostly throughout in-person intercepted meetings between Samios and Appellant, which occurred from February 26 to March 2, 2004. N.T. 8/13/13, pp. 61-62. He stated that "I think in the context of these ten tapes and the seven days or eight days of the interaction between [Appellant] and Samios, it's very clear there what's being said." Samios did not use explicitly specific language regarding this scheme because Appellant had previously chided him for doing so while talking to him via cell phone. N.T. 8/13/13, pp. 91-92. Furthermore, Carroll indicated that throughout the time in which the interceptions were made, Samios and Appellant had discussions about other matters that were unrelated and/or irrelevant to the instant case, including the alleged sale of a truck from Samios to Appellant which occurred during the general time period of the investigation. N.T. 10/10/13, pp. 110-16; N.T. 10/11/13, pp. 43-45. Based on his knowledge of the facts underlying the case and

---

[64] *See* N.T. 6/30/14, pp. 30-31 (Detective Carroll's corroborating testimony).

[65] Detective Carroll received this directly from Samios on February 27, 2004. N.T. 10/10/13, p. 136.

[66] Detective McDonough then submitted the currency and other items seized pursuant to the search warrant to Chief McAteer. N.T. 8/17/12, pp. 52-53.

his careful review of all intercepted conversations, and with regard to the $500 payment made to

Samios in the course of the investigation, Detective Carroll found that

> "[t]he 2,000 in my mind and in the context of the tapes was clearly for the crime,
> for committing the crimes. It was a down payment. And then [Appellant] talks later
> about paying the balance, so I think it's separate payments. I think there's payment
> for work, and I think there's payment clearly for the solicitation."

N.T. 10/10/13, pp. 114-15. Specifically, in terms of discussions regarding the sale of the truck,

Detective Carroll determined that this was separate from the solicitation concerning the murder of

Mr. Witthauer. N.T. 10/10/13, p. 115; N.T. 10/11/13, p. 20.

During the course of the foregoing PCRA proceedings, Mr. Samios died and Detective

Carroll testified that he attended his viewing. N.T. 6/30/14, pp. 60-61; *see* Exh. C-PCRA-9.

### d. Chief Christopher F. McAteer, Jr.'s PCRA Testimony

Chief McAteer began his career in law enforcement as a police officer and then a detective

with the Bristol Township Police Department in Bucks County, being employed there from April

1974 to October 1990. Thereafter, he became a Special Agent with the Pennsylvania Attorney

General's Office until 1997, when he began work at the Bucks County District Attorney's Office

as a detective. He was promoted to Deputy Chief of Detectives in 2000. N.T. 5/03/13, pp. 43-44.

In 2004, at the time the investigation underlying Appellant's instant conviction was under way,

Chief McAteer held the position of Deputy Chief. N.T. 5/03/13, p. 9.

Chief McAteer was the evidence custodian for all evidence that was submitted by

detectives pertaining to this investigation. Chief McAteer recalled receiving the intercepts and the

original Memorandums of Request, Consent and Approval for the intercepts from Detective

Carroll, and he then secured them in a temporary evidence locker in the Bucks County District

Attorney's Office. N.T. 5/03/13, pp. 9, 16, 45. This is reflected on Property Receipt 4667. *See*

Exh. P-129. Chief McAteer was the only person who had a key to that evidence locker. He later

removed the tapes from the evidence locker and turned them over to Detective Carroll, who transported them to an individual (Mr. Herbert Joe) who was going to review the tapes on behalf of Appellant. Following review, Detective Carroll turned them over for permanent storage at the Bucks County evidence warehouse located at Thiokol. N.T. 5/03/13, pp. 45-46.

The $2,000.00 provided to Samios by Appellant that was seized during the execution of a search warrant of Appellant's home office was signed into evidence on March 4, 2004, as reflected by Property Receipt 4666. N.T. 5/03/13, pp. 10, 17; *see* Exh. P-130. Chief McAteer explained that he maintains an evidence locker that he placed the currency in. He testified that there were no photographs taken of the currency nor was there a recording of the serial numbers of the money. Further, Chief McAteer was of the belief that the money had been forfeited. N.T. 5/03/13, pp. 10-11, 42. The evidence seized during the execution of the search warrant was also later secured at the Thiokol warehouse. N.T. 5/03/13, p. 47.

### e. Dr. Cohen's PCRA Testimony

Appellant called Dr. Cohen as his own witness in an attempt to establish that he was incompetent at the time he entered his *nolo contendere*/guilty but mentally ill plea. We accepted Dr. Cohen as an expert in the field of psychology; however, we denied Appellant's request that he be admitted as an expert in the field of pharmacology. N.T. 11/19/10, pp. 28-30.

Dr. Cohen was contacted by Friends Hospital[67] when Appellant was discharged, and was asked if he would continue follow up treatment with Appellant. He saw Appellant from November 24, 2004 to March 17, 2005, approximately twice per week for forty-five (45) minute sessions. N.T. 11/19/10, pp. 31, 87. Dr. Cohen diagnosed Appellant with "Bipolar disorder, severe with delusions; actually bipolar disorder, severe with psychotic features." N.T. 11/19/10, p. 40.

---

[67] Friends Hospital is a psychiatric hospital. N.T. 11/19/10, p. 33.

Appellant was also diagnosed with a seizure disorder and polysubstance abuse. N.T. 11/19/10, pp. 67-69. Dr. Cohen further testified that in terms of a dissociative identity disorder,

> That was a rule out dissociative identity disorder. That's a phrase we use when we think it might be going on but we're not sure yet. And certainly by history it seemed like there was most likely an issue of dissociative identity disorder. And that formerly was known as multiple personality disorder.

N.T. 11/19/10, p. 40. He later explained that he would have had to conduct further diagnosing and testing to confirm this potential diagnosis. N.T. 11/19/10, pp. 99-100. Dr. Cohen was of the opinion that Appellant needed prescribed medication to become stable, and on March 22, 2005, after he learned that Appellant was taken back to BCCF, he wrote Attorney Fink expressing his concern that he should be maintained on his medication. N.T. 11/19/10, pp. 41-42; *see* Exh. P-9.

Dr. Cohen testified that the medical records provided from BCCF (Exh. P-15) showed no record of any medications administered to Appellant in March of 2005.[68] Furthermore, notes from March 31, 2005 indicated that Appellant had not had his medications "in awhile" and he was experiencing "probable delusions and judgment and insight [were] poor." N.T. 11/19/10, pp. 59-62. Dr. Cohen was not familiar with the procedures at the BCCF Mental Health Unit and did not have personal knowledge that the prison withdrew medication from Appellant. N.T. 11/19/10, pp. 87-88.

Dr. Cohen related that some of the medications Appellant was on would require "titrating downward," or decreasing the medication, so as to monitor whether symptoms are re-emerging before the medication was fully out of his system. N.T. 11/19/10, pp. 74-75. He testified that if Appellant was taken off his medications there could have been a re-emergence of symptoms. N.T.

---

[68] The District Attorney and Appellant stipulated that, if called to testify, Ms. Linda Dunn, who is the records custodian and responsible for the directions of the dispensary at the BCCF, would explain that any medication that is not noted on the dispensary sheet was not prescribed and, on the other hand, if the medication that was prescribed was not marked as given, then it was not given to an inmate. N.T. 6/13/11, pp. 176-79.

11/19/10, p. 81. However, Dr. Cohen did not have knowledge as to whether Appellant was experiencing any withdrawal or symptoms at the time of his plea, and he explained that withdrawal differs from one person to the next as well as from one medication to the next. N.T. 11/19/10, pp. 91-92.

Notwithstanding this prior testimony, Dr. Cohen testified at Appellant's Guilty but Mentally Ill/Sentencing Hearing that he believed Mr. Guarrasi to be competent as of the last time he saw him on March 17, 2005. N.T. 11/19/10, p. 86; *see* N.T. 5/25/05, p. 85.

### f. Alan Tauber's PCRA Testimony

Mr. Tauber was retained because Appellant was "considering going to trial and [wasn't] sure whether or not [he was] going to have Mr. Fink try the case, [Mr. Tauber's] firm try it, or a combination of both." N.T. 6/13/11, p. 127. However, neither Tauber nor members of his firm entered their appearance on Appellant's behalf. N.T. 6/13/11, p. 139. Tauber recalled meeting with both Appellant and Fink on one occasion, and both he and other partners in his firm met with him personally on other occasions. They also communicated via telephone conference and e-mail correspondence. N.T. 6/13/11, pp. 125-26, 128, 136-37. Tauber and other members of his firm recommended that he waive litigating the suppression motions, as a result of the determination that it would not make strategic sense to litigate the motion in the context of working out a guilty plea. He believed there may have been meritorious issues, but he was unable to say whether the suppression motion would have prevailed or not. N.T. 6/13/11, pp. 135-136. He did recall, however, that Fink believed the suppression motion would not be successful. N.T. 6/13/11, pp. 140-141.

Prior to Appellant's guilty plea, Tauber went down to the holding cell with Fink to talk to him. N.T. 6/13/11, pp. 128-129. He testified that it was solely Appellant's decision to enter a

guilty plea, and he did not promise Appellant a sentence, nor did any other attorney to his knowledge. N.T. 6/13/11, pp. 141-42.

Mr. Tauber was present at Appellant's guilty plea hearing, and recalled that he did not see any reason to believe that Appellant did not understand the proceedings. N.T. 6/13/11, p. 143. Ultimately, he believed that there was no specific basis or grounds to withdraw Appellant's guilty plea. N.T. 6/13/11, p. 145.

He recalled communicating with Appellant regarding the filing of a motion to withdraw guilty plea following sentencing; however, Tauber suggested Appellant had to do that through a PCRA Petition. N.T. 6/13/11, p. 130; *see* Exh. P-92. Tauber did not file a withdrawal of guilty plea issue based on the following:

> I didn't believe there was a record-based issue that questioned the competency of the guilty plea at that time. I believe that from what I witnessed and what my understanding of the record was, that there was an adequate basis for the guilty plea, and the colloquy was appropriate, and I didn't believe there was a foundation for it.

Furthermore, he testified that he informed Appellant of this via a letter dated July 26, 2005, in response to earlier correspondence from Appellant dated July 14, 2005. If Appellant had made the request to file a motion to withdraw guilty plea in a timely manner, he would have filed a motion with the Court of Common Pleas thereafter. Moreover, Tauber concluded that "…if there was a record basis that I saw for withdrawal of the guilty plea and he had asked me to withdraw it, I would have raised that…" as an issue on direct appeal. N.T. 6/13/11, pp. 144-146.

Finally, Tauber testified that he recalled Appellant was very unhappy with his sentence. N.T. 6/13/11, p. 146.

### g. T. Gary Gambardella's PCRA Testimony

Judge Gambardella worked in the Bucks County District Attorney's Office from 1988 to 2010. He maintained the office of Assistant District Attorney from the time he began with the District Attorney's Office until the time he left, albeit holding different titles, i.e., Deputy, Senior Deputy, Chief Deputy, and Chief of Special Investigations. He was the prosecuting attorney in this case and, thus, was involved in the intercepts. He was authorized to sign criminal informations, as were all other senior attorneys in the office in 2004.[69] N.T. 9/19/11, pp. 97, 117-119.

On December 28, 2000, Judge Gambardella was provided with the authority to supervise the conducting of intercept surveillance by then-District Attorney Gibbons. N.T. 9/19/11, pp. 98, 119.

In terms of his record keeping responsibilities pursuant to Section 5714, Judge Gambardella went through a number of the records that were generated with regard to the interceptions here and ensured everything statutorily required was complied with. He testified that ultimately the tapes were in the possession of the detectives and they were kept in a safe location. N.T. 9/19/11, pp. 99, 101, 112.

Both Judge Gambardella and then District Attorney Gibbons were aware of the initial investigation into Appellant's involvement in a solicitation to commit insurance fraud. The investigating detectives kept them both apprised of what was occurring during the course of this investigation. N.T. 9/19/11, pp. 128-131.

---

[69] Exhibit C-PCRA-2 consists of documentation filed with the Clerk of Courts dated January 11, 2000, designating First Assistant District Attorney David W. Zellis, then-chief of prosecution, to sign criminal informations on behalf of District Attorney Gibbons. Mr. Zellis endorsed Appellant's criminal information in the instant case. N.T. 1/20/12, pp. 46-47.

The Clerk of Courts' files relevant to the interceptions in the instant case, No. CP-09-MD-0000253-2004 ("253-2004") and CP-09-MD-0000254 ("254-2004"), were incorporated into the PCRA record.

Regarding Case 254-2004, Judge Gambardella identified numerous documents therein, including a Sealing Order signed in his presence by Judge Biehn upon application of Judge Gambardella on February 23, 2004. Judge Gambardella also identified the Application for an Order Authorizing the Consensual Interception of Oral Communications in a Home attached thereto, which he signed and attested to the contents of the facts contained in the Affidavit of Probable Cause (authored by Detectives Carroll and Mosiniak), as well as Judge Gambardella's letter of authorization from District Attorney Gibbons to approve the interception of communications under the provisions of Section 5704(2)(ii). The Order authorizing interception of oral communications at Appellant's office (at 2995 York Road, Furlong, Warwick Township, Bucks County), as well as "any residence, of target, Joseph Guarrasi, his owned or commonly used places of abode, or any home or place wherein oral communications may occur relating to the same consenting party and participants or anyone else acting on his behalf," was also signed by Judge Biehn on February 23, 2014 in Judge Gambardella's presence.[70] N.T. 9/19/11, pp.119-123, 128.

Judge Gambardella had reviewed all the physical evidence pertaining to the intercept tapes and ensured they were kept in a safe location by the investigating detectives. He also insured that the recording requirements of the Wiretap Act (specifically Section 5714) were complied with by doing the following:

---

[70] President Judge Heckler designated Judge Biehn as having wire authorization. N.T. 9/19/11, 171.

I met with the informant. I did what we call in layman's language a consensualization of the informant[71] to make sure what he was doing was voluntary. It was. In the instance in which we believed that it was—that the conversations may be taken in a place where had you [sic] an expectation of privacy, I obtained judicial authorization to have the recordings done in those places. I made sure all the paperwork was in order. And I signed the affidavits that were required.

N.T. 9/19/11, pp. 99-100.

Judge Gambardella met with Samios in person for the first consensualization. He identified the Memorandum of Consent of Mr. Samios, which was signed in his presence and dated February 23, 2004. Samios appeared to be alert and oriented and there was no indication that he was under the influence. There were no promises or threats made by either Judge Gambardella or anyone in his presence to force Mr. Samios to consent. Following Judge Gambardella's meeting with Samios, and his subsequent signing of the Memorandum of Consent and his review of the Affidavit of Probable Cause, he approved this one-party interception. The Memorandum of Consent was dated February 13, 2004 at 12:56 p.m. N.T. 9/19/11, p. 123-127.

Judge Gambardella listened to each and every tape shortly after the conversations were intercepted. Judge Gambardella testified that although this was not necessarily required by the statute, in an abundance of caution he wished to make the Court aware that the focus of the investigation had changed from the insurance fraud to something more serious and, therefore, he secured an additional order and "reconsented" Mr. Samios.[72] Samios was "reconsented" a second time by Judge Gambardella over the phone. Judge Gambardella testified that he recognized Samios' voice and there was no hesitation in his cooperation. No threats or promises were made in order to get Samios to consent. N.T. 9/19/11, pp. 104, 130-131, 137, 141.

---

[71] *See also* N.T. 9/19/11, p. 119.
[72] *Accord* N.T. 10/10/13, pp. 130-32; N.T. 10/11/13, pp. 77-78 (Detective Carroll's corroborating testimony).

The documents regarding this "reconsent" were contained in 253-2004. Judge Gambardella identified the following documents contained in that file which ultimately led to Judge Heckler's February 27, 2004 Order[73] authorizing the intercepts: an Application for an Order Authorizing the Consensual Interception of Oral Communications in a Home, District Attorney Gibbon's authorization for Mr. Gambardella to approve the interception of communications pursuant to Section 5704(2)(ii), the Affidavit of Probable Cause[74] including additional information gained as a result of the prior intercepted conversations, Officer's Memorandum of Request including additional information to include Criminal Solicitation to Commit Aggravated Assault and related crimes, as well as a Memorandum of Consent to include additional crimes as well. N.T. 9/19/11, pp. 132-138.

President Judge David W. Heckler signed this second Order Authorizing the Consensual Interception of Oral Communications on February 27, 2004 in Judge Gambardella's presence.[75] Furthermore, a sealing order, as requested by Judge Gambardella, was simultaneously endorsed by Judge Heckler on February 27, 2004. Judge Gambardella thereafter sealed the documents. N.T. 9/19/11, pp. 133, 138-139.

Judge Gambardella testified that he did not tamper with any of the documents contained within either 254-2004 or 253-2004 following the entrance of the sealing order. N.T. 9/19/11, p. 163.

---

[73] This Order also related to Appellant's office/residence located at 2995 York Road, Furlong, Warwick Township, Bucks County, as well as "any residence of target, Joseph Guarrasi, his owned or commonly used places of abode or any home or place wherein oral communications may occur..."

[74] This document was sworn to and subscribed by investigating officers in Judge Heckler's presence. N.T. 9/19/11, p. 135.

[75] Although these documents were prepared for Judge Biehn, he was unavailable at this time and, therefore, Judge Heckler signed for Judge Biehn. N.T. 9/19/11, p. 171.

Following additional intercepted conversations pursuant to the February 27, 2004 Order, Judge Gambardella was kept apprised of the contents of the interceptions and, in fact, listened to those interceptions himself. He kept District Attorney Gibbons apprised as well, and she also listened to certain portions of the interceptions. N.T. 9/19/11, pp. 141-143.

Judge Gambardella only recalled one (1) single problem with the tapes, which was the auto-reverse issue in which Detective Carroll informed him that one part of the tape had been inadvertently taped over. N.T. 9/19/11, p. 115.

Judge Gambardella recalled that through Samios, they gave Appellant an opportunity to recant and he did not do so. Judge Gambardella recalled that when they had Samios call Appellant to inform him that he was "heading there now to kill [the Witthauers]," Appellant told him to "call me tomorrow when it's all done." N.T. 9/19/11, p. 144.

Then-District Attorney Gibbons made the ultimate decision to file charges against Appellant in discussions with then-DDA Gambardella and the investigating detectives. N.T. 9/19/11, pp. 144-45.

Judge Gambardella provided Fink with some information ahead of time, and he also provided Fink with an opportunity to listen to relevant portions of the tapes with his client in the District Attorney's Office. Fink was shocked as to what was contained in the tapes, and as a result he reacted to them. Judge Gambardella later provided Fink with all of the discoverable materials. The discovery was not filed in the Clerk of Courts file as a result of Fink's request not to do so in his effort to "keep the publicity down in this case." N.T. 9/19/11, pp. 145-148.

At the preliminary hearing, Fink was provided with the opportunity to question Samios. N.T. 9/19/11, p. 147.

In terms of the Habeas Corpus challenge to the charge of attempted murder or solicitation to commit murder, Judge Gambardella testified that he had prepared a response in which he summarized and quoted certain aspects of the interceptions, although there was no actual formal transcription of the tapes because there had been no preliminary hearing in this case for Judge Biehn to base a habeas ruling upon. Furthermore, he indicated that the Affidavit of Probable Cause relating to the charges that were ultimately brought against Appellant constituted a summary of the substance of the statements made by Ms. Fryling, Mr. Samios and those present in the intercepted conversations. N.T. 9/19/11, pp. 148-151.

At the guilty plea proceeding, Judge Gambardella testified that Appellant appeared to be competent, oriented and he answered questions appropriately. Furthermore, Judge Gambardella was of the impression that Appellant was feigning mental illness at this point, as he observed that "...when Judge Biehn was in court and would address him, I recall that he was almost lethargic in his responses. And as soon as Judge Biehn got off the bench, he was very snappy and lively in his talk." N.T. 9/19/11, pp. 155-156, 164.

Judge Gambardella prepared a "composite tape" of the interceptions which was played for Judge Biehn at Appellant's Guilty but Mentally Ill/Sentencing Hearing. This composite was based off of the copies of the interceptions provided to him by the investigating detectives. Appellant appeared to be oriented during the course of the sentencing proceedings. He testified that "there was no issue whatsoever in [his] mind" regarding competency of Appellant. N.T. 9/19/11, pp. 158, 164; *see* Exh. C-PCRA-1.

### h. David Zellis' PCRA Testimony

Mr. Zellis testified that he initialed the Criminal Information on District Attorney Gibbons' behalf. He and other senior attorneys in the District Attorney's Office were authorized to sign

criminal informations. He recalled that he either signed his name or his initials following a review

for any problems or obvious defects in the informations themselves. Besides endorsing the

Criminal Information, however, he was not involved in any other aspect of the instant case. N.T.

8/17/12, pp. 21-22, 32-33.

## III.   ISSUES

Following the close of the sixteen (16) evidentiary hearings, Appellant set forth the claims

upon which he believes he is entitled to relief, under the dictates of the PCRA, in his Brief in

Support thereof, filed on September 4, 2014, as follows, *verbatim*:

1) Counsels ineffectiveness caused the Appellant to enter an involuntary and unknowing plea by having a severely mentally ill Appellant, unmedicated for several days, stand for an open guilty plea, while Title 50 Section 7402 Incompetent, where the Appellant wanted to go to trial and the Appellant was innocent.

2) Counsels ineffectiveness caused the Appellant to enter an involuntary and unknowing plea by failing to object or correct a patently defective guilty plea colloquy, where Appellant wanted to go to trial, unaware of available affirmative defenses, affirmative defenses that would have succeeded at trial, and the Appellant is innocent as the legal requirements were not, and could not, be met for crimes charged.

3) Counsels ineffectiveness caused the Appellant to enter an involuntary and unknowing plea by failing to litigate an intercept suppression motion of arguable merit, counsel admits would likely have won, and the intercepts were the gravamen of the Commonwealth's case.

4) Counsels ineffectiveness caused the Appellant to enter an involuntary and unknowing guilty plea by failing to undertake a reasonable investigation, unaware of law fundamental to the case, abandoning requested discovery, and stipulating to false facts which directly inculpated the Appellant, at an in-chambers, off the record, Habeas Corpus hearing, with counsel paid in excess of $250,000 dollars for Petitioner's legal defense.

5) The PCRA Hearing delays violate the Appellant's Due Process rights and the DAO is precluded at law from alleging prejudice purported from Mr. Samios

death pursuant to 42 Pa.C.S. 9543(b) and <u>Commonwealth v. Renchenski</u>, 616
Pa. 608, 52 A.3d 251 (Pa. 2012).

*See* "Brief for Appellant," 9/04/14, p. 4. We focus our analysis on these issues and find they encompass the additional more detailed claims presented in Appellant's Amended Petition filed on February 3, 2010.[76]

## IV. ANALYSIS

### a. Jurisdiction

The PCRA requires that any petition for post-conviction relief must be filed within one year of the date judgment becomes final. 42 Pa.C.S. § 9545(b)(1). The Superior Court of Pennsylvania affirmed Appellant's conviction and judgment of sentence on July 6, 2006. Appellant did not seek review with the Supreme Court of Pennsylvania and, accordingly, he had until approximately October 6, 2007 to file a timely PCRA Petition. Therefore, his initial *pro se* Petition filed on June 29, 2007 is timely.

### b. Waiver

We find that some claims raised pursuant to Appellant's brief filed on September 4, 2014 are waived and, as a result, we set forth the general rule of waiver below.

The entrance of a guilty plea "constitutes a waiver of all nonjurisdictional defects and defenses" and "[w]hen a Appellant pleads guilty, he waives the right to challenge anything but the legality of his sentence and the validity of his plea." <u>Commonwealth v. Montgomery</u>, 401 A.2d 318, 319 (Pa. 1979) (internal citations omitted). *Accord* <u>Commonwealth v. Unger</u>, 432 A.2d 146 (Pa. 1980); <u>Commonwealth v. Khorey</u>, 500 A.2d 462, 463 (Pa. Super. 1985).

---

[76] We note that all issues presented in Appellant's Amended PCRA petition filed on February 3, 2010 were addressed in his brief and, as a result, we will only analyze those claims in addition to the more detailed factual bases thereunder as set forth in his amended petition.

Pennsylvania Rule of Criminal Procedure (Pa.R.Crim.P.) 902 (A)(11) provides that a PCRA Petitioner is required to provide all grounds for the relief requested in his PCRA Petition. Furthermore, the Petitioner is required to set forth the facts supporting each ground that appear in the record and the place where they appear in the record, as well as an identification of any affidavits, documents, or other evidence showing supporting facts that are not of record. Pa.R.Crim.P. 902(A)(12)(a) & (b).

It follows that a claim is waived where a petitioner fails to raise it in his PCRA Petition or any amended petition filed thereafter. *See* Commonwealth v. Brown, 872 A.2d 1139, 1146 (Pa. 2005).

### c. Prejudice

We previously denied the Commonwealth's "Motion to Deny and Dismiss PCRA Action Based on Substantial Prejudice to the Commonwealth" on August 18, 2011. However, upon consideration of the additional testimony and evidence presented pursuant to the nine (9) additional evidentiary hearings which occurred following our denial, we will revisit the issue herein.

42 Pa.C.S. § 9543(b) provides as follows: "Even if the petitioner has met the requirements of subsection (a), the petition shall be dismissed if it appears **at any time** that, because of delay in filing the petition, the Commonwealth has been prejudiced either in its ability to respond to the petition or in its ability to re-try the petitioner." 42 Pa.C.S. § 9543(b) (emphasis added). Such a delay has been interpreted to encompass a delay in the filing of an amended petition. Commonwealth v. Markowitz, 32 A.3d 706, 712-13 (Pa. Super. 2011). More recently, in Commonwealth v. Renchenski, 52 A.3d 251 (Pa. 2012), the Supreme Court of Pennsylvania established the following:

> Upon review, we find that the Commonwealth's construction of Section 9543(b) as applicable to delays in filing either original or amended petitions is the most

consistent with the legislative intent underlying the PCRA. Initially, we note that Section 9543(b) was enacted as a part of the General Assembly's overhaul of the post-conviction relief process in 1988...and the requirement that an evidentiary hearing be held prior to dismissal for a delay in filing that causes prejudice to the Commonwealth was added via the 1995 amendments to the PCRA, which also created the one-year jurisdictional time bar... We have observed that this one-year time limitation, coupled with its few exceptions, reflects a legislative balance between the competing concerns of the finality of adjudications and the reliability of convictions. Section 9543(b) further demonstrates this balance by permitting a PCRA court to dismiss a matter on grounds of delay, which promotes the interest in finality, while requiring an evidentiary hearing where the Commonwealth must prove prejudice, thereby protecting the reliability of the underlying conviction. Similarly, as the Commonwealth points out, Section 9543(b) specifies that prejudice can occur 'at any time,' indicating that it was not only the commencement of PCRA proceedings with which the Legislature was concerned.

Renchenski, 52 A.3d at 259 (internal citations omitted). In dismissing the Appellant's PCRA Petition based on prejudice resulting to the Commonwealth due to the delay in the filing of an amended petition, the Court reasoned as follows:

In sum, we conclude that the Legislature has balanced the policy concerns implicated by protracted litigation of PCRA claims and determined that, in certain instances of substantial delay, the prejudice suffered by the Commonwealth as a result of that delay, as demonstrated at an evidentiary hearing, justifies dismissal of an original or amended petition.

Id. at 623-24. *See also* Commonwealth v. Bell, 706 A.2d 855, 859-60 (Pa. Super. 1988) (finding prejudice existed rendering the Commonwealth unable to re-try a PCRA petitioner where the only eyewitness to the offenses underlying his conviction was unavailable).

Thus, based on the preceding caselaw, the Supreme Court of Pennsylvania has recognized that the Commonwealth can assert prejudice even after a first petition is filed, and, therefore, the examination of the existence of prejudice is not limited to the timing of the initial petition. As such, we will review the Commonwealth's assertion of prejudice as a result of the protracted delay of litigation in the instant case, as well as the delay in Appellant's filing of an amended petition.

On February 17, 2011, Mr. Samios, who in this Court's estimation was a necessary and material witness in the Commonwealth's case, died. His death occurred after our grant of Appellant's request to proceed *pro se* and three (3) evidentiary hearings in which Appellant represented himself. It is unequivocal that Samios was present at Appellant's preliminary hearing and, in fact, because of the waiver of that hearing, the District Attorney permitted Mr. Fink to question Samios directly in order to get more information to attempt to establish the vitality of any potential defense.

At the outset of his PCRA proceedings, Appellant filed numerous Motions to Remove Attorney Elgart, and despite his representation by Attorney Cooper thereafter following counseled hearings which had already concluded, he continually indicated his desire to proceed further *pro se.*[77] At the time of the first hearing on January 23, 2008, until the date of the Grazier hearing on October 1, 2009 (the initial "close" of proceedings), almost two (2) years had elapsed. Moreover, we granted Appellant's Petition to Open [the record], and, to give the Commonwealth sufficient notice of any new claims Appellant now raised, we ordered that he file an Amended PCRA petition while providing the District Attorney a commensurate amount of time to respond. This Amended Petition was not filed until February 3, 2010.

Our review of the facts supporting Appellant's conviction, as well as the evidence admitted in the numerous PCRA hearings, confirms that Mr. Samios' testimony was essential to prove what occurred during the face-to-face meetings with Appellant, including the receipt of the $2,000 down payment as well as documents to corroborate his presence at the Lower State Road property. Although there is a record of the conversations which took place during this time and Detective Carroll attested that Mr. Samios provided him with the $2,000.00 following the in-person meeting

---

[77] Appellant **DEMANDED** hearings by video, as opposed to in-person, which ultimately extended the delay between hearings, due to the scarcity of video dates at Cresson SCI, the unavailability of witnesses, lawyers and the court.

captured on Tape 6, there is no video or physical surveillance of the meeting. It would be in the Commonwealth's interest for Mr. Samios to testify as to the content of conversations which were not recorded in Tape 10, as a result of the tape being full. Furthermore, Appellant's argument regarding a violation of the Wiretap Act regards his claim that Mr. Samios, in his own words, was "on Heroin when coerced into consent, and that Commonwealth promised to have 703 North Street, Doylestown, Pa, Deeded to Informants in exchange for consent," which implicates the necessity of Samios' testimony. *See* "Amended PCRA," 2/03/10, ¶ 5(A)(e)(i).

Moreover, Appellant alleges that the interceptions took place in North Wales, Montgomery County, Pennsylvania and in Baltimore, Maryland, further necessitating Samios' testimony to the contrary. *See* id. at ¶ 5(A)(f). Appellant also challenges the fact that there are no statements, interview or police reports to corroborate Samios' statements that the investigation began in the context of insurance fraud. *See* id. at ¶ 6(A)(d)(ii).

We also incorporate by reference this prejudice analysis in terms of the relief sought by Appellant, i.e., a withdrawal of his guilty plea. Where an Appellant seeks to withdraw his guilty plea after sentence has been imposed, he must show that "manifest injustice will result if he is not permitted to withdraw the plea." Commonwealth v. Kirsch, 930 A.2d 1282, 1284-85 (Pa. Super. 2007). Even when an Appellant seeks to withdraw his/her guilty plea prior to sentencing, which is liberally granted as long as he/she offers a "fair and just" reason and asserts his/her innocence, the trial court makes an exception for those cases in which substantial prejudice would inure to the Commonwealth as the result of the grant of a new trial, which in this case would require witnesses, prosecutors and defense counsel try a case fourteen years-old, and where an essential witness has died. Id. at 1285.

Prejudice in this context is defined as follows:

...a showing that due to events occurring after the plea was entered, the Commonwealth is placed in a worse position than it would have been had trial taken place as scheduled. This follows from the fact that the consequence of granting the motion is to put the parties back in the pre-trial stage of proceedings. This further follows from the logical proposition that prejudice cannot be equated with the Commonwealth being made to do something it was already obligated to do prior to the entry of the plea.

Id. at 1286.

Pennsylvania caselaw dictates that the Commonwealth suffers substantial prejudice where necessary witnesses become unavailable or reluctant to testify during the time period between the guilty plea and the filing of a motion to withdraw a guilty plea. *See* Commonwealth v. Cole, 564 A.2d 203, 206 (Pa.Super. 1989); Commonwealth v. Carr, 543 A.2d 1232, 1234 (Pa.Super. 1988). Although Carr involves the reluctance of family members, we find the following reasoning to be applicable by extension to Mr. Samios' death in the instant case:

...the delays occasioned by the plea and subsequent motions for continuances by appellant resulted in a shift in family sympathies from the child victim to appellant. Though undoubtedly available in a technical sense, the reluctance of family members to testify in a way which would cause the incarceration of appellant is evident, and would have significantly impaired the prosecution of this case...

Carr, 543 A.2d at 1234.

Appellant's allegation that the District Attorney's Office in any way delayed these proceedings is frivolous and without merit. The record is replete with Appellant's engaging in a "fishing expedition," and although we gave Appellant much leeway as a result of his *pro se* status, he incessantly attempted to not only amass additional trivial evidence from witnesses to establish inapt new claims, he also entered into evidence dilatable exhibits collateral to this Petition. He inundated this Court, the District Attorney and his appointed counsel with over fifteen (15) exhibit "sets" containing documentation relative mostly to the civil litigation brought against many of the

individuals involved in his prosecution and defense in an attempt to establish minor contradictions or inconsistent statements in various witnesses' testimony. This evidence was likewise without merit.

Further, there were many collateral matters advanced by Appellant at the evidentiary hearings that we considered but did not utilize in our analysis of his claims, as set forth below, including the civil litigation between Appellant and Samios and Fryling regarding the Bill of Sale for a truck and a Quiet Title action on the 703 North Street property, information regarding an individual who was present at Appellant's residence during the execution of the search warrant and whose computer was allegedly found to contain pornography, and Detective Carroll's phone records, which did not in any way lessen the credibility of his testimony, all of which had no bearing on the instant claims. Further, he challenged the efficacy of Judge Biehn's authority as well as the authority of all individuals who were employed at the District Attorney's Office during this relevant time period. He insisted on playing the intercepted tapes for the Court during Detective Carroll's testimony, despite our independent review of all tapes in chronological order. Ultimately, Appellant used the PCRA process as an attempt to re-try his case, and we find Appellant strayed from his proposed summary of the evidence that he set forth at the August 26, 2010 hearing (the first *pro se* hearing). N.T. 8/26/10, pp. 22-35.

In the 1,987 total pages of transcripts[78] from the thirteen (13) evidentiary hearings in which Appellant proceeded *pro se*, a very small portion of the testimony can be attributed to the Commonwealth's cross-examination, as the Commonwealth's evidence consisted solely of the cross-examination of witnesses as well as the admission into evidence of the following relevant exhibits: a total and complete copy of the transcribed tapes, Detective Carroll's Memorandum of

---

[78] An additional 953 pages of transcripts comprises the prior counseled hearings for a total of 2,940 pages.

Interception, the composite tape played at Appellant's Guilty but Mentally Ill/Sentencing Hearing, Detective Carroll's "A" Certification with related documents, copies of the original envelopes containing the intercept tapes, Mr. Samios' death certificate, and a document indicating that Mr. Zellis was designated to sign criminal informations on behalf of District Attorney Gibbons.

We find that Appellant's attempted "fishing expedition" and the introduction of uncorroborated evidence are an abuse of the PCRA process and do not indicate any "rehabilitation" on his part.

Therefore, Appellant's fifth claim,[79] that the PCRA Hearing delays violate the Appellant's Due Process rights prohibiting the Bucks County District Attorney's Office from alleging prejudice based on the death of Mr. Samios to be without merit and, we find sufficient prejudice has been established to support the dismissal of the instant PCRA Petition. We will, however, address all claims Appellant has alleged to fully answer this appeal.

### d. Ineffective Assistance of Counsel/Voluntariness of a Valid Guilty Plea

Appellant's first (1st) through fourth (4th) claims presented in his Brief in Support of his PCRA petition encompass ineffective assistance of counsel. As such, we will briefly set forth the applicable standard below.

Pursuant to the PCRA, in order to sustain a claim for ineffective assistance of counsel, Appellant has the burden to prove by a preponderance of the evidence that his conviction and judgment of sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of [his] particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 P.C.S. § 9543(a)(2)(ii).

---

[79] We have taken this claim out of turn, as its disposition is sufficient, in and of itself, to warrant our denial of Appellant's PCRA Petition and all amended petitions filed thereafter.

A criminal defendant has the right to effective assistance of counsel during a plea process as well as during trial. Commonwealth v. Rathfon, 899 A.2d 365, 369 (Pa.Super. 2006) (citation omitted). In reviewing an ineffective assistance of counsel claim, a court presumes that counsel was effective. Commonwealth v. Fletcher, 986 A.2d 759, 772 (Pa. 2009). A defendant has the burden to show that (1) the underlying claim is of arguable merit; (2) counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; **and** (3) he was prejudiced by counsel's ineffectiveness. Commonwealth v. Walls, 993 A.2d 289, 296 (Pa. Super. 2010).[80] Counsel cannot be deemed ineffective for failing to raise a meritless claim. Commonwealth v. Spotz, 896 A.2d 1191, 1122 (Pa. 2006) (citation omitted). In order to meet the prejudice prong, a defendant must show that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Walls, 993 A.2d at 296, *quoting* Strickland v. Washington, 104 S.Ct. 2052, 2068 (1984). A claim of ineffectiveness may be denied where a defendant's evidence fails to meet any of these prongs. Commonwealth v. Rainey, 928 A.2d 215, 224 (Pa. 2007).

Furthermore, Appellant claims that trial counsel's ineffectiveness caused him to enter an involuntary and unknowing plea. The court in Commonwealth v. Kersteter held that "[a] defendant is permitted to withdraw his guilty plea under the PCRA if ineffective assistance of counsel caused the defendant to enter an involuntary plea of guilty." 877 A.2d 466, 468 (Pa. 2005). In order to prevail on a claim alleging ineffective assistance of counsel in connection with the entry of a guilty plea, a defendant must demonstrate that the ineffective assistance caused the defendant to enter an involuntary or unknowing plea. Commonwealth v. Hickman, 799 A.2d 136, 141 (Pa.Super. 2002).

---

[80] Referred to hereinafter as the "ineffectiveness standard."

It is important to note that all that is required in terms of a valid guilty plea is that the Appellant's decision to enter said plea be knowingly, voluntarily and intelligently made, and "[t]he law does not require that a Appellant be pleased with the outcome of his decision to enter a plea of guilty." Commonwealth v. Myers, 642 A.2d 1103, 1105 (Pa.Super. 1994).

The Comments to Pa.R.Crim.P. Rule 590 provide guidelines for determining whether a defendant acted knowingly, voluntarily, and intelligently in entering a guilty plea, as follows:

(1) Does the Appellant understand the nature of the charges to which he or she is pleading guilty or *nolo contendere*?

(2) Is there a factual basis for the plea?

(3) Does the Appellant understand that he or she has the right to trial by jury?

(4) Does the Appellant understand that he or she is presumed innocent until found guilty?

(5) Is the Appellant aware of the permissible range of sentences and/or fines for the offenses charged?

(6) Is the Appellant aware that the judge is not bound by the terms of any plea agreement tendered unless the judge accepts such agreement?

Moreover, "reliance on counsel's advice as to the likely consequences of a guilty plea does not render the plea involuntary and is not grounds for the withdrawal of a plea." Commonwealth v. Price, 452 A.2d 840, 843 (Pa.Super. 1982). "[A] defendant is bound by the statements which he makes during his plea colloquy." Commonwealth v. Barnes, 687 A.2d 1163, 1167 (Pa. 1997). In addition, "once a defendant has entered a plea of guilty, it is presumed that he was aware of what he was doing, and the burden of proving involuntariness is upon him." Commonwealth v. Myers, 642 A.2d 1103, 1105 (Pa.Super. 1994) (quotations and citations omitted). The determination as to whether or not a guilty plea was involuntary is made by an examination of the totality of the circumstances surrounding the plea. Commonwealth v. Fluharty, 632 A.2d 312, 314-

15 (Pa.Super. 1993), *citing* Commonwealth v. Shaffer, 446 A.2d 591, 595-96 (Pa. 1982), Commonwealth v. Klinger, 470 A.2d 540, 547 (Pa.Super. 1983).

The Superior Court of Pennsylvania succinctly set forth the following with regard to a claim of an involuntary guilty plea:

> In order for a guilty plea to be constitutionally valid, the guilty plea colloquy must affirmatively show that the Appellant understood what the plea connoted and its consequences. This determination is to be made by examining the totality of the circumstances surrounding the entry of the plea. Thus, even though there is an omission or defect in the guilty plea colloquy, a plea of guilty will not be deemed invalid if the circumstances surrounding the entry of the plea disclose that the Appellant had a full understanding of the nature and consequences of his plea and that he knowingly and voluntarily decided to enter the plea.

Fluharty, 632 A.2d at 314-315 (internal quotations and citations omitted).

Regarding the factual basis prerequisite to a valid guilty plea, "[i]t is clear that before accepting a plea of guilty, the trial court must satisfy itself that there is a factual basis for the plea…However, 'the 'factual basis' requirement does not mean that the defendant must admit every element of the crime.'" Id. at 315 (internal citations omitted).

A careful review of both the notes of testimony from the Guilty Plea and Guilty but Mentally Ill/Sentencing Hearing reveal that Appellant's plea was knowing, intelligent and voluntarily made. Appellant understood that he was waiving his right to a trial, as well as the Commonwealth's burden of proving the crimes with which he was charged beyond a reasonable doubt. Furthermore, he understood that he was afforded the presumption of innocence and by pleading guilty he was "giving up substantially all of [his] legal rights." In terms of cases like his, in which there was not an agreement as to sentence, Appellant understood that Judge Biehn would refer to the Sentencing Guidelines' recommendation. N.T. 3/28/05, pp. 3, 6.

Judge Biehn meticulously set forth each crime that Appellant was charged with, the grading of said crime, as well as the maximum penalty. Appellant indicated that he understood. Judge Biehn recognized that he was aware that Appellant was on medication several days prior to the plea, and he ensured again that Appellant understood the proceedings. N.T. 3/28/05, pp. 7-17.

In terms of the factual basis, as set forth above, Mr. Fink, Appellant and Judge Gambardella agreed that the facts set forth in the Habeas Corpus document (Exh. C-1) were to be incorporated as the factual basis for the plea. Again, Appellant indicated that he reviewed said stipulation and he acknowledged it was accurate and that he committed all acts outlined therein. Appellant made two (2) additional acknowledgments that he committed the instant offenses, and he also acknowledged that he understood that he had the right to file a motion to withdraw his guilty plea within ten (10) days. N.T. 3/28/05, pp. 17-21.

Appellant indicated that he had no questions regarding the guilty plea proceedings in open court just prior to Judge Biehn's acceptance of said plea. Finally, Appellant again indicated that he understood the guilty plea proceedings. N.T. 3/28/05, pp. 21, 23-24.

In terms of the guilty but mentally ill plea procedure, following an in-depth explanation from Judge Biehn, Appellant indicated that he understood. N.T. 3/28/05, pp. 14-16, 19-20.

At Appellant's Guilty but Mentally Ill/Sentencing Hearing, Judge Gambardella set forth the facts from the Habeas Corpus document on the record, which was later entered into evidence as Exh. CE-1. N.T. 5/25/05, pp. 6-30. During this recitation, the record reveals that Appellant understood the recitation and he never made an indication that he disagreed with the facts presented therein.

Judge Biehn indicated that Appellant appeared to understand "exactly what I said and seemed to have no question about that. He is an attorney and he seemed to follow along." N.T. 3/28/05, p. 20.

Furthermore, it is noteworthy that Appellant admitted he had occasion to practice criminal law when he was still a barred attorney and was therefore familiar with the elements prerequisite to a lawful guilty plea colloquy, and understood that any right he possessed prior to the entrance of the plea was waived and that his sentence was at the discretion of the trial judge. N.T. 6/26/08, pp. 30-31, 67-68, 69, 70, 89-90, 97; N.T. 11/25/08, pp. 46-48.

With this backdrop, we will address Appellant's more specific claims below.

### i. Involuntary and Unknowing Guilty Plea- Competency

Appellant first claims that his guilty plea was involuntarily and unknowingly entered as the result of his alleged incompetence based on withdrawal symptoms from the "sudden cessation of medication." *See* "Amended PCRA," 2/03/10, ¶ 4(A)(a)(i).

A well-settled principle in this Commonwealth is that "a defendant is presumed to be competent to stand trial." Commonwealth v. Santiago, 855 A.2d 682, 694 (Pa. 2004). Furthermore, "the burden is on Appellant to prove, by a preponderance of the evidence, that he was incompetent to stand trial." Id. 50 Pa.C.S. § 7402(a) provides that incompetency is defined as follows: "[w]henever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense."

The Superior Court of Pennsylvania set forth the relevant standard to determine a Appellant's mental competency to enter a guilty plea as follows: "whether [a defendant] had sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational

understanding, and have as a rational, as well as a factual understanding of the proceedings against him." Commonwealth v. Scott, 414 A.2d 388, 390 (Pa. Super. 1979), *citing* Commonwealth v. Marshall, 312 A.2d 6 (Pa. 1973); Commonwealth v. McNeill, 305 A.2d 51 (Pa. 1973).

Furthermore, in Santiago the Court noted that it was "bound by the PCRA court's credibility determinations where there is record support for those determinations." Santiago, 855 A.2d at 694 (*citing* Commonwealth v. Abu-Jamal, 720 A.2d 79, 93 (Pa. 1998)).

Appellant advanced no evidence, besides his own self-serving and uncorroborated statements, that he was not competent to proceed or that he did not understand the guilty plea proceedings because of his mental illnesses in conjunction with the fact that he remained unmedicated for days leading up to the entrance of the guilty plea.[81] Throughout his testimony and brief, he seemed to confuse his diagnosis of mental illness with competency, which are two (2) separate and distinct constructs. Furthermore, as early as the PCRA evidentiary hearing on June 13, 2011, we indicated our finding that Appellant was not credible. N.T. 6/13/11, p. 162. This finding did not waver and remained unchanged throughout the following nine (9) additional evidentiary hearings.

Dr. Cohen, a mental health expert, had occasion to evaluate Appellant at the time of his guilty plea and Guilty but Mentally Ill/Sentencing Hearings. Although Dr. Cohen was of the opinion that Appellant should remain medicated in order to maintain stability, he did not find that he was incompetent to stand trial at this time. Furthermore, Dr. Cohen testified at Appellant's Guilty but Mentally Ill/Sentencing Hearing that as of the last time he saw him, on March 17, 2005, just a week prior to the guilty plea, he was competent. N.T. 11/19/10, p. 86; N.T. 5/25/05, p. 85.

---

[81] As set forth above, the District Attorney stipulated that if called to testify, Ms. Dunn, the records custodian of the BCCF, would state that the prison records established that there were no medications noted on Appellant's log, indicating it was not prescribed and thus not given. *See* N.T. 6/13/11, pp. 176-79.

Moreover, Dr. Cohen's report, entered into evidence at both the Guilty Plea and Guilty but Mentally Ill/Sentencing Hearing, described Appellant as "well oriented in all spheres" and his "Attention/Concentration is characterized by an ability to attend and maintain focus." While Dr. Cohen indicated that if Appellant stopped taking prescribed medications there **could** have been a re-emergence of symptoms (*see* N.T. 11/19/10, p. 81 (emphasis added)), the testimony of other witnesses indicates that no such re-emergence occurred in the instant case.

Additionally, Dr. Strochak testified at Appellant's Guilty but Mentally Ill/Sentencing Hearing that Appellant was competent to stand trial and he never found him to be incompetent at any point. N.T. 5/25/05, p. 71.

We now turn to the examining testimony of the attorneys who represented Appellant at the guilty plea and sentencing proceedings, both of whom we found credible. Mr. Fink testified that both doctors who examined Appellant, Dr. Cohen and Dr. Strochak, determined that he was competent to stand trial. N.T. 11/24/08, pp. 162-63. Although he was aware that Appellant had not been taking his medication following incarceration at the BCCF, and despite his diligent efforts to forward over Dr. Cohen's letter imploring the disposition of said medication, Fink testified that this was brought to Judge Biehn's attention. N.T. 11/19/10, p. 154. Furthermore, based on his interactions, observations and conversations with Appellant on the day of his guilty plea and during plea proceedings, Fink did not see any indication that Appellant was incompetent, nor did Appellant exhibit an inability to understand the proceedings. N.T. 919/11, pp. 68-70, 72. Similarly, Mr. Tauber testified that he was present at Appellant's guilty plea hearing, met with him in his holding cell prior to that hearing, and did not see any reason to believe that Appellant did not understand the proceedings. N.T. 6/13/11, p. 143. Therefore, this testimony in and of itself

establishes that Appellant was able to consult with counsel with a reasonable degree of rational understanding.

Most importantly, Judge Biehn went to great lengths to ensure that Appellant understood the proceedings, as Judge Biehn was aware of Appellant's lack of medication. Judge Biehn was satisfied with Appellant's indications that he understood the charges against him, the maximum penalties said charges bring, the guilty but mentally ill procedure, the fact that Judge Biehn had discretion in fashioning sentence based on the recommendation of the Sentencing Guidelines, the fact that he was giving up numerous rights afforded by criminal defendants by entering the guilty plea, the fact that his bases for appeal would be limited following entrance of the plea, and his ability to file a motion to withdraw the guilty plea within ten (10) days, as reflected by the record.

Furthermore, Judge Gambardella, who was also present at Appellant's guilty plea hearing and who we find credible, indicated that at the guilty plea hearing Appellant appeared to be competent, oriented and he answered questions appropriately. N.T. 9/19/11, pp. 155-56, 164. Moreover, Judge Gambardella recalled that it was his belief that Appellant was feigning mental illness as demonstrated by his change of behavior when Judge Biehn was on the bench versus his "lively" behavior once the Judge left the bench. *See* N.T. 9/19/11, p. 164.

Finally, our own review of the record indicates that Appellant provided responsive, complete and articulate answers at the guilty plea proceedings. There was no evidence to indicate Appellant was anything less than clear of mind.

Therefore, because Appellant failed to present any evidence of his incompetence at the guilty plea proceedings, and the evidence submitted at the evidentiary PCRA proceedings and the guilty plea proceedings indicates the opposite, Appellant failed to meet the first prong of the

ineffectiveness standard, i.e. that the underlying claim has arguable merit. Thus, trial counsel cannot be deemed ineffective for failing to raise a meritless claim.[82]

### ii. Involuntary and Unknowing Guilty Plea- No Written Colloquy, Not Present for General Colloquy, No Factual Basis, Instructions of Law Incorrect and/or Confusing, Affirmative Defenses[83]

#### a. No Written Colloquy

We will first address Appellant's contention that trial counsel was ineffective for causing Appellant to enter into an involuntary and unknowing guilty plea as the result of the fact that no written colloquy was provided. At the time of Appellant's guilty plea, it was not the practice of this Court to provide criminal defendants with written plea colloquies. Nor is the existence of a written guilty plea colloquy a requirement or prerequisite to establish a knowing, voluntary and intelligent plea. Therefore, because Appellant cannot meet the first prong with regard to the ineffectiveness standard, i.e., his underlying claim is of arguable merit, and he has failed to present authorities to the contrary, we believe this claim should be dismissed.

Next, Appellant makes the bald claim that he was not present for the general guilty plea colloquy. Appellant did not plead this claim in his Amended PCRA Petition, nor was it pled in any prior petition, and thus, it is waived and should be dismissed. *See* Pa.R.C.P. 902(A)(12)(a) &

---

[82] In his Brief, Appellant raises this same ineffective claim regarding failing to raise the issue of competency on the part of Attorney Tauber as well. Although Tauber did not enter his appearance on Appellant's behalf and this claim was not raised in Appellant's Amended PCRA Petition, thus rendering it waived, in the interest of justice we find that the argument pertaining to Attorney Fink on this same subject is applicable by extension. Thus, Tauber cannot be found to be ineffective on the basis of Appellant's meritless claim that he was incompetent prior to his entrance of the guilty plea.

[83] Appellant raises the following claims in his brief relative to Tauber, although these claims were not specifically raised in his amended petition, with the exception of the contention that Tauber was ineffective in failing to withdraw Appellant's plea as a result of a generally "defective plea colloquy apparent on the face of the record." *See* "Amended PCRA," 2/03/10, ¶ 6(B) As such, these claims are waived. *See* Pa.R.C.P. 902(A)(11), (12)(a) & (b). Regardless, the analysis set forth in depth below regarding Fink is applied to Tauber by extension. Accordingly, based on the foregoing analysis we find that Tauber rightfully determined that no basis existed to withdraw Appellant's guilty plea or raise an appellate issue based on a defective plea colloquy. *See* N.T. 6/13/11, pp. 144-146.

(b); Commonwealth v. Albrecht, 720 A.2d 693 (Pa. 1998) (holding claims not raised in an initial *pro se* and subsequent counseled Amended PCRA Petition are deemed waived and cannot be raised on an appeal from the denial of said PCRA Petitions).

In the interest of justice and judicial economy, and despite the fact that this claim is waived, the Notes of Testimony from the guilty plea hearing reflect that Appellant was physically present during the colloquy. *See* N.T. 3/28/05, pp. 2-7. Furthermore, Appellant failed to submit any evidence to the contrary, nor did he testify to same. His physical presence is further corroborated by Judge Gambardella, who was able to describe him as being competent, oriented and able to answer questions appropriately.[84] N.T. 9/19/11, pp. 155-56, 164. Finally, Appellant failed to show any prejudice, as his PCRA testimony establishes that he was familiar with the constitutional rights he possessed that he was giving up by entering into a guilty plea. *See* N.T. 6/26/08, pp. 30-31, 67-68, 70, 89-90, 97; N.T. 11/25/08, pp. 46-48.

### b. No Factual Basis

Next, we will address Appellant's contention that Mr. Fink's ineffectiveness rendered Appellant's guilty plea unknowing and involuntary as the result of his failure to challenge the alleged lack of a factual basis to support the guilty plea, as set forth in his brief. In Appellant's Amended Petition, however, he does not claim that the factual basis was nonexistent and, instead, he claims that he was not consulted regarding the factual basis and avers that it contained "false and misleading information designed to wrongfully inculpate" him. *See* "Amended PCRA," 2/03/10, ¶ 6(A)(e)(i)-(iv).

---

[84] Had Appellant raised this issue previously, testimony regarding his presence during the guilty plea colloquy could have been established.

Because nowhere in the pleadings does Appellant raise the issue that the facts contained in "Court's Exhibit 1" and read into the record at his Guilty but Mentally Ill/Sentencing Hearing would not form a factual basis establishing each and every element of every crime charged, we will not address this more specific contention.

As previously discussed at length, Appellant's plea was subject to stipulated facts incorporated into the record at Appellant's Guilty Plea Hearing and later entered into evidence at the Guilty but Mentally Ill/Sentencing Hearing as Exhibit CE-1. At his guilty plea hearing, Appellant indicated that he reviewed the document and made numerous acknowledgments that he did in fact commit the crimes for which he was charged and convicted. N.T. 3/28/05, pp. 17-10, 21. On May 25, 2005, when Appellant's guilty but mentally ill plea was accepted by the Court following the testimony of two (2) psychiatrists, the District Attorney read said Habeas Corpus document into the record. N.T. 5/25/05, 6-30. The record is devoid of any attempts by Appellant to object to the contents contained therein.

Appellant testified that there existed no factual basis for his plea contained on the record because the District Attorney did not read the affidavit of probable cause or other documents into the record. However, the Notes of Testimony indicate that this was the result of a stipulation between the parties, which Appellant indicated he understood. *See* N.T. 3/28/05, pp. 17-18. Additionally, the facts were read into the record at the Guilty but Mentally Ill/Sentencing Hearing, during which Appellant's Guilty but Mentally Ill plea on Solicitation to Commit Murder was accepted by the Court following testimony from two (2) mental health experts. Appellant was only sentenced on the Solicitation to Commit Murder count.

We find Appellant's testimony that he never reviewed Exhibit CE-1 prior to it being read into the record disingenuous and not worthy of belief. *See* N.T. 3/28/05, p. 18. The record reflects

that Appellant reviewed the Affidavit of Probable Cause attached to the Criminal Complaint (which forms the basis for the Habeas Document, in addition to the content of the transcribed tapes); that he listened to relevant portions of the interceptions at the District Attorney's Office with both Fink and Judge Gambardella present, that Fink provided him with a copy of the tapes prior to the Guilty Plea, and that he listened to those tapes prior to the plea. N.T. 11/24/08, p. 19; N.T. 11/25/08, p. 64; 5/25/05, pp. 90-91. Fink corroborated that portions of the transcribed tapes were played for Appellant at a meeting in the District Attorney's Office. N.T. 11/24/08, pp. 142, 151-53; N.T. 9/19/11, pp. 83-84; N.T. 2/08/11, p. 131.

Furthermore, we find Fink's testimony credible in that he assured this Court that he discussed the possibility of a guilty plea at length with both Appellant and Attorney Tauber, that Appellant understood the decision to enter the plea, the reasons supporting Fink's recommendation he enter into a plea, and what the facts of the case were. N.T. 11/24/08, pp. 126-28, 173-74; N.T. 9/19/11, pp. 57, 63-65, 67, 72.

Therefore, because trial counsel cannot be deemed ineffective for failing to raise a meritless claim, and because Appellant has not established any evidence aside from his uncorroborated and self-serving statements[85] that he brought any disagreement with the facts contained in Exhibit CE-1 to counsel's attention, he cannot succeed on this claim.

### c. Incorrect/Confusing Instructions of Law

Appellant attempts to claim that Judge Biehn's guilty plea colloquy did not adequately set forth the elements of Burglary, Kidnapping, and Attempted Murder and incorrectly identified False

---

[85] Although Fink recalled that Appellant disagreed with alleged misstatements of fact made by Samios and Fryling as related to the probable cause affidavits, he was of the opinion that even with these facts being excised there still existed sufficient evidence. *See* N.T. 9/19/11, pp. 63-65.

Imprisonment and Unlawful Restraint as a lesser included offense of Kidnapping. Our review of the Guilty Plea colloquy and relevant caselaw indicates that this claim is without merit.

Regarding Burglary, Appellant claims that the charge omitted the exception of "unless licensed or privileged to enter." *See* "Brief for Appellant," 9/04/14, p. 22. The record reflects that Judge Biehn explained that Burglary was "the entry of a building with the intention of committing a crime." N.T. 3/38/05, pp. 16-17. Caselaw dictates that the elements of burglary or attempted burglary are as follows: "...intent to commit a felony or any qualified crime within the burglarized premises." Commonwealth v. Wilamowski, 633 A.2d 141 (Pa. 1993) (*citing* Commonwealth v. Graves, 334 A.2d 661 (1975), Commonwealth v. Stanley, 309 A.2d 408 (1973)). Further, 18 Pa.C.S. 3502(a) provides that individuals cannot be convicted of Burglary where they are "licensed and privileged" to enter the premises. *See* Commonwealth v. Sanchez, 82 A.3d 943, 973 (Pa. 2013). However, "[a]ny license or privilege to enter a premises is negated when it is acquired by deception." Id. Furthermore, "legal ownership is not synonymous with license or privilege" to enter for purposes of Burglary. Commonwealth v. Majeed, 694 A.2d 336, 338 (Pa. 1997). Finally, the Superior Court of Pennsylvania in Commonwealth v. Corbin, 446 A.2d 308, 311(Pa. Super. 1982), held that a person who is privileged to enter a premises may still be found guilty of Burglary if he/she was not reasonably expected to be present. Thus, Appellant cannot show prejudice.

In terms of the Kidnapping charge, Appellant claims that Judge Biehn failed to state the element of "unlawfully moving another a substantial distance." We find this claim to be of no merit. Judge Biehn explained at the guilty plea hearing that Criminal Attempt to Commit Kidnapping entailed the following elements: "to take someone and move them to another spot with the intention of committing some crime upon them." N.T. 3/28/05, p. 13. Therefore, although not

in the exact language of the Kidnapping statute, 18 Pa.C.S. § 2701(a)(2)&(3), we find Judge Biehn's colloquy adequately informed Appellant of the elements, and that Appellant, as a former attorney who previously had the opportunity to practice criminal law, indicated he understood. *See* N.T. 3/28/05, p. 13. Thus, Appellant is unable to show prejudice and Attorney Fink cannot be found ineffective for failing to raise this meritless claim.

Appellant next challenges Judge Biehn's description of Attempted Murder, which was as follows:

> A First Degree Murder is basically a killing which is committed by malice. There has to be premeditation and there has to be a specific intention to take human life. That's what is required to be proved in order to prove a First Degree Murder. It has to be a malicious killing with the specific intention to take life.

*See* N.T. 3/28/05, p. 11. In conjunction with this, Judge Biehn explained that Appellant was entering a guilty plea to Criminal Attempt to Commit Attempted Murder, and that the elements of Criminal Attempt are as follows: "you intended to took a substantial step towards the commission of these crimes...These crimes didn't bear fruition, they weren't culminated, but you attempted to do it and you had the intention of doing it at that time." *See* N.T. 3/28/05, p. 11. Our review of the elements of First Degree Murder, 18 Pa.C.S. § 2702(a), and Criminal Attempt, 18 Pa.C.S. § 901(a), demonstrates that Judge Biehn's explanation of both offenses was accurate and did not contain any material deviations from the requisite statutes.

Finally, in terms of Kidnapping, False Imprisonment and Unlawful Restraint, we find no fault in Judge Biehn's description of False Imprisonment and Unlawful restraint as offenses of a lesser degree than that of Kidnapping. *See* N.T. 3/28/05, p. 14; In re T.G., 836 A.2d 1003, 1009 (Pa.Super. 2003) (holding that false imprisonment is of a lesser magnitude than kidnapping); Commonwealth v. Ackerman, 361 A.2d 746, 748-749 (Pa.Super. 1976) (holding that the only difference in the elements of Kidnapping and Unlawful Restraint is that Unlawful Restraint

includes the element of risk of serious bodily injury, whereas Kidnapping only encompasses the intent to commit bodily injury). Nevertheless, Appellant admitted that he understood the reason Judge Biehn did not set forth in detail the elements of False Imprisonment and Unlawful Restraint. *See* N.T. 3/28/05, p. 14. Ultimately, because Appellant was not sentenced on these offenses separately, pursuant to 18 Pa.C.S. 906, Appellant cannot show prejudice, nor can he show that Fink was ineffective for failing to raise this as a basis to establish a defective plea colloquy.

We note that Appellant's brief cites no authority to support these claims.

### d. Affirmative Defenses

Throughout this section of Appellant's Brief (pages 23-24), Appellant continually mischaracterizes the evidence that was presented throughout the PCRA evidentiary hearings, and twists uncorroborated and self-serving facts in order to prove that an affirmative defense existed in this case.

We agree with Appellant that an individual cannot enter into an intelligent guilty plea where he is unaware of an applicable affirmative defense. *See* Commonwealth v. Fluharty, 632 A.2d 312, 315 (Pa.Super. 1993). However, Appellant failed to disclose that this proposition rests on the fact that "a guilty plea should not be accepted if the Appellant asserts facts that might constitute a defense..." Id. The record reflects that Appellant made no such statement at the guilty plea proceedings. Furthermore, a review of Exhibit CE-1 does not indicate, either directly or indirectly, any potential defense to the crimes charged.

Additionally, Fink testified that he diligently investigated any potential affirmative defenses, including entrapment and drug usage during the intercepted conversations (N.T. 9/19/11, p. 60; N.T. 11/24/08, pp. 95-97), Samios' lack of consent to the interceptions (N.T. 9/19/11, pp. 66, 77); and insanity (N.T. 11/24/08, pp. 162, 164-65; N.T. 8/26/10, pp. 82-85, 86-87, 74-75; N.T.

9/19/11, pp. 27, 58). Ultimately, with regard to all of the above defenses, we found Attorney Fink's statements credible regarding both his investigation as well as his ultimate opinion that none would be meritorious.

### iii. Involuntary and Unknowing Guilty Plea- Failure to Litigate Suppression Motion[86]

The crux of Appellant's claims set forth in his "Amended PCRA" revolve around alleged Wiretap Act violations. *See* "Amended PCRA," 2/03/10, ¶ 5(A)(a)-(h); "Brief for Appellant," 9/04/14, pp. 37-48.

The Wiretapping and Electronic Surveillance Act ("the Wiretap Act"), 18 Pa.C.S. § 5701 et seq., provides in relevant part as follows:

> (2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:
>
> ...
>
>> (ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be initiated, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing

---

[86] Appellant raises the following claims in his brief relative to Attorney Tauber, although Tauber did not enter his appearance in this case and these claims were not specifically raised against Tauber in his amended petition. As such, these claims are waived. *See* Pa.R.C.P. 902(A)(11), (12)(a) & (b). Regardless, the analysis set forth in depth below regarding Attorney Fink is applied to Tauber by extension and, because each and every claim regarding an alleged Wiretap Act violation is without merit, Tauber cannot be deemed ineffective for failing to raise it, to the extent he was legally responsible as he was not Appellant's counsel of record during the trial phase.

the interception shall be the custodian of recorded evidence obtained therefrom;

...

(iv) the requirements of this subparagraph are met. If an oral interception otherwise authorized under this paragraph will take place in the home of a nonconsenting party, then, in addition to the requirements of subparagraph (ii), the interception shall not be conducted until an order is first obtained from the president judge, or his designee who shall also be a judge, of a court of common pleas, authorizing such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

18 Pa.C.S. 5704(2)(ii) & (iv).

Therefore, pursuant to the dictates of the statute, the only requirements for a one-party consensual interception are as follows: the law enforcement officer suspects criminal activity relating to an offense set forth in Section 5708 ("Order authorizing interception of wire, electronic or oral communications"),[87] one of the parties to the communication has given consent to the interception of wire, electronic or oral communications; the district attorney (or a designated assistant district attorney) reviewed the facts and is satisfied that the party had given consent; and that the district attorney (or her designee) has given approval for the interception and acts pursuant to his record-keeping responsibilities set forth in Section 5714(a) and as evidence custodian. *See* 18 Pa.C.S. § 5704(2)(ii).

---

[87] These enumerated offenses include Murder, Aggravated Assault, Kidnapping, Burglary, and Theft by Deception, all of which Appellant initially was suspected and later charged with (except Theft by Deception).

Moreover, for oral interceptions which occur in a non-consenting party's home, in addition to the requirements set forth pertaining to Section 5704(2)(ii), an Order must first be obtained from the President Judge or his designee based upon an affidavit of probable cause prepared by a law enforcement officer. *See* 18 Pa.C.S. § 5704(2)(iv).

In terms of the probable cause requirement necessary to obtain court approval for one-party consensual interceptions, the Superior Court of Pennsylvania has defined the standard for determining whether probable cause exists as that used to determine probable cause for the issuance of search warrants, set forth below:

> The facts contained in the affidavit for a search warrant must be such that an independent, issuing authority, exercising reasonable caution, can conclude that the items sought are connected with criminal activity and that they will be found in the place to be searched. Similarly, in an application for a wiretap, the Commonwealth must establish probable cause to believe that (1) a person has or is about to commit one of the offenses enumerated in the statute, (2) that communications relating to that offense will be transmitted, and (3) that such communications will be intercepted on the facility under surveillance.

Commonwealth v. Doty, 498 A.2d 870, 882 (Pa.Super. 1985) (internal citations omitted).

Pursuant to 18 Pa.C.S. § 5714(a), a further requirement regarding one-party consensual interceptions is that the law enforcement officer must be certified under the act pursuant to Section 5724[88] and should maintain a written record regarding the dates and hours of surveillance, the time and duration of each intercepted communication, the participant(s) in each intercepted conversations and a summary of the content of each intercepted conversations, "where practicable." 18 Pa.C.S. § 5714(a).

---

[88] The Wiretap Act charges the Attorney General and the Commissioner of the Pennsylvania State Police with the responsibility of establishing "a course of training in the legal and technical aspects of wiretapping and electronic surveillance." 18 Pa.C.S. § 5724.

As set forth above, after review of the testimony and relevant evidence (including specifically the wiretap documents contained within 253-2004 and 254-2004), we are satisfied that the oral telephone and in-person conversations were intercepted in accordance with the guidelines and requirements set forth in 18 Pa.C.S. § 5704(2)(ii) & (iv). Detective Carroll, as the criminal investigator, was investigating Appellant based on information from two (2) named informants that Appellant was involved in an insurance fraud and theft by deception scheme. Prior consent to intercept and monitor the telephone calls was obtained from Samios, who was consistently one of the parties involved in the communication. Approval for the interception of the telephone calls that captured the communications at issue here was obtained from Judge Gambardella, who at that relevant time was a Deputy District Attorney designated with the authority to approve and monitor said interceptions. Finally, for the in-home communications, Judge Gambardella petitioned, and Judge Biehn approved his request, for the interception of those communications following a review of Detective Carroll's affidavit of probable cause and a finding that the requisite level of probable cause was established therein.

We found that Detective Carroll possessed the requisite qualifications and training as set forth by the Pennsylvania State Police, as he received his "A" Certification in 1994 and has not experienced a lapse in his status as a law enforcement officer. N.T. 11/24/08, p. 182; N.T. 10/11/13, pp. 48-51, 54-55; *See* Exhibit C-PCRA-6.

The grounds upon which an individual subject to one-party non-consensual interceptions can move to exclude those communications are enumerated in 18 Pa.C.S. § 5721.1, provides in pertinent part as follows:

> **(b) Motion to exclude.**--Any aggrieved person who is a party to any proceeding in any court, board or agency of this Commonwealth may move to exclude the contents of any wire, electronic or oral communication, or evidence derived therefrom, on any of the following grounds:

(1) Unless intercepted pursuant to an exception set forth in section 5704 (relating to exceptions to prohibition of interception and disclosure of communications), the interception was made without prior procurement of an order of authorization under section 5712 (relating to issuance of order and effect) or an order of approval under section 5713(a) (relating to emergency situations) or 5713.1(b) (relating to emergency hostage and barricade situations).

(2) The order of authorization issued under section 5712 or the order of approval issued under section 5713(a) or 5713.1(b) was not supported by probable cause with respect to the matters set forth in section 5710(a)(1) and (2) (relating to grounds for entry of order).

(3) The order of authorization issued under section 5712 is materially insufficient on its face.

(4) The interception materially deviated from the requirements of the order of authorization.

(5) With respect to interceptions pursuant to section 5704(2), the consent to the interception was coerced by the Commonwealth.

(6) Where required pursuant to section 5704(2)(iv), the interception was made without prior procurement of a court order or without probable cause.

18 Pa.C.S. § 5721.1(b). Thus, the preceding provision limits the suppression of evidence for non-constitutional violations of the Wiretap Act to those specific enumerated grounds.

Before reading Appellant's more specific claims of violations of the Wiretap Act, we note for the record that **we found both Detective Carroll and Judge Gambardella's testimony wholly believable and credible.** (emphasis added)

### a. "Section 5721.1(b)(4) Order Deviation"

**First,** Appellant claims that the in-person interceptions which occurred at "4074 Durham Road," his parent's Gardenville residence located in Plumstead Township, Bucks County,

constituted a material deviation pursuant to Section 5721.1(C)(3) from the requirements of Judge Biehn's February 23 and February 27, 2004 Intercept Orders. Both Orders indicate that Judge Biehn authorized in-home interceptions at Appellant's home office in Furlong, as well as "any residence, of target, Joseph Guarrasi, his owned or commonly used places of abode, or any home or place wherein oral communications may occur relating to the same consenting party and participants or anyone else acting on his behalf." Appellant's bald assertion that said language is a violation of his constitutional rights is of no merit and Appellant failed to provide any authority supporting his position. Further, Appellant does not deny that the oral communications intercepted from his parents' Gardenville residence (reflected on Tapes 6 and 10) reflect conversations between Appellant (the target) and Samios (the consenting party), nor does he dispute that this property is situated in Bucks County. Therefore, Fink cannot be deemed ineffective for failing to raise this meritless claim.

**Second**, Appellant claims a material deviation exists from Judge Biehn's February 23 and Judge Heckler's February 27, 2004 Intercept Orders because, according to him, he was in Baltimore, Maryland when some of the calls were intercepted by Detective Carroll. It is uncontradicted that all interceptions in the instant case were conducted, monitored and intercepted in Bucks County. N.T. 8/12/13, pp. 55-56; N.T. 10/10/13, pp. 119, 153; N.T. 10/11/13, p. 64; *See* C-PCRA-5. Furthermore, although Carroll testified that "there may have been times when" Appellant was in Baltimore while interceptions were made, it was clear that during those times Samios (the consenting party) was situated in Bucks County. N.T. 5/03/13, pp. 96-96; N.T. 8/12/13, p. 57. Both parties agree that neither Judge Gambardella nor Detective Carroll sought to submit an application or obtain an order for interceptions in the state of Maryland. N.T. 5/03/13, pp. 98-99; N.T. 8/12/13, p. 147. Appellant again fails to present authority to support this claim,

and he does not dispute that all recordings were monitored and intercepted in Bucks County.[89] Furthermore, with regard to the authority of the District Attorney (or designee) to authorize an interception, pursuant to the dictates of the Wiretap Act, the clear language of Section 5704(2)(ii) indicates that said District Attorney/designee must be of the county "wherein the interception is to be **initiated**." 18 Pa.C.S. § 5704(2)(ii) (emphasis added). Hence, because the designee of the Bucks County District Attorney approved the one-party consensual interceptions in the instant case and all interceptions were conducted and recorded in Bucks County, Appellant's claim is without merit and it follows that, as a result, Fink cannot be deemed ineffective for failing to raise and/or litigate it.

**Third**, Appellant claims that the District Attorney's Office disclosed the content of interceptions in a press conference in violation of the Wiretap Act (18 Pa.C.S.A. § 5717 & § 5704(2)(iv)). This issue was not raised in his Amended PCRA Petition or any other petition. It is, therefore, waived. *See* Pa.R.C.P. 902(A)(11), (12)(a) & (b). Regardless, Appellant's reliance on Karoly v. Mancuso, 65 A.3d 301 (Pa. 2013), and his own self-serving and uncorroborated statements are misplaced. Karoly was a civil case on appeal from the granting of a defense motion for summary judgment involving private non-consensual communications between an attorney and his client who was, at the relevant time, incarcerated and calling from a county correctional facility. Id. at 303, 309-313. Appellant does not point to anything substantial in the record, besides the fact that Fink was aware of the publicity and a newspaper article regarding Appellant's case,[90] which would indicate that a specific violation of the Wiretap Act occurred regarding any alleged unlawful

---

[89] In Appellant's Amended Petition, he advances the same argument with regard to his alleged presence in Montgomery County. See "Amended PCRA," 2/03/10, ¶ 5(a)(f). Although Appellant does not now advance this claim in his brief, we apply our reasoning regarding the lack of merit by extension.

[90] N.T. 11/24/08, pp. 92-93. *See* N.T. 2/07/11, p. 8.

disclosures to the press. Moreover, the newspaper article to which Appellant refers was, according to him, published on March 3, 2004, which occurred after the filing of the criminal complaint. The criminal complaint was dated and filed on March 2, 2004, and is, by its very nature, a public record. Accordingly, Fink cannot be deemed ineffective for failing to raise this meritless claim.

Appellant's **fourth** claim relates to the context of Samios' consent. Appellant claims that Samios was coerced by the Commonwealth to consent by the promise of a deed to the 703 North Street property, in violation of Section 5721.1(b)(5), and therefore his consent was involuntary and Fink was ineffective for failing to litigate this claim.

Appellant's analysis is solely supported by mischaracterized evidence and testimony as well as facts not in evidence. Throughout Appellant's examination of witnesses, particularly Detective Carroll, he continually attempted to elicit collateral information regarding the 703 North Street property, which was the subject of the suspected theft by deception offense that launched the investigation into the instant case and ultimately led to investigators' awareness of the solicitation to commit murder plot relative to a different property.[91] Appellant was never charged or convicted for the alleged theft by deception regarding the 703 North Street property. Appellant claims that the District Attorney and County detectives aided Samios and Fryling in "regaining" this property. He fails, however, to cite or present any evidence to support his contention that any promises or threats were made regarding this property to force Samios to consent. Appellant's contention is speculative, frivolous and the result of his unwillingness to accept, as reflected by his incessant examination of witnesses about the residence in a failed attempt to glean information establishing and supporting a PCRA claim, that the events regarding the North Street property are collateral and wholly separate and distinct from the crimes for which he was convicted.

_____

[91] *See* N.T. 8/17/12, pp. 96-98, 102, 108-11; N.T. 8/12/13, p. 167; N.T. 10/10/13, pp. 130-31, 133-35, 142, 156-57, 162-64; N.T. 10/11/13, p. 58; N.T. 6/30/14, pp. 64, 67.

In fact, the record indicates that Samios' consent was knowing and voluntary. Judge Gambardella testified that at the time that Samios signed the Memorandum of Consent, which was contained in 254-2004, he was alert, oriented and there was no indication that he was under the influence. Judge Gambardella indicated that no promises or threats were made to force Samios to consent. N.T. 9/19/11, pp. 124-126. In terms of the second consent regarding 253-2004, Judge Gambardella testified that no threats or promises were made in order to force Samios to consent. N.T. 9/19/11, p. 141. Furthermore, Detective Carroll corroborated that he had no knowledge of any promises or offers made to Samios to secure his cooperation and/or consent. N.T. 10/10/13, p. 130; N.T. 10/11/13, pp. 58, 59, 93. Detective Carroll also noted that Samios participated in the investigation without hesitation following the issuance of Judge Biehn and Judge Heckler's Orders authorizing the non-consensual telephone and in-person interceptions. N.T. 10/11/13, pp. 59, 93.

In terms of the argument that Samios did not give proper consent for the monitoring and recording of the intercepted conversations, Fink explained that in his interview of Samios on the date the preliminary hearing was waived, Samios was "eager to assist the Commonwealth and eager to help prosecute Mr. Guarrasi." N.T. 9/19/11, pp. 66, 77. Additionally, Fink indicated that he, Tauber and other attorneys from Tauber's firm reviewed the relevant statute and caselaw and determined that any attack which could be launched on the one-party consensual intercepts would prove unsuccessful. *See* N.T. 11/24/08, pp. 122-23, 173; N.T. 2/07/11, pp. 12-17, 148-53; N.T. 2/07/11, pp. 112-13; N.T. 9/19/11, pp. 60-61. Accordingly, because Appellant is unable to establish that the Commonwealth coerced Samios' consent, Fink cannot be found ineffective for failing to litigate said claim.

Appellant's **fifth** claim regarding alleged Wiretap Act violations is that Detective Carroll was not in compliance with Section 5704(2)(iv) because he did not draft the Memorandum of

Interception contemporaneously with the monitoring and recording of intercepted telephone and in-person conversations. We find his contention is of no moment, because although Detective Carroll did not draft the Memorandum of Interception admittedly until 2010, this in and of itself does not establish any of the enumerated statutory grounds necessitating exclusion of the contents of the intercepted conversations. *See* 18 Pa.C.S. § 5721.1(b)(1)-(6). Furthermore, Section 5714(a) (indicating a written record should be kept of interceptions) contains the proviso "where applicable," and the significant contents of the intercepted conversations were properly set forth by Carroll in the Affidavit of Probable Cause. The Memorandum of Interception that Carroll prepared, describing the date and hours of investigation, the dates, times, duration, and location of each intercepted conversation, the identifies of the target (Appellant) and the consenting party (Samios), as well as a summary of the content of each intercepted conversation, is now part of the record. Again, this claim does not constitute a recognized violation of the Wiretap Act warranting exclusion and, accordingly, Fink was not ineffective for failing to raise or litigate said claim on a suppression motion.

Appellant's **sixth** claim is that some of the issues pertaining to the intercepted recordings that were identified and rectified by Detective Carroll amount to a violation of Section 5714(a), which requires that "[t]he recording shall be done in such a way as will protect it from editing or other alteration." 18 Pa.C.S. § 5714(a).

It is well-established in Pennsylvania that

> ...the Commonwealth need not establish the sanctity of its exhibits beyond all moral certainty; all that is required is a reasonable inference that the identity and condition of the exhibits remain unimpaired until surrendered to the court.

Commonwealth v. Judge, 648 A.2d 1222, 1224-25 (Pa.Super. 1994) (internal citations omitted).

In the interest of justice and judicial economy, we believe that Detective Carroll honestly and truthfully set forth all technical issues as well as his own inadvertent mistakes in taping over some of the content and misstating the date of an interception in his preamble.[92] We accept, without reservation, his explanations as to what caused each and every inadvertent issue and mistake, and we find that those issues arose in the absence of malice or intent on the part of the Commonwealth and its investigating officers.

In terms of Appellant's contention that the intercepted tapes lacked a proper chain of custody, we determined that the chain of custody was properly established. Detective Carroll testified that he maintained physical custody of the original analog and digital tapes until they were turned over to Chief McAteer for storage. N.T. 11/24/08, p. 186; N.T. 9/19/11, p. 181; N.T. 8/17/12, pp. 50-51, 55; N.T. 10/11/13, p. 65. Chief McAteer testified that he was the evidence custodian for all of the evidence submitted regarding the instant investigation. N.T. 5/03/13, p. 9. He recalled that he placed the tapes he received from Detective Carroll in the temporary evidence locker in the Bucks County District Attorney's Office, and he was the only person who had a key to that evidence locker. He testified that he turned them over to Detective Carroll who transported them to Mr. Herbert Joe, who was going to review the tapes on behalf of Appellant.[93] Following review, Detective Carroll turned them over for permanent storage at the Bucks County evidence warehouse, located at the Thiokol warehouse. N.T. 5/03/13, pp. 45-46.

Detective Carroll corroborated that Chief McAteer maintained custody of the tapes in the evidence locker located in the detective's section of the District Attorney's Office until Chief McAteer gave them back to Carroll, who then provided them to Mr. Herbert Joe to review on

---

[92] Those issues and explanations are discussed in depth on pages 55 to 58 of this Opinion.

[93] Mr. Joe never testified during the PCRA proceedings or otherwise regarding any detection of evidence tampering.

behalf of Appellant in May of 2009. N.T. 9/19/11, p. 193; N.T. 10/11/13, pp. 65-66. Following Mr. Joe's review of the tapes, Carroll transported them to the Thiokol warehouse where they were placed in a temporary evidence locker. N.T. 9/19/11, pp. 193-94.

In terms of the alleged "tampering" with said tapes, the chain of custody has been established and we accept Detective Carroll's testimony that he did not intentionally delete, alter, make any edits to the tapes, splice different conversations together, nor did he do anything in an attempt to purposefully prejudice Appellant. N.T. 11/24/08, pp. 185-86; N.T. 8/12/13, p. 92; N.T. 10/11/13, pp. 62-63, 69, 95-96. Furthermore, we now have been engaged with Detective Carroll for over six (6) years, and in that time, he has proven to be an effective law enforcement officer, always reliable, truthful and never deceitful.

Thus, based on the foregoing, any claim raised by Attorney Fink regarding a lack of the chain of custody or evidence tampering would have been frivolous and, therefore, he cannot be deemed ineffective.

Appellant's contention that Fink was ineffective for failing to litigate a suppression motion with regard to his claim that Judge Gambardella did not have proper designation to approve one-party consensual interceptions is without merit, as his written authorization from the District Attorney on December 28, 2000[94] proves otherwise, and Section 5704(2)(iv) subsumes all requirements set forth in Section 5704(2)(ii). Thus, Judge Gambardella had proper designation to approve the interceptions.

Appellant also advances the argument that Judge Biehn was not a designee of President Judge Heckler for purposes of the Wiretap Act, and thus, he was not authorized to issue the February 23, 2004 Order. We find this claim frivolous and we take judicial notice that Judge

---

[94] The written authorization was attached as "Exhibit A" to Judge Gambardella's Application for an Order Authorizing the Consensual Interception of Oral Communications in a Home.

Biehn, as the administrative criminal judge during this relevant time, would have beenPresident Judge Heckler's designee.

Finally, Appellant claims that the Affidavit in support of probable cause for purposes of the Orders authorizing one-party consensual interceptions lacked sufficient probable cause. The crux of Appellant's argument is that the affidavit contained numerous "knowing and intentional" false statements that were misleading to the court. Further, he alleges that the Affidavit is silent as to the "informants," i.e. Mr. Samios and Ms. Fryling, in terms of their reliability, veracity, and basis of knowledge. *See* "Brief for Appellant," 9/04/14, pp. 42-43. Because these informants are in fact named and their basis of knowledge established, as the Affidavit sets forth Fryling and Samios' familiarity with Appellant, the contention regarding their reliability, veracity and basis of knowledge is irrelevant.

In terms of the alleged knowing and intentional false statements, Detective Carroll credibly testified that the affidavits of probable cause underlying the wire application documents did not contain known incorrect statements of fact. *See* N.T. 8/17/12, p. 116. The "proof" surrounding Appellant's contention regarding the alleged false facts is nothing more than his mischaracterization of facts, oftentimes "facts" not of record, that followed from his attempt at continuing to abuse the PCRA process throughout the course of the thirteen (13) evidentiary hearings in which he proceeded *pro se* in an attempt to re-try the instant case, despite his competent, knowing, intelligent and voluntary entrance of a guilty plea. We accept Detective Carroll's testimony that he had no knowledge of any of these alleged "false facts" contained within the respective affidavits, and we are satisfied that the affidavits contain sufficient probable cause and that all facts contained therein are true and accurate to the best of Detective Carroll's knowledge.

Accordingly, as previously set forth, Fink cannot be found ineffective for failing to raise meritless and frivolous claims, and because we can glean no determinable Wiretap Act violation, we recommend that Appellant's claims pursuant thereto be dismissed.

### iv. Involuntary and Unknowing Guilty Plea- Failure to Investigate/Factual Basis

Appellant next raises the claim that Fink unreasonably failed to investigate his case, indicating more specifically that he unreasonably failed to investigate the "key evidence" in his case, i.e. the intercept tapes, that he failed to interview alleged "eyewitnesses," that he failed to review Wiretap Act documents, that he failed to properly investigate the $2,000, and that he failed to request or receive full discovery. Initially, we note that Appellant had possession of Fink's file regarding his case and, thus, he was in the best position to determine exactly what discovery documents were contained therein.

In terms of an ineffective assistance of counsel claim regarding an alleged failure to investigate, the "reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation." Commonwealth v. Miller, 987 A.2d 638, 666 (Pa. 2009).

Moreover, in Commonwealth v. Kahlil the Superior Court set forth as follows:

> [t]o establish ineffectiveness for failure to call a witness, Appellant must establish that: (1) the witness existed; (2) the witness was available; (3) counsel was informed of the existence of the witness or counsel should otherwise have known of him; (4) the witness was prepared to cooperate and testify for Appellant at trial; and (5) the absence of the testimony prejudiced Appellant so as to deny him a fair trial.

Commonwealth v. Kahlil, 806 A.2d 415, 422 (Pa.Super. 2002) (citations omitted).

Fink cannot be deemed ineffective for failing to review the entirety of the intercept tapes, as he reviewed the material portions thereof and employed an investigator to review the tapes as a whole. N.T. 11/24/08, pp. 99, 101-02, 179-80; N.T. 11/19/11, p. 30. Furthermore, as previously

noted, he reviewed the Wiretap Act and all relevant caselaw and determined, in consultation with Attorney Tauber, his staff, and Appellant, that no violations of this Act would affect the intercepted tapes' admissibility. *See* N.T. 11/24/08, pp. 122-25, 173, 179; N.T. 2/07/11, pp. 12-17, 148-53; N.T. 2/07/11, pp. 112-13; N.T. 9/19/11, pp. 60-61; N.T. 6/13/11, pp. 135-36, 140-41. Further, as we set forth in detail, Appellant did not establish any Wiretap Act violations warranting the exclusion of the intercepted conversations on the intercepted tapes or the Wiretap Act documents contained within 253-2004 and 253-2005.

Next, in terms of the $2,000, Detective Carroll testified that he provided Detective McDonough with said currency, which was later signed into evidence on March 4, 2004, and placed into an evidence locker by Detective McAteer, for which only he is responsible. N.T. 9/19/11, p. 192. Detective McAteer corroborated this. Further, Detective McAteer was under the impression that this money had since been forfeited. N.T. 5/03/13, pp. 10-11, 17, 42. Therefore, Appellant has not established a break in the chain of custody of the currency, and Fink cannot be found ineffective for failing to ensure the currency was photographed/fingerprinted or otherwise forensically tested or photographed, because conversation captured on Tape 6 verified that the $2,000 was paid to Samios. This was further verified by the detectives' subsequent receipt of the currency that was then immediately placed into evidence.

Appellant failed to raise his claim of the existence of "eyewitnesses" who were not investigated by Fink in his Amended Petition and, accordingly, it is waived. *See* Pa.R.C.P. 902(A)(11), (12)(a) & (b). Nevertheless, Appellant has failed to set forth that counsel was or should have been aware of the existence of the "eyewitnesses," or that the "eyewitness" was prepared to cooperate and testify on behalf of Appellant. Because we do not know the identity of these mystery eyewitnesses, Appellant is unable to establish prejudice. Appellant also failed to call

these witnesses at any of the thirteen (13) evidentiary hearings following his grant of *pro se* status, and he was unable to identify for this Court the content of their proposed testimony. Thus, this claim lacks merit.

Furthermore, subsumed in Appellant's allegation of Fink's failure to investigate is Fink's failure to investigate the basis for Court's Exhibit 1. We have previously explained that this adequately set forth the factual basis for Appellant's plea, and we note that, in the absence of a transcript from the preliminary hearing due to Appellant's decision to waive his preliminary hearing, Judge Biehn reviewed the document that was prepared by Judge Gambardella and stipulated to by Attorney Fink as being a fair and accurate representation of the facts in the Commonwealth's possession at the time of the habeas corpus review.

Because we find none of Appellant's preceding claims have merit, Fink cannot be held ineffective for failing to raise said frivolous claims.

Accordingly, we find trial counsel was not ineffective.

## V.   CONCLUSION

The issues with counsel and Appellant's independent choice to proceed *pro se* has contributed to a plethora of procedural irregularities during the course of this litigation. Appellant's January 14, 2009 Appeal from his PCRA proceedings, in which no Order denying his claims and relief has been issued, was premature and caused a year-long delay. In addition, in the interest of justice, we did not want to limit Appellant's ability to present any witnesses and evidence he deemed relevant in support of his claims. Appellant, however, presented this court with countless voluminous exhibits, which were irrelevant and collateral at best, and continued to ask witnesses on examination either objectionable, repetitive, and/or minimally relevant questions. Ultimately, our review of the Notes of Testimony, documents contained within 253-2004 and 254-

2004, all PCRA filings made by both the Commonwealth and Appellant, and all claims raised through Appellant's June 29, 2007 PCRA Petition and all Amended Petitions filed thereafter, as well as our review of relevant statutory sections and caselaw, reveals Appellant has failed to prove that he is entitled to relief pursuant to the PCRA. We find any and all issues raised herein are without merit, and accordingly enter the Order attached hereto.

Albert J. Cepparulo, Judge